# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

**VERNON SPEAK,**

      **Plaintiff,**

**v.**                                    **CASE NO. 2:18-cv-00826-FtM-99UAM**

**STEVE WHIDDEN, in his official
capacity as SHERIFF of HENDRY
COUNTY, FLORIDA, and STEVE
WHIDDEN, in his individual
capacity,**

      **Defendant.**

_____/

### PLAINTIFF'S RESPONSE AND MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Within weeks prior to Plaintiff's termination, Defendant Whidden told Plaintiff's immediate supervisor, Lieutenant Buchhhofer, that he could never forgive Plaintiff for what he did to him and to his family. Lieutenant Shawn Reed told Lt. Buchhofer weeks before Plaintiff's predisciplinary hearing that Plaintiff would be fired, and thereafter, Lt. Reed sat on the predisciplinary panel, refused Plaintiff a fair hearing, and voted to fire him. Plaintiff's termination was a foregone conclusion even before the predisciplinary hearing because Plaintiff reported Defendants and their agents for statutory and policy violations, including interfering with criminal investigations and arrests. Plaintiff was fired because he spoke out against the corruption in the Sheriff's office, in violation of the exercise of his First Amendment rights to free speech pursuant to 42 U.S.C. §1983, and for reporting mismanagement, misfeasance and/or malfeasance, in violation of Florida's "whistleblowing" statute, §112.3187, Florida Statutes.

## I.  PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

1.  Admitted.

2.  Admitted.

3.  Admitted that Plaintiff investigated a hit-and-run incident on September 11, 2015. Denied that Plaintiff and Defendant Whidden merely had a "difference of opinion," or that Defendant Whidden wanted to protect Plaintiff from making a "bad arrest." On September 11, 2015, a minor was struck on the shoulder by a passing truck while she was walking to a bus stop and well off the road. [Ex. 100, Pltf. Aff., ¶ 4-5; Ex. 9, Offense Report, 9/11/15]. Thereafter, Plaintiff, along with other employees of Defendants, staked out the area in an attempt to locate the driver who did not return to the area while the victim waited for the bus. [Ex. 100, Pltf. Aff., ¶ 6; Ex. 102, Reed's Dep., p. 6-7; Ex. 9, Offense Report]. On September 22, 2015, Plaintiff stopped a white truck which was speeding and did not stop at a stop sign; while speaking with the driver, Richard Smith, the driver admitted to Plaintiff that he had hit something a couple of weeks before, and confirmed that the accident occurred on September 11, 2015. [Ex. 100, Pltf. Aff., ¶ 6-7; Ex. 9, Offense Report]. The driver also expressed that he was in a hurry because he was late for work, and while Plaintiff was running Smith's license and plates, Smith called Defendant Whidden, personally, who, in turn, called Plaintiff's partner and then Plaintiff, at which time, Defendant Whidden told Plaintiff that Smith was a "good guy," that he was in a bad spot, and asked that Plaintiff hurry to complete the traffic stop so that Smith could get to work. [Ex. 100, Pltf. Aff., ¶ 8; Ex. 9, Offense Report; Ex. 11, Pltf. Dep., 8/10/16, p. 39-42, 55-56]. Pursuant to the Sheriff's order, Plaintiff scheduled Smith for an interview later in the day, but Smith never appeared for the interview, and the following day, September 23, 2015, the Sheriff verbally reprimanded Plaintiff

2

for pressing the matter, told Plaintiff that he had told Smith not to appear for the follow-up interview, and that he believed Plaintiff understood that there was no proof of intent and that the case would not go anywhere, despite the fact that Smith admitted to having struck something on September 11, 2015 and that the victim reported that the driver never came back to check on her while she waited for the school bus. [Ex. 100, Pltf. Aff., ¶ 5, 9-13; Ex. 9, Offense Report; Ex. 11, Pltf. Dep., 8/10/16, p.46-55].

4. Admitted that Plaintiff did not send the case to the State Attorney's Office ("SAO") and admitted that once the SAO reviewed the file, they declined to prosecute Smith. Denied that Plaintiff failed to follow orders. Rather, Plaintiff attempted to interview Smith later in the day on September 22, 2015, but Smith never appeared for the follow up interview. [Ex. 100, Pltf. Aff., ¶ 9-11; Ex. 9, Offense Report]. On September 24, 2015, Lieutenant Joshua Woods closed the case at the direction of Defendant Whidden and/or Chief Deputy Nelson, citing Smith's alleged lack of intent, and in closing the case, Woods did not seek further prosecution or advice from the SAO and did not forward the case to the SAO, again, at the direction of Defendant Whidden and/or Nelson. [Ex. 9, Offense Report; Ex. 103, Woods' Dep., p. 11-12, 17-18]. Only when the minor victim's civil attorney called the SAO to inquire the status of the case did the SAO contact Defendants to obtain information, and thereafter, Defendants forwarded the case to the SAO in October, 2015, and on November 9, 2015, Assistant State Attorney Mirra declined to prosecute based on the information which Lt. Woods included in the offense report. [Ex. 9, Offense Report, 9/11/15; Ex. 10, Felony Warrant Request; Ex. 44, Memorandum, 8/24/16; Ex. 52, FDLE Investigative Summary, 8/28/17; Ex. 53, State Attorney File Review Memorandum, 5/16/18].

5. Admitted.

3

6. Admitted.

7. Admitted that deputies are expected to testify during depositions as part of the furtherance of criminal investigations and prosecutions. Denied that Plaintiff's report of Defendant Whidden's interference with Smith's arrest for the September 11, 2015 hit and run incident was a part of Plaintiff's job duties. [Ex. 100, Pltf. Aff., ¶ 21].

8. Admitted that the August 10, 2016 deposition was the first incident of Plaintiff blowing the whistle on Defendants and their agents and the first incident for which Defendants and their agents retaliated against Plaintiff for exercising his First Amendment rights. However, as described below, Plaintiff engaged in multiple exercises of his rights and reported violations of law and policy for which he was retaliated against for the remainder of his employment with Defendants.

9. Admitted.

10. Admitted that Plaintiff did not lose rank or pay. However, as described below, Plaintiff was subject to discipline, investigations and termination for his disclosures.

11. Admitted that Plaintiff only received two (2) verbal reprimands between August, 2016 and his termination on January 25, 2019. However, Plaintiff was the subject of Internal Affairs ("IA") investigations in 2017 and 2018, the latter of which led to his termination. While the 2017 investigation concluded with an unsubstantiated finding, Chief Deputy Nelson ordered that Plaintiff's supervisor, Lieutenant Buchhofer, discipline Plaintiff, although Lt. Buchhofer refused to comply because the IA findings were unsubstantiated. [Ex. 104, Bucchofer's Dep., p. 54-61; Ex. B7, Memorandum, 5/25/17].

12. Admitted that Plaintiff was subjected to multiple instances of harassment and retaliation for his disclosures of statutory and policy violations, as described below.

4

13.     Without knowledge, and therefore, denied. However, Chief Nelson did request that Lieutenant Morales change Plaintiff's 2016 evaluation, claiming that Plaintiff's performance did not merit such a high score, and Lt. Morales relayed the information to Plaintiff when he refused to change the score. [Ex. 100, Pltf. Aff., ¶ 23; Ex. 101, Pltf. Dep., p. 284-287; Ex. 5, 2016 Evaluation].

14.     Admitted.

15.     Admitted as to the requests to keep Butler's identity confidential. Further admitted that Lt. Buchhofer agreed to disclose Butler's name because Plaintiff's investigation uncovered the fact that Butler was a possible co-defendant in the matter. [Ex. 100, Pltf. Aff., ¶ 27-29; Ex. 104, Buchhofer's Dep., p. 111-114].

16.     Admitted that Plaintiff was asked to help in the investigation. However, Lt. Buchhofer instructed Plaintiff to meet with Deputy Pascher at the Sheriff's Office to interview the owner of the business where the parts from the stolen truck were located, according to Butler; when Plaintiff learned that the parts were still at the shop, he questioned why they were interviewing the owner at the office, rather than at the business where the stolen parts were. [Ex. 100, Pltf. Aff., ¶ 27, 31; Ex. 101, Pltf. Dep., p. 239; Ex. 24, Offense Report, 1/31/17]. Plaintiff did not immediately include Pascher's involvement in the offense report, but as the investigation developed, and after interviewing multiple suspects and/or witnesses, Plaintiff included Pascher's name in the report because he obtained statements which he relayed in the report stating that Pascher informed Butler of their impending arrival to search the business, and Butler, in turn, relayed the information to the suspects/witnesses. [Ex. 100, Pltf. Aff., ¶ 29, 31; Ex. 101, Pltf. Dep., p. 238-239; Ex. 24, Offense Report, 1/31/17].

17.     Without knowledge, and therefore, denied. However, both Plaintiff and Lt. Buchhofer raised Pascher's possible involvement in the matter with Lieutenant Rowe, Internal Affairs Investigator; Rowe requested that they subpoena Pascher's telephone records, which Lt. Buchhofer explained would have no evidentiary value to the investigation which Plaintiff was conducting because Plaintiff and Buchhofer knew that Pascher spoke with Butler, something to which Pascher admitted, and Rowe refused to subpoena the telephone records himself. [Ex. 100, Pltf. Aff., ¶ 31-32; Ex. 104, Buchhofer's Dep., p. 114, 121-122; Ex. 105, Rowe's Dep., p. 42-46; Ex. 65, IA Investigation, p. 267-268]. See Response to ¶ 16.

18.     Admitted that Pascher was the subject of an IA investigation as to her communication with Butler on January 31, 2017. Without knowledge and therefore, denied as to the remainder of the paragraph. See Response to ¶ 16 and 17.

19.     Admitted that Rowe ruled the allegations against Pascher unfounded. Denied that Plaintiff's conduct in investigating the incident violated policy. See Response to ¶ 16 and 17.

20.     Admitted as to Plaintiff's statement. However, Defendants omit the fact that Plaintiff explained during the pendency of the IA investigations both against Pascher and against Plaintiff that the offense report was closed at the time that Pascher clarified her involvement with Plaintiff in an unsworn statement, and therefore, Plaintiff could not supplement the closed offense report. [Ex. 100, Pltf. Aff., ¶ 65; Ex. 26, Internal Affairs Statements, p. 8-9, 13-15; Ex. 65, IA Investigation, p. 267-268].

21.     Without knowledge, and therefore, denied. See Response to ¶ 15.

22.     Without knowledge, and therefore, denied. See Responses to ¶ 15-18, 20.

23.     Admitted that an IA investigation was opened against Plaintiff. Without knowledge,

and therefore, denied as to the remainder of the paragraph. <u>See</u> Responses to ¶ 15-18, 20.

24.     Admitted as to Plaintiff's testimony. <u>See</u> Response to ¶ 20.

25.     Admitted as to Plaintiff's testimony. However, at no time was Butler registered as a confidential informant for Defendants. [Ex. 100, Pltf. Aff., ¶ 29; Ex. 105, Rowe's Dep., p. 40-42]. <u>See</u> Response to ¶ 15.

26.     Without knowledge, and therefore, denied. However, Plaintiff's supervisor, Lt. Buchhofer, signed Plaintiff's investigation and testified that Plaintiff did a complete and thorough investigation. [Ex. 100, Pltf. Aff., ¶ 64; Ex. 24, Offense Report, 1/31/17; Ex. 104, Buchhofer's Dep. 135-136, 168-171, 173-174]. In addition, the SAO sought warrants for the arrests of the suspects named in Plaintiff's offense report. [Ex. 100, Pltf. Aff., ¶ 64; Ex. 104, Buchhofer's Dep., p. 168-171, 173-174; Ex. 25, Warrant Affidavits].

27.     Without knowledge, and therefore, denied. However, Plaintiff reported what witnesses/suspects told him in the offense report. [Ex. 100, Pltf. Aff., ¶ 28; Ex. 104, Buchhofer's Dep., p. 170-171; Ex. 24, Offense Report, 1/31/17]. <u>See</u> Responses to ¶ 15-18.

28.     Admitted.

29.     Admitted as to Rowe's findings. Denied that the findings were accurate. <u>See</u> Response to ¶ 15-18, 20.

30.     Without knowledge, and therefore, denied. However, the IA investigation was initially commenced with the encouragement of Nelson only about a month after the conclusion of the SAO investigation into Defendants' interference in Smith's arrest for the September 11, 2015 hit and run. [Ex. 53, State Attorney Review Memorandum, 5/16/18; Ex. 57, Memorandum, 6/27/18].

31.     Admitted.

32.     Admitted.

33.     Without knowledge, and therefore, denied.

34.     Without knowledge, and therefore, denied.

35.     Admitted.

36.     Admitted.

37.     Admitted.

38.     Admitted that the panel recommended Plaintiff's dismissal. Without knowledge, and therefore, denied as to the remainder of the paragraph.

39.     Without knowledge, and therefore, denied. However, Lieutenant Shawn Reed told Lt. Buchhofer that Plaintiff would be fired even before the hearing was held. [Ex. 104, Buchhofer's Dep., p. 138-139].

40.     Admitted that Plaintiff was terminated on January 25, 2019. Without knowledge, and therefore, denied as to the remainder of the paragraph.

41.     Without knowledge, and therefore, denied.

## II.  DISPUTED MATERIAL FACTS PERTAINING DIRECTLY TO PLAINTIFF

Plaintiff was initially hired by Defendant Sheriff as a reserve deputy on July 10, 2013. [Ex. 100, Pltf. Aff., ¶ 1-2; Ex. 101, Pltf. Dep., p. 45]. Plaintiff was then hired into a full-time position on March 5, 2014 and was later promoted to Detective Sergeant in the Criminal Investigations Department ("CID"), the position that Plaintiff held at the time of his wrongful termination. [Ex. 100, Pltf. Aff., ¶ 3; Ex. 101, Pltf. Dep., p. 48-49].

On September 11, 2015, Plaintiff was assigned an investigation of a hit and run accident

8

involving a minor walking to a school bus stop who was struck by a vehicle, which the minor identified as a white Ford truck. [Ex. 100, Pltf. Aff., ¶ 4; Ex. 101, Pltf. Dep., p. 68-69; Ex. 8, Traffic Crash Report, 9/11/15]. The minor reported that the truck did not return to the scene while she waited for the bus or at any time before the bus departed the area, and Plaintiff retrieved evidence at the accident scene, including the fact that the minor's footprints were at least 3 feet from the road and pieces of the broken side mirror. [Ex. 100, Pltf. Aff., ¶ 5; Ex. 101, Pltf. Dep., p. 68-69, 90-91; Ex. 8, Traffic Crash Report, 9/11/15; Ex. 9, Offense Report, 9/11/15]. As part of the investigation, Plaintiff staked out the area with other of Defendant Sheriff's employees, and on September 22, 2015, Plaintiff was able to effectuate a traffic stop for a white Ford truck, matching the description provided by the minor, which had an obviously new side mirror matching that of the damaged mirror for which Plaintiff retrieved pieces on September 11, 2015; the driver of the truck had been speeding and did not stop at a stop sign. [Ex. 100, Pltf. Aff., ¶ 6; Ex. 9, Offense Report, 9/11/15]. Plaintiff interviewed the driver who admitted that he had struck something a week or two earlier, and confirmed that the accident occurred on September 11, 2015. [Ex. 100, Pltf. Aff., ¶ 7; Ex. 101, Pltf. Dep., p. 90-91; Ex. 9, Offense Report, 9/11/15]. While Plaintiff ran the driver's license and plates, the driver, Richard Smith, called Defendant Whidden personally and asked to have the traffic stop rushed because he was late for work. [Ex. 106, Whidden's Dep., p. 30]. In turn, Defendant Whidden called and told Plaintiff that Smith was a "good guy," and that Plaintiff should rush the traffic stop because Smith was late for work; Whidden also told Plaintiff that he could have Smith come in later that day to interview about the hit and run. [Ex. 100, Pltf. Aff., ¶ 8; Ex. 9, Offense Report; Ex. 11, Pltf. Dep., 8/10/16, p. 39-42, 55-56]. Plaintiff spent a few more minutes interviewing Smith who continued to admit he was aware he hit something and that

he waited to go back to the scene to try to identify what he had hit.  Plaintiff then scheduled Smith to return to the Sheriff's Office for another interview at 4:00 p.m. on September 22, 2015. [Ex. 100, Pltf. Aff., ¶ 9; Ex. 9, Offense Report; Ex. 11, Pltf. Dep., 8/10/16, p. 39-42, 55-56]. Smith did not appear for the second interview. [Ex. 100, Pltf. Aff., ¶ 11; Ex. 9, Offense Report, 9/11/15].

The following day, September 23, 2015, Defendant Whidden confronted Plaintiff about Smith's traffic stop. [Ex. 100, Pltf. Aff., ¶ 12; Ex. 11, Pltf. Dep., 8/10/16, p. 52-53]. Whidden told Plaintiff that he told Smith not to appear for the follow up interview and that he believed Plaintiff understood that the case would go nowhere, that he believed the case was taken care of and that he thought he and Plaintiff understood each other that no further investigation into the incident would occur because he thought Plaintiff had no proof of intent. [Ex. 100, Pltf. Aff., ¶ 12; Ex. 11, Pltf. Dep., 8/10/16, p. 52-54]. Whidden, himself, did not investigate the incident and only formed his opinion based on the information verbally provided to him by Smith and Plaintiff. [Ex. 106, Whidden's Dep., p. 33].

In addition, Chief Deputy Nelson met with Plaintiff and Plaintiff's direct supervisor, Sergeant Shawn Reed, and verbally reprimanded them for entering an offense report which included the Sheriff, although the only reference to the Sheriff in the report was the fact that Smith contacted him while Plaintiff was obtaining information about Smith, and did not include any information about Plaintiff's conversation with the Sheriff during the traffic stop. [Ex. 100, Pltf. Aff., ¶ 14; Ex. 101, Pltf. Dep., p. 96-97].

Thereafter, Defendant Whidden met with Plaintiff again and assured Plaintiff that they were good and that he was no longer mad at Plaintiff about the hit and run investigation. [Ex. 100, Pltf. Aff., ¶ 15; Ex. 101, Pltf. Dep., p. 96-97].

On September 24, 2015, Lieutenant Woods closed the case for lack of evidence of Smith's intent to leave the scene. [Ex. 103, Woods' Dep., p. 11-12; 17-18; Ex. 9, Offense Report, 9/11/15]. Woods testified that he closed the case at the direction of Defendant Whidden and/or Chief Deputy Nelson and that he did not send the matter to the SAO for review again at the direction of Whidden and/or Nelson. [Ex. 103, Woods' Dep., p. 11-12, 17-18; Ex. 9, Offense Report, 9/11/15].

In October, 2015, the minor's attorney, Steven Ramunni, representing her in a civil case against Smith, called the SAO to inquire the status of the criminal investigation; the SAO, in turn, contacted Defendants, and obtained the incident report with Lt. Woods' supplement closing the case. [Ex. 44, Memorandum, 8/24/16]. In addition, Defendant Whidden spoke with ASA Mirra, personally, to ask why she was requesting the file and to tell her that he did not believe the case merited further investigation. [Ex. 44, Memorandum, 8/24/16].

Smith actually contributed to Defendant Whidden's campaign for Sheriff. [Ex. 46, Treasurer's Reports; Ex. 58, FDLE Investigative Reports, p. 10-11].

In July, 2016, Plaintiff loaned his traffic vest to another deputy who did not have one but who was directing traffic in a high-volume area, and thereafter, despite multiple written requests for a replacement and after threats of discipline for misplacing agency equipment, Plaintiff was not able to receive a replacement until approximately 2018. [Ex. 100, Pltf. Aff., ¶ 16; Ex. 104, Buchhofer's Dep., p. 75-80; Ex. 56, Memorandum, 3/23/18].

On August 10, 2016, Attorney Ramunni placed Plaintiff under subpoena and deposed him in the civil case against Smith, and as part of the sworn testimony, Plaintiff described Defendant Whidden's involvement during and after the traffic stop in September, 2015. [Ex. 100, Pltf. Aff., ¶ 17; Ex. 11, Pltf. Dep., 8/10/16, p. 36-60, 101-103]. Thereafter, Attorney Ramunni sent a letter to

the SAO asking that an investigation be commenced into Defendants' violation of criminal statutes for interfering in the hit and run investigation. [Ex. 45, Letter, 8/15/16]. By Executive Order, the Governor's Office instructed the SAO for Palm Beach County to investigate Defendants and their agents for corruption. [Ex. 40, Executive Order 16-224].

In addition, the Florida Department of Law Enforcement ("FDLE") began an investigation into the Sheriff's involvement in the case. [Ex. 52, FDLE Investigative Summary, 8/28/17].

After the investigations began, and Plaintiff's involvement in the investigation was disclosed, Plaintiff's coworkers began harassing him, calling him a snitch and whistleblower, excluding him from gatherings and ignoring him. [Ex. 100, Pltf. Aff., ¶ 19]. In addition, where Defendant Whidden used to treat Plaintiff in a friendly manner, after the corruption investigation began, Defendant Whidden ignored Plaintiff and/or treated Plaintiff in an intimidating manner. [Ex. 100, Pltf. Aff., ¶ 20; Ex. 101, Pltf. Dep., p. 318-320].

On or about September 26, 2016, after Plaintiff's involvement in the corruption investigation was disclosed, Plaintiff received an evaluation scoring 98.1%. [Ex. 100, Pltf. Aff., ¶ 22; Ex. 5, 2016 Evaluation]. Plaintiff's supervisor, Lieutenant Morales, told Plaintiff that Chief Nelson questioned such a high score for Plaintiff and ordered Lt. Morales to lower the score. [Ex. 100, Pltf. Aff., ¶ 23; Ex. 101, Pltf. Dep., p. 284-287].

On September 29, 2016, Plaintiff filed a memorandum with his supervisor and chain of command reporting that Detective Sergeant Nester Echevarria was calling Plaintiff a snitch, warning Plaintiff's coworkers that Plaintiff could not be trusted and requesting that Plaintiff be removed from the SRT team because of his testimony during the August 10, 2016 deposition. [Ex. 100, Pltf. Aff., ¶ 24; Ex. 12, Memorandum, 9/29/16]. Echevarria received a verbal counseling for

referring to Plaintiff as a snitch, but Defendant Whidden and/or Chief Deputy Nelson refused to investigate Plaintiff's complaint, and instead, ordered that the matter be handled within the SRT team. [Ex. 107, Echevarria's Dep., p. 8; Ex. 104, Buchhofer's Dep., p. 20-21; Ex. 108, Harney's Dep., p. 22-25].

On October 31, 2016, Plaintiff gave a sworn statement to FDLE as part of the corruption investigation. [Ex. 100, Pltf. Aff., ¶ 25; Ex. 43, FDLE Investigation Statement].

On January 4, 2017, Plaintiff submitted a memorandum to Chief Nelson requesting that multiple individuals, departments and agencies be recognized for their assistance in two (2) homicide investigations; Chief Nelson refused the request. [Ex. 100, Pltf. Aff., ¶ 26; Ex. 101, Pltf. Dep., p. 139-144; Ex. 13, Memorandum, 1/4/17].

On January 31, 2017, Lt. Buchhofer called Plaintiff to assist Deputy Briana Pascher in interviewing individuals at the Sheriff's Office relative to a theft of a truck and arson which Lt. Buchhofer was investigating; Lt. Buchhofer overheard a conversation between Deputy Pascher and her boyfriend, Elvin Butler, and Butler provided Pascher with information about the location of parts from the stolen truck. [Ex. 100, Pltf. Aff., ¶ 27; Ex. 104, Buchhofer's Dep., p. 100-104]. When Plaintiff learned of the location of the stolen parts, he questioned Pascher as to why they were conducting interviews at the Sheriff's Office, rather than the shop where the parts were located, and Pascher and Plaintiff met with witnesses at the shop, where they received consent to search, but many of the parts had already been removed from the shop and thrown into the ditch along the roadway. [Ex. 100, Pltf. Aff., ¶ 27; Ex. 101, Pltf. Dep., p. 238-240; Ex. 104, Buchhofer's Dep., p. 105-106; Ex. 24, Offense Report, 1/31/17]. Ultimately, Plaintiff was assigned as lead investigator for the case, and in drafting his report, he accurately relayed conversations that he had

13

with the witnesses and/or suspects, including the fact that the suspects received information from Deputy Pascher through her boyfriend, Butler, that law enforcement officers were on the way to the shop, and that was why the stolen parts were discarded in the ditch. [Ex. 100, Pltf. Aff., ¶ 28; Ex. 101, Pltf. Dep., p. 238-239; Ex. 104, Buchhofer's Dep., p. 107-108, 120-121; Ex. 24, Offense Report, 1/31/17]. Initially, at Buchhofer's direction, Plaintiff did not identify Butler in the report, but rather, referred to Butler as a concerned citizen in order to keep his identity confidential and as a courtesy to Deputy Pascher, but as the investigation unfurled, Plaintiff was convinced that Butler acted in some way, whether intentionally or not, to relay the information from Deputy Pascher that law enforcement was on the way to the shop where Butler and the stolen parts were located, and as such, Plaintiff felt it necessary to identify Butler in the report as a possible codefendant in the crime. [Ex. 100, Pltf. Aff., ¶ 29; Ex. 104, Buchhofer's Dep., p. 112-114]. Assistant State's Attorney John Dommerich testified that if Plaintiff had not included Butler's name within his report, Dommerich would have required him to do so prior to the arrests made in the case because Dommerich would have been required to disclose the name to the suspects' defense attorneys. [Ex. 118, Dommerich's Dep., p. 24-25, 61]. Plaintiff was also forced to include Defendant Whidden's son in the report because one of the suspects attempted to use the Sheriff's son as an alibi. [Ex. 100, Pltf. Aff., ¶ 30; Ex. 101, Pltf. Dep., p. 250-252; Ex. 25, Warrant Affidavits; Ex. 37, Memorandum, 7/31/18, p. 4-5].

In addition, because Butler obtained the information from Deputy Pascher, Plaintiff was concerned about her possible involvement in disclosing the information to the suspects; Plaintiff raised his concerns with Lt. Buchhofer, and together, they spoke with Lt. Rowe in IA, voicing their concerns about her involvement. [Ex. 100, Pltf. Aff., ¶ 31; Ex. 104, Buchhofer's Dep., p. 111-112].

14

ASA Dommerich testified that if Plaintiff had not reported the information about Pascher possibly disclosing information to the suspects which was confirmed by multiple witnesses, that Plaintiff's failure to report the issue would be concerning. [Ex. 118, Dommerich's Dep., p. 95-96, 103, 106-107]. Rowe attempted to pass off his responsibility in investigating Pascher to Plaintiff, which Plaintiff was not authorized to investigate a fellow employee, by ordering Plaintiff to subpoena Pascher's telephone records; Lt. Buchhofer explained that Plaintiff could not obtain a warrant for the telephone records as part of the criminal investigation because they had no evidentiary value since Lt. Buchhofer, himself, heard Pascher speaking to Butler. [Ex. 100, Pltf. Aff., ¶ 32; Ex. 104, Buchhofer's Dep., p. 114, 121-122]. Although Plaintiff and Lt. Buchhofer reported Pascher's involvement to Rowe, nothing was done to investigate the matter until Plaintiff sought arrest warrants from the SAO for suspects in the case, and the SAO requested clarification from Defendants as to Pascher's involvement. [Ex. 100, Pltf. Aff., ¶ 34; Ex. 104, Buchhofer's Dep., p. 121-123; Ex. 118, Dommerich's Dep., p. 18-19, 53-55].

On February 2, 2017, Plaintiff filed a memorandum to Chief Nelson regarding his interest in applying for a road patrol sergeant promotion. [Ex. 100, Pltf. Aff., ¶ 35; Ex. 14, Memorandum, 2/2/17]. Plaintiff did take the sergeant test and interviewed for the position. [Ex. 100, Pltf. Aff., ¶ 36]. Plaintiff's supervisor, Lieutenant Shawn Reed, told Plaintiff of the 3 applicants for the 2 open positions, Plaintiff scored the highest on the exam, as well as the interview, and that Sgt. Reed's younger brother, Nick Reed, scored lower on the exam but did well on the interview, while the third applicant, Andrew Taylor, failed the exam and did poorly on the interview. [Ex. 100, Pltf. Aff., ¶ 37; Ex. 101, Pltf. Dep., p. 147-152]. Although Lt. Reed was related to one of the applicants, he was allowed to sit on the interview panel. [Ex. 100, Pltf. Aff., ¶ 38; Ex. 101, Pltf. Dep., p. 147-

152]. While Lt. Reed told Plaintiff he scored the highest of the 3 applicants, Plaintiff was not promoted, and instead, both Nick Reed and Andrew Taylor were promoted to the road patrol sergeant positions. [Ex. 100, Pltf. Aff., ¶ 39].

In March, 2017, Plaintiff applied for a position with the Seminole Police Department. [Ex. 100, Pltf. Aff., ¶ 40; Ex. 101, Pltf. Dep., p. 184-186].

On or about March 21, 2017, Plaintiff and his partner, Detective Louis Scowden, were driving on State Road 80 in unmarked vehicles with no lights or sirens installed when they encountered a vehicle doing well below the speed limit in the left lane, and Plaintiff noted that the driver was using a cell phone. [Ex. 100, Pltf. Aff., ¶ 41; Ex. 101, Pltf. Dep., p. 160-163; Ex. 109, Scowden's Dep., p. 23-26; Ex. 17, Memorandum, 4/3/17]. When Plaintiff gestured for the car to move out of the passing lane, the driver cursed at Plaintiff and flipped Plaintiff off; then, the driver began following Plaintiff and Detective Scowden, recklessly changing lanes and attempting to video record the incident. [Ex. 100, Pltf. Aff., ¶ 42; Ex. 109, Scowden's Dep., p. 23-26]. Both Plaintiff and Detective Scowden called the encounter in to dispatch, requesting a marked vehicle to respond to the incident, and Plaintiff met Lt. Buchhofer to fuel his vehicle and relayed the incident to him while Detective Scowden followed the vehicle to the driver's residence. [Ex. 100, Pltf. Aff., ¶ 43; Ex. 101, Pltf. Dep., p. 160-163; Ex. 109, Scowden's Dep., p. 23-26; Ex. 17, Memorandum, 4/3/17]. As Detective Scowden attempted to get a statement from the driver, Deputy Lopez and Deputy Echevarria responded to the call, and Deputy Echevarria dismissed Detective Scowden and Deputy Lopez while he took the driver's statement. [Ex. 109, Scowden's Dep., p. 26-28; Ex. 17, Memorandum, 4/3/17].  Thereafter, the driver, Joe Valdez, filed a citizen complaint against Plaintiff in which he accused Plaintiff of flipping him off and cursing at him during the

encounter. [Ex. 15, Citizen Complaint, 3/27/17]. Chief Nelson personally went to Valdez' residence to obtain the complaint from Valdez. [Ex. 111, Nelson's Dep., p. 50-52; Ex. 15, Citizen Complaint, 3/27/17].

Chief Nelson then referred the complaint to Sergeant Rowe in IA to investigate Plaintiff, although normal policy is to refer citizen complaints to a direct supervisor for an inquiry, and only after a supervisor determines additional investigation is required is an IA investigation commenced. [Ex. 100, Pltf. Aff., ¶ 46; Ex. 104, Buchhofer's Dep., p. 44-47; Ex. B7, Memorandum, 5/25/17]. The allegations against Plaintiff were deemed unsubstantiated, but Chief Nelson instructed Lt. Buchhofer to issue Plaintiff discipline for his driving during the encounter. [Ex. 104, Buchhofer's Dep., p. 54-61; Ex. B7, Memorandum, 5/25/17]. Although Detective Scowden was traveling in a separate vehicle during the incident and traveled similar speeds to Plaintiff, Detective Scowden was not subject to an investigation or to discipline for his actions. [Ex. 104, Buchhofer's Dep., p. 32-33; Ex. 109, Scowden's Dep., p. 29-31].

As a result of being placed under the IA investigation, Plaintiff's application to the Seminole Police Department was not processed. [Ex. 100, Pltf. Aff., ¶ 50; Ex. 101, Pltf. Dep., p. 184-186].

On April 14, 2017, Plaintiff filed another memorandum with his supervisors to report that now Sergeant Echevarria refused him back up assistance when Plaintiff had a flat tire on State Road 80 at about 10:00 p.m. [Ex. 100, Pltf. Aff., ¶ 51; Ex. 101, Plf. Dep., p. 195-201; Ex. 18, Memorandum, 4/14/17]. Although Deputy Hunter Kearns told Plaintiff he would bring a jack right away, within minutes, Deputy Kearns texted Plaintiff to say that he was told not to come, and Deputy Kearns later told Plaintiff that Sgt. Echevarria ordered him not to assist Plaintiff, a

statement which was confirmed by Deputy Mike Lilley. [Ex. 100, Pltf. Aff., ¶ 52; Ex. 101, Pltf. Dep., p. 195-201]. In fact, Sgt. Echevarria testified that he told his subordinates to make up their own minds whether to help Plaintiff, and that he was not AAA; and while Echevarria claimed he did not order his subordinates not to help, he also did not order them to help Plaintiff, although Plaintiff was in a dangerous place on an unlit road well after dark. [Ex. 107, Echevarria's Dep., p. 13-16]. Only after Lt. Reed called and ordered that someone assist Plaintiff did Deputy Hudson respond to Plaintiff's call. [Ex. 100, Pltf. Aff., ¶ 53; Ex. 107, Echevarria's Dep., p. 16-17; Ex. 18, Memorandum, 4/14/17].

On May 5, 2017, Plaintiff filed a written request to meet with Chief Nelson. [Ex. 100, Pltf. Aff., ¶ 54; Ex. 19, Memorandum, 5/5/17]. Although Chief Nelson had an open-door policy that employees could see him for any reason when they needed, Chief Nelson demanded that Plaintiff provide him with a specific reason for the meeting and refused Plaintiff's request. [Ex. 100, Pltf. Aff., ¶ 55; Ex. 19, Memorandum, 5/5/17; Ex. 110, Nelson's Dep., p. 46-49].

On July 19, 2017, Lt. Buchhofer issued Plaintiff an evaluation scored 93.3%; Chief Nelson again questioned Plaintiff's supervisor for scoring Plaintiff too high. [Ex. 100, Pltf. Aff., ¶ 57; Ex. 104, Buchhofer's Dep., p. 34-35; Ex. 6, 2017 Evaluation].

On August 28, 2017, the FDLE completed their portion of the corruption investigation. [Ex. 52, FDLE Investigation Summary, 8/28/17].

On or about September 18, 2017, Chief Nelson told the family of a deceased individual whom Plaintiff had tried to contact multiple times but was unable that Plaintiff was a horrible detective and apologized for Plaintiff not contacting them; Chief Nelson through Lt. Stevens relayed information to Plaintiff's supervisor, Lt. Buchhofer, that the family was irate with Plaintiff

for failing to inform them of the death of the father and for missing an appointment with them which Plaintiff did not schedule and for which Plaintiff could not attend. [Ex. 100, Pltf. Aff., ¶ 58; Ex. 101, Pltf. Dep., p. 213-218; Ex. 104, Buchhofer's Dep., p. 85-88; Ex. 20, Memorandum, 9/18/17]. At no time did the family indicate to Plaintiff that they were upset with him for missing the appointment. [Ex. 101, Pltf. Dep., p. 213-218; Ex. 20, Memorandum, 9/18/17].

On December 11, 2017, Plaintiff filed another memorandum concerning an encounter Plaintiff had with Sgt. Nick Reed when Plaintiff requested a backup for a traffic stop. [Ex. 100, Pltf. Aff., ¶ 60; Ex. 21, Memorandum, 12/11/17]. After Plaintiff requested backup, Deputy Germane Garcia told Plaintiff he would respond, but Sgt. Reed intervened and asked Plaintiff why he needed backup; later, Deputy Garcia told Plaintiff that Sgt. Reed instructed him not to respond to Plaintiff's request, but rather, to sit down and finish his breakfast. [Ex. 100, Pltf. Aff., ¶ 61; Ex. 101, Pltf. Dep., p. 223-229]. After Plaintiff concluded the traffic stop, Sgt. Reed informed Plaintiff that his subordinates were not to assist with traffic stops and accused Plaintiff of disrespecting him and his authority when Plaintiff attempted to explain the situation and disagreed with him. [Ex. 100, Pltf. Aff., ¶ 62; Ex. 101, Pltf. Dep., p. 223-229; Ex. 21, Memorandum, 12/11/17]. Finally, Sgt. Reed told Plaintiff he had been video recording the encounter without Plaintiff's knowledge or permission, in violation of statute and Defendants' policies and procedures. [Ex. 100, Pltf. Aff., ¶ 63; Ex. 21, Memorandum, 12/11/17].

In or about March, 2018, Plaintiff closed his investigation for the stolen and burned truck from January 31, 2017, and Plaintiff sought the arrest of 3 suspects; the SAO determined that there was sufficient evidence, based on Plaintiff's probable cause affidavits, to bring charges against 6 other individuals, and therefore, Plaintiff complied with the SAO's request to complete additional

19

warrant affidavits for all 9 suspects. [Ex. 100, Pltf. Aff., ¶ 64; Ex. 101, Pltf. Dep., p. 240-243; Ex. 104, Buchhofer's Dep., p. 110-111, 126-127; Ex. 118, Dommerich's Dep., p. 9-12, 31-36, 43-47, 67-68, 96-97, 100; Ex. 65, IA Investigation, p. 1-13, 52-101].

Only after Plaintiff sought arrest warrants for the suspects and the SAO demanded clarification as to Pascher's involvement in the incident did Defendants and/or their agents bother to open an IA investigation as to whether Pascher committed any misconduct in disclosing to her boyfriend who disclosed to the suspects that deputies were on the way to the shop to investigate stolen parts, although Lt. Buchhofer and Plaintiff had reported the issue to Rowe in February, 2017; Lt. Rowe interviewed Plaintiff multiple times relative to the investigation. [Ex. 100, Pltf. Aff., ¶ 65; Ex. 104, Buchhofer's Dep., p. 109-112, 121-123; Ex. 118, Dommerich's Dep., p. 18-19, 53-55; Ex. 26, Internal Affairs Statements]. ASA Dommerich testified that although Pascher's involvement in the case was concerning, it did not affect his decision to pursue the prosecution of the 9 suspects. [Ex. 118, Dommerich's Dep., p. 19-20, 22-23, 75-76, 82-83].

On May 16, 2018, the Palm Beach County SAO closed the corruption investigation into Defendant Whidden and Chief Deputy Nelson relative to interference with the hit and run case. [Ex. 53, State Attorney File Review Memorandum, 5/16/18].

In early June, 2018, Plaintiff applied for a position with the Palm Beach County Sheriff's Office ("PBCSO"). [Ex. 100, Pltf. Aff., ¶ 66; Ex. 101, Pltf. Dep., p. 229-230].

On June 25, 2018, Lt. Rowe sought authorization from Chief Deputy Nelson to bring an IA investigation against Plaintiff for including Pascher's and Butler's names in the offense report that Plaintiff completed as to the stolen and burned truck. [Ex. 54, Memorandum, 6/25/18]. Chief Nelson granted permission on June 27, 2018, suggesting a number of charges against Plaintiff.

[Ex. 57, Memorandum, 6/27/18]. The first charge that Chief Nelson included was allegedly Plaintiff's failure to report his suspicions of Pascher's wrongdoing to the agency; however, as previously shown, both Plaintiff and Lt. Buchhofer reported the issue to Lt. Rowe over a year prior, and Lt. Rowe failed to act. [Ex. 100, Pltf. Aff., ¶ 31-34, 65; Ex. 104, Buchhofer's Dep., p. 109-112; Ex. 57, Memorandum, 6/27/18].

On June 28, 2018, Lt. Rowe served Plaintiff with a notice of the investigation. [Ex. 100, Pltf. Aff., ¶ 67; Ex. 27, Notice of Investigation, 6/28/18]. Rowe interviewed Plaintiff on July 30, 2018, during which Plaintiff supplied Rowe with the same information about Pascher which Plaintiff provided during the statements he gave for Pascher's IA investigation. [Ex. 100, Pltf. Aff., ¶ 68; Ex. 26, Internal Affairs Statements, p. 7-8; Ex. 29, Internal Affairs Statement, p. 11-12]. Once again, in initiating the IA investigation, Lt. Rowe failed to inform Plaintiff's supervisor, Lt. Buchhofer, who was actually part of the stolen truck investigation, of the allegations against Plaintiff, and contrary to Defendants' policies, no supervisor inquiry occurred prior to the IA investigation. [Ex. 100, Pltf. Aff., ¶ 69; Ex. 101, Pltf. Dep., p. 246-249].

After Rowe initiated the IA investigation, ASA Dommerich dropped all charges against the suspects because Plaintiff's integrity was questioned by the investigation. [Ex. 118, Dommerich's Dep., p. 14-15, 66, 83]. ASA Dommerich testified that he found it odd that he raised Pascher's involvement in the case as a concern to the Sheriff, but instead, Plaintiff was the target of an investigation. [Ex. 118, Dommerich's Dep., p. 45-46].

In the summer of 2018, Rowe told a coworker, Nicholas Todd, that he had everything in place to get rid of Plaintiff. [Ex. 111, Todd's Dep., p. 46-47].

Because of the IA investigation, Plaintiff was not selected for a position with the PBCSO.

21

[Ex. 100, Pltf. Aff., ¶ 70; Ex. 101, Pltf. Dep., p. 231].

On August 2, 2018, Rowe served Plaintiff with additional transcripts of individuals interviewed as part of the IA investigation, including interviews with individuals whom Plaintiff arrested as part of the stolen truck investigation. [Ex. 100, Pltf. Aff., ¶ 71; Ex. 37, Memorandum, 7/31/18, p. 5-6].

Thereafter, Rowe scheduled a tentative second interview with Plaintiff for August 20, 2018, but Plaintiff and his attorney asked for a different date; when no final date was reached, Rowe demanded that Plaintiff appear on August 20, 2018, but again, Plaintiff and his attorney asked to have the interview rescheduled, to which Rowe agreed. [Ex. 100, Pltf. Aff., ¶ 72; Ex. 37, Memorandum, 7/31/18, p. 6; Ex. 35, Memorandum, 11/27/18; Ex. 65, IA Investigation, p. 15-16]. Plaintiff was interviewed a second time on August 27, 2018. [Ex. 100, Pltf. Aff., ¶ 73; Ex. 30, IA Statement].

On September 7, 2018, Rowe served Plaintiff with an amended notice of investigation to include the charge that Plaintiff failed to comply with a direct order of an IA Investigator for his failure to appear during the tentatively scheduled August 20, 2018 interview, although Plaintiff and his attorney had previously advised Rowe that they could not attend on August 20, 2018. [Ex. 100, Pltf. Aff., ¶ 74; Ex. 31, Amended Notice of Investigation, 9/7/18].

On November 27, 2018, Defendants served Plaintiff with a notice of proposed discipline, terminating Plaintiff, based on Rowe's IA findings, including that Plaintiff failed to protect Butler's identification and disparaged Pascher by including both individuals in the offense report and warrant affidavits, that Plaintiff failed to attend the tentatively scheduled August 20, 2018 interview at Rowe's demand and that Plaintiff provided untruthful statements about Butler's and

22

Pascher's roles in the January 31, 2017 incident. [Ex. 100, Pltf. Aff., ¶ 75; Ex. 32, Notice of Proposed Discipline, 11/16/18; Ex. 65, IA Investigation, p. 14-22]. In rendering his findings, Rowe determined that Plaintiff did not violate policy 1.16 on Responsibility of Members which Chief Nelson had suggested for Plaintiff's failure to timely report his suspicions of Pascher's involvement, thereby, covering up his own failure to timely investigate Pascher after Plaintiff and Lt. Buchhofer reported their suspicions well over a year prior to the start of Rowe's investigation into Pascher. [Ex. 57, Memorandum, 6/27/18; Ex. 65, IA Investigation, p. 14; Ex. 104, Buchhofer's Dep., p. 109-112].

ASA Dommerich testified that he had no concerns or criticisms with Plaintiff's investigation or work product for the stolen and burned truck case, and that Plaintiff had completed the investigation as other employees of Defendant Sheriff investigated cases. [Ex. 118, Dommerich's Dep., p. 7-9, 12-14, 23-24, 36-38, 79-80, 87-89, 91-93]. In fact, ASA Dommerich challenged many of Rowe's findings, including the fact that Plaintiff did not seek a search warrant for the locked side of the shop because a warrant was unnecessary when witnesses testified that the unlocked side which was searched with consent was where the dismantling of the stolen truck occurred and because the locked side was visible to law enforcement who could see that the locked side did not contain evidence. [Ex. 118, Dommerich's Dep., p. 12-14, 30, 87-88]. While Rowe determined that Plaintiff violated policy by telling suspects Jonathan Rodriguez and Jake Buckwheat that he did not believe they committed certain crimes, and thereafter, filed arrest warrants for them without "clearing their innocence" with the SAO, ASA Dommerich does not understand the allegation in the way that Rowe drafted it, has never heard of a law enforcement officer having to clear the innocence of a suspect, and ASA Dommerich made the determination

to pursue charges against Rodriguez and Buckwheat based on their statements to Plaintiff; ASA Dommerich testified that it was the responsibility of defense attorneys to challenge the validity of the admissions made. [Ex. 118, Dommerich's Dep., p. 34-36, 43-45, 67-68, 96-97; Ex. 65, IA Investigation, p. 16].

Rowe determined that Plaintiff violated policy by failing to interview witnesses and/or to obtain multiple statements from witnesses and suspects, including after arrests were made; ASA Dommerich testified that Plaintiff obtained all relevant witness statements, including conducting additional interviews at ASA Dommerich's request, and that obtaining statements from a suspect after an arrest occurs can actually be detrimental to the prosecution of a case. [Ex. 118, Dommerich's Dep., p. 8-9, 40-43, 88-89; Ex. 65, IA Investigation, p. 15-16].

Rowe determined that Plaintiff violated policy by copying and pasting information into all 9 probable cause statements rather than doing each individually, but ASA Dommerich testified that it was not unusual for Defendant's employees to copy and paste information relevant to the same investigation. [Ex. 118, Dommerich's Dep., p. 79; Ex. 65, IA Investigation, p. 16].

Rowe determined that Plaintiff violated policy by not having all fingerprints taken from the shop processed by FDLE, but ASA Dommerich testified that the fingerprints were not relevant to prosecuting the suspects because of the testimony obtained in the case. [Ex. 118, Dommerich's Dep., p. 74, 89; Ex. 65, IA Investigation, p. 17].

Rowe determined that Plaintiff violated policy by not opening a separate criminal investigation against Butler for tipping off suspects, but ASA Dommerich testified that it was not necessary to open a separate investigation when Butler's involvement was already part of a criminal investigation, and that it was ASA Dommerich's determination not to pursue Butler's

24

criminal prosecution. [Ex. 118, Dommerich's Dep., p. 24-25, 27-28, 31, 61, 74-75; Ex. 65, IA Investigation, p. 18-19].

Rowe determined that Plaintiff violated policy by failing to supplement his investigation with information he obtained from Pascher after the investigation was completed and Plaintiff had submitted the warrant affidavits to the SAO; ASA Dommerich testified that Plaintiff had no obligation to update him with Pascher's denial of her involvement in the case, and that he expected that Pascher would deny any involvement. [Ex. 118, Dommerich's Dep., p. 25-26, 53-55, 94-96, 106-107].

In fact, Rowe interviewed ASA Dommerich allegedly "off the record," but then, Rowe used statements made by ASA Dommerich in his investigation finding that Plaintiff violated policies. [Ex. 118, Dommerich's Dep., p. 50-51, 93-96; Ex. 65, IA Investigation, p. 23]. Rowe failed to provide all information provided to him by ASA Dommerich. [Ex. 118, Dommerich's Dep., p. 50-51, 93-96; Ex. 119, Close Out Memorandum, 11/16/18, p. 23].

Plaintiff was placed on administrative leave effective November 27, 2018. [Ex. 100, Pltf. Aff., ¶ 77]. Before leaving the office, Lt. Buchhofer took inventory of Plaintiff agency issued vehicle, against Lt. Rowe's wishes. [Ex. 104, Buchhofer's Dep., p. 137; Ex. 112, Buchhofer's Sworn Statement, p. 113-118]. Thereafter, Rowe broke the chain of custody by having the vehicle removed from the office, against Lt. Buchhofer's orders, and had Plaintiff's personal possessions stripped from the vehicle and placed in an unsecured area. [Ex. 112, Buchhofer's Sworn Statement, p. 113-118].

Plaintiff filed a rebuttal to Rowe's findings with Defendants on November 27, 2018. [Ex. 100, Pltf. Aff., ¶ 79; Ex. 35, Memorandum, 11/27/18]. In his rebuttal, Plaintiff disputed every

allegation made by Rowe, explained each of the flaws in Rowe's investigation, including that Rowe would not accept that Plaintiff could not recall details of the investigation that occurred almost 2 years prior, and accused Plaintiff of perjury and/or untruthfulness for any discrepancy between his multiple interviews. [Ex. 100, Pltf. Aff., ¶ 80-96; Ex. 35, Memorandum, 11/27/18, p. 4-6, 9-23].

In December, 2018, Defendant Whidden told Lt. Buchhofer that he could not forgive Plaintiff for what he did to Defendant Whidden and his family, i.e. making statements which initiated the corruption investigation. [Ex. 104, Buchhofer's Dep., p. 155-158]. In addition, Lt. Buchhofer sought additional employees to be assigned to CID, and Lt. Shawn Reed told Lt. Buchhofer he would need a replacement for Plaintiff because Plaintiff was "pretty much gone," i.e. would be fired. [Ex. 104, Buchhofer's Dep., p. 138-139; Ex. D, Memorandum, 12/21/18].

In January, 2019, Plaintiff attended a predisciplinary hearing before a panel of 3 of Defendants' agents, including Lt. Shawn Reed, and the panel voted unanimously to uphold Rowe's findings against Plaintiff, despite the many flaws and discrepancies in Rowe's investigation. [Ex. 100, Pltf. Aff., ¶ 80-97; Ex. 101, Pltf. Dep., p. 262; Ex. 102, Reed's Dep., p. 15-16].

On January 25, 2019, Plaintiff's termination was upheld and effectuated. [Ex. 100, Pltf. Aff., ¶ 98; Ex. 33, Notice of Discipline, 1/25/19].

After Plaintiff was terminated, he complied with Lt. Rowe's order to schedule a time with Lt. Buchhofer to return the remainder of his agency issued equipment; when Chief Nelson saw Lt. Buchhofer with the equipment he commented that Plaintiff again failed to follow instructions because he failed to schedule an appointment with Defendants to turn in the equipment. [Ex. 104, Buchhofer's Dep., p. 81-83].

Although Lt. Buchhofer recommended Plaintiff for multiple commendations, Defendants and/or their agents refused to issue such commendations. [Ex. 104, Buchhofer's Dep., p. 165-168].

Prior to his promotion to IA Investigator, Rowe told Defendant Whidden that if Whidden gave Rowe his lieutenant bars and made him an investigator, Rowe would go after individuals who caused problems for Defendant Whidden. [Ex. 113, Rodrigez' Dep., p. 19-20]. Shortly after Rowe was promoted, he began targeting individuals who were vocal in their criticism of Defendants and/or their agents. [Ex. 113, Rodriguez' Dep., p. 19-21; Ex. 114, Griffin's Dep., p. 7-11; Ex. 115, Taylor's Dep., p. 7-11, 14, 17-18; Ex. 111, Todd's Dep., p. 4-5, 27].

Rowe also had a reputation for placing individuals under an IA investigation when said individuals applied for employment to outside agencies. [Ex. 114, Griffin's Dep., p. 7-11; Ex. 113, Rodriguez' Dep., p. 25-26; Ex. 116, Bolt's Dep., p. 3-4, 14-15; Ex. 109, Scowden's Dep., p. 9-10, 12]. Additionally, Rowe had a history of conducting flawed investigations and lying within his findings, including sustaining a finding that a volunteer crime scene investigator held outside employment without authorization, although the volunteer disclosed all outside employment in her original application filed in 2008. [Ex. 117, Suboch's Sworn Statement, p. 4, 8, 22-23, 33; Ex. 112, Buchhofer's Sworn Statement, p. 85-88; Ex. N, IA Findings].

Moreover, Defendant Whidden had a reputation for getting people whom he knew out of trouble. [Ex. 103, Woods' Dep., p. 22-24].

While Plaintiff was terminated for Rowe's manufactured and twisted allegations, other employees committed similar or more egregious violations and were not subjected to termination or even an IA investigation, including Sergeant Michael Favara who was recorded using racial slurs against citizens and who was later promoted to lieutenant. [Ex. 106, Whidden's Dep., p. 81-

82].

On October 14, 2016, Lt. Buchhofer filed a complaint through his chain of command that Detective Moore failed to secure a crime scene and then lied about his activities; no IA investigation occurred. [Ex. 63, Memorandum, 10/14/16; Ex. 112, Buchhofer's Sworn Statement, p. 25-28].

On August 21, 2018, Rowe referred for a supervisory inquiry a citizen complaint to Lt. Buchhofer in which the complainant claimed that Detective Sergeant Moorehead alleged that the citizen admitted to a crime; no IA investigation was initiated into the matter, although Plaintiff was subjected to such an investigation based on a citizen complaint which was far less egregious than a possible false admission. [Ex. 60, Memorandum, 8/21/18].

On September 4, 2018, Lt. Buchhofer filed a complaint against Deputy Norwood for failing to search and properly document evidence; again, no IA investigation was opened into this matter. [Ex. 61, Memorandum, 9/4/18; Ex. 112, Buchhofer's Sworn Statement, p. 25-28].

### III.  STANDARD FOR SUMMARY JUDGMENT

A plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. Smith v. Lockheed-Martin Corporation, 644 F.3d 1321, 1328 (11th Cir. 2011).

### IV.    PLAINTIFF EXHAUSTED ADMINISTRATIVE REMEDIES

Defendant Sheriff asserts that Plaintiff failed to preserve his claims regarding any adverse employment action prior to 180 days from the date that he filed his initial lawsuit on December 21, 2018.  First, this isn't true.  Second, this matter was put to rest in ECF 39.  Plaintiff filed a Motion for Leave to Amend [ECF 26] to file an Amended Complaint, which was granted.  At the

time Plaintiff filed his original complaint, he had been told he was going to be fired.  Around a month later, his termination was confirmed.  Defendants' argument that no adverse action occurred within 180 days prior to the date the original complaint was filed is specious.

Third, in addition to being told he was going to be fired, within the 180 days prior to Plaintiff filing this case, he was subjected to continuing harassment and retaliatory actions, including discipline, IA investigations, failure to promote and ultimately, termination that stemmed from the time that Plaintiff first spoke out against Defendant Sheriff and his agents for policy and statutory violations, including corruption and interference with investigations and arrests. In fact, Rowe and Nelson, Defendant's agents, commenced an IA investigation into Plaintiff in late June, 2018, after summarily dismissing such an investigation against Deputy Pascher for tipping off suspects. The investigation was opened only about a month after the Palm Beach County SAO finally closed the corruption investigation into Defendant Sheriff and Nelson.

Moreover, the continuing violations doctrine allows for plaintiffs to present disparate treatment or incidents of discrimination that fall outside the typical statute of limitations if the incidents show an ongoing unlawful employment practice. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002). Continuing violations are exceptions to the rule that one must file a claim. Short v. Immokalee Water & Sewer Dist., 165 F. Supp. 3d 1129, 1142 (M.D. Fla. 2016). "When the allegedly unlawful employment practices amount to a continuing violation, the time period for filing an EEOC charge does not begin until the last occurrence of the discrimination." Id.

Here, Plaintiff filed his lawsuit in December, 2018, less than 180 days after Rowe started the final IA investigation into Plaintiff allegedly making false statements about Deputy Pascher.

The investigation ended with Plaintiff receiving notice of his termination in December 2018 followed by his in January, 2019. Therefore, even for claims that predate 180 days before he filed his original lawsuit in December 2018, Defendant's retaliatory acts against Plaintiff represent continuing violations, and all acts by Defendant against Plaintiff fall under the continuing violations exception to the statute of limitations.

Defendant Sheriff also claims that Plaintiff's termination is subject to dismissal because Plaintiff failed to timely amend his complaint within 180 days after his termination, waiting until March, 2020 to amend the complaint to include the termination as an adverse employment action.

This was addressed in Plaintiff's Motion for Leave to Amend, ECF 26.  In his amended complaint, Plaintiff retained all factual allegations and claims he had filed originally. However, Plaintiff included the fact that his termination was finalized on January 25, 2019, a termination that he mentioned as recommended in the original complaint.

An amended complaint, even when filed after a statute of limitations has expired, relates back to an originally filed claim where "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading." Fed. R. Civ. P. 15(c)(1)(b). "If the claim asserted in the amendment arises out of the conduct or occurrence set forth in the original complaint, the amendment is given retroactive effect to the date the original complaint was filed." Sessions v. Rusk State Hosp., 648 F.2d 1066, 1070 (5th Cir. 1981)(citing FRCP 15(c)).

> The doctrine of relation back under Rule 15(c) is liberally applied today in the Federal Courts, especially if no disadvantage will accrue to the opposing party. Rule 15(c) is 'based on the idea that a party who is notified of litigation concerning a given transaction or occurrence is entitled to no more protection from statutes of limitations than one who is informed of the precise legal description of the rights sought to be enforced.'

30

Williams v. United States, 405 F.2d 234, 236 (5th Cir. 1968)(internal citations omitted).

> The Federal rule on the 'relation back' of amendments to pleadings, as embodied in Federal Rule 15(c), is permissive. As long as the amended complaint refers to the same transaction or occurrence that formed the basis for the original complaint and the defendant was put on notice of the claim by the first complaint, there will be no bar to amendment; **even new defendants and new theories of recovery will be allowed.**

Travelers Ins. Co. v. Brown, 338 F.2d 229, 234 (5th Cir. 1964)(emphasis added).

Although not explicitly required in Rule 15(c)(1)(B), courts inquire into whether the opposing party has been put on notice of the newly-asserted claim or claims raised in the amended pleading. The central purpose behind the relation back doctrine is fair notice of the possibility of new claims being asserted based on the same underlying conduct alleged in the initial complaint. "Although the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " Baldwin Cty. Welcome Ctr. v. Brown, 466 U.S. 147, 149 n. 3 (1984)(quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). As such, "[t]he critical issue in Rule 15(c) determinations," the Eleventh Circuit wrote, "is whether the original complaint gave notice to the defendant of the claim now being asserted." Moore v. Baker, 989 F.2d 1129, 1131 (11th Cir. 1993) (citing Woods Expl. & Producing Co., Inc. v. Aluminum Co. of Am., 438 F.2d 1286, 1299-1300 (5th Cir. 1971)).

Without question, Plaintiff's notice of proposed termination is in his original complaint and Plaintiff, quite frankly, thought that this matter was put to rest by this Court in ECF 39. Defendant cannot in good faith argue that it was not on notice of Plaintiff's termination in his original complaint.  [See ECF 26, 39].  Plaintiff invokes the relation back doctrine for his termination to

31

his original complaint filed in December, 2018.

## V.  <u>WHISTLEBLOWER RETALIATION</u>

The intent of the Florida Legislature in enacting the Whistleblower Act was to prevent the government from retaliating against employees who report any abuse or neglect of duty by a public employee. <u>See</u> <u>Ujcic v. City of Apopka</u>, 581 So.2d 218, 219 (Fla. 5th DCA 1991). The Florida Supreme Court made it clear that the Act should be interpreted liberally, holding that it is a "remedial statute designed to encourage the elimination of public corruption by protecting public employees who 'blow the whistle'… the statute should be construed liberally in favor of granting access to the remedy." <u>Irven v. Department of Health and Rehabilitative Services</u>, 790 So.2d 403, 405-06 (Fla. 2001)(quoting <u>Martin County v. Edenfield</u>, 609 So.2d 27, 29 (Fla. 1992)). In overturning the lower court's narrow interpretation of §112.3187, the Court in <u>Irven</u> stated, "The statute could not have been more broadly worded." <u>Irven</u> at 406(internal citations omitted).

To establish a prima facie case of whistleblower retaliation, a plaintiff must show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) a causal relationship between the two events. <u>See</u> <u>Goldsmith v. Bagby Elevator Co., Inc.</u>, 513 F.3d 1261, 1277 (11th Cir. 2008).[1] The burden then shifts to the employer to articulate a non-retaliatory basis for its employment action. <u>See</u> <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981). If the employer meets this burden, the inference of retaliation drops out of the case and the plaintiff must show by a preponderance of the evidence that the proffered reasons are pretextual. <u>See</u> <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 511 (1993).

---

[1]  Plaintiff's whistleblower claim is analyzed under the same standard as Title VII retaliation claims. <u>See</u> <u>Allocco v. City of Coral Gables</u>, 221 F.Supp.2d 1317, 1367 (S.D. Fla. 2002).

**A.  Protected Speech**

The "Whistle-blower's Act" requires that Plaintiff disclose one or more of the following in order to have whistle-blower protection:

> (a) Any violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee or agent of an agency or independent contractor which creates and presents a substantial and specific danger to the public's health, safety, or welfare.

> (b) Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, suspected or actual Medicaid fraud or abuse, or gross neglect of duty committed by an employee or agent of an agency or independent contractor.

§ 112.3187(5), Fla. Stat.; <u>Rosa v. Dept. of Children and Families</u>, 915 So.2d 210 (Fla. 1st DCA 2005). Protection is also given if a public employee discloses "any other abuse." §112.3187(2), Florida Statutes. The "nature of information disclosed" is a question of fact. <u>Rice-Lamar v. City of Fort Lauderdale</u>, 853 So.2d 1125, 1133 (Fla. 4th DCA 2003) (reversing order of summary judgment on basis of, among other things, whether plaintiff disclosed any item required under §112.3187(5)).

Plaintiff reported the Defendants' illegal interference in a legitimate arrest when he was initially deposed in the civil hit and run case in August, 2016. Plaintiff then went on to participate in the FDLE and SAO investigations which arose from his original testimony.  Thereafter, when Plaintiff began experiencing harassment from supervisors and coworkers, he filed written complaints with his supervisory chain of command about the policy violations committed by Defendants' agents.

The disclosure of information related to possible abuse and/or retaliation by Plaintiff's supervisors clearly falls within §112.3187(5).  As important, it was the supervisors' ultimate

33

decision to terminate Plaintiff, the very people whom Plaintiff reported for corruption and interference with his arrest and investigation of Richard Smith.

Plaintiff's disclosures related to safety violations by supervisors and corruption by officials are certainly actionable and make this case materially indistinguishable from Hussey v. City of Marianna, Fla., 2011 WL 3294827 (N.D. Fla. 2011). In Hussey, the Court held that an agency's violation of its own policies is "gross mismanagement" under § 112.3187. "At a minimum, a [governmental entity's] personnel policies guide [its] personnel decisions. Straying from those policies may be an indication of managerial abuse and because of the [Whistle-blower's Act] policy in favor of a broad interpretation of the statute, employees are afforded protection for reporting suspected violations of those policies." Id. at *1.

Actionable disclosures under §112.3187(5), Florida Statutes, are not restricted to acts which threaten "the health, safety, or welfare of the public at large."  Hutchison v. Prudential Insurance Co., 645 So.2d 1047, 1049 n.4 (Fla. 3d DCA 1994); see also King v. State of Florida, 650 F.Supp.2d 1157, 1164 (N.D. Fla. 2009)(plaintiff's complaint about a supervisor's alleged bias in defendant's hiring process for law enforcement officers was a protected whistle-blower disclosure); Lindamood v. Office of State Attorney, Ninth Judicial Circuit of Florida, 731 So.2d 829 (Fla. 5th DCA 1999)(plaintiff's complaints about gender-based disparities in pay and work distribution were protected whistle-blower disclosures); Saunders v. Don Hunter, et al., 980 F. Supp. 1236, 1245 (M.D. Fla. 1997)(plaintiff's complaint she was not paid overtime wages that were due her and that she was retaliated against by not receiving any pay increases when she complained were protected whistle-blower disclosures).

The court in Shuck v. Clark, 2007 WL 676198 (M.D. Fla. 2007), also recognized that

verbally disclosing actual or suspected violations of laws or rules during an investigation is whistle-blowing activity. Shuck, the plaintiff, was interviewed by the defendant's City's Employee Relations Department. Id. at *2. During the interview, Shuck disclosed that her supervisor refused to permit employees to record compensatory time, implicating the Fair Labor Standards Act. Id. The court ruled that her divulging this information while participating in a governmental inquiry was protected under the Whistle-blower's Act. Id. at *4-5.

Plaintiff has further support in Jones v. School Bd. of Orange County, Fla., 2005 WL 1705504 (M.D. Fla. 2005). There, the plaintiff was requested to participate in a meeting with management. Id. at *3. It was stressed to plaintiff that the meeting was "troubleshooting" in nature and was not disciplinary. Id. Plaintiff made her purported whistle-blower disclosures during that meeting. The court noted without ruling that the troubleshooting meeting with management may have been an "inquiry" as defined in § 112.3187(7), Florida Statutes. Id. at *10.

Defendant not only challenges the content of the information that Plaintiff disclosed, but also to whom the information was disclosed. Defendant claims that Plaintiff's participation in the original deposition was not protected activity because the deposition was taken in a private civil matter and the information was not given to the Sheriff, himself, or to another "appropriate local governmental official." §112.3187(6), Fla. Stat. However, Defendant ignores the fact that Plaintiff's original testimony led to a corruption investigation conducted by the SAO, and to that end, Plaintiff participated by giving statements to FDLE, the oversight agency of Defendant Sheriff.

Moreover, Defendant ignores the many other instances of protected activity, including the memoranda Plaintiff filed with his chain of command, after he began experiencing harassment and

retaliation for his participation in the investigation.

Clearly, reporting circumstances which have absolutely no effect on the public - even those which solely affect the plaintiff - can be protected activity under the Act.  But here, Plaintiff identified severe safety violations and corruption by Defendant Sheriff and his agents. Those internal, personnel disclosures are protected disclosures.

Plaintiff's verbal complaints to supervisors about the corruption also qualify as protected speech. See Martin County v. Edenfield, 609 So.2d 27 (Fla. 1992)(disclosures made in discussions with County Commissioners qualify under the statute as protected activity). Plaintiff has satisfied the first element of his *prima facie* case.

## C.  Causal Connection

To establish a causal connection, a plaintiff must show that the protected activity and the adverse action "are not completely unrelated." Wideman v. Wal-Mart Stores, Inc., 141 F. 3d 1453, 1457 (11th Cir. 1998). Where the protected speech and adverse employment action are close in time, causation may be inferred.  See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)("burden of causation can be met by showing close temporal proximity). Plaintiff filed complaints against supervisors. Thereafter, the supervisors about whom Plaintiff complained treated Plaintiff coldly, allowed his coworkers to harass him, disciplined him, investigated him, and then fired him.  This period of retaliatory harassment, from his initial reporting through subsequent written complaints prepared through December 2018, ended only after he was actually fired in January 2019.  These retaliatory actions are actionable.  Wideman, 141 F. 3d 1456-57; Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010)(en

36

banc)("workplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context.").

In fact, only about a month after the SAO investigation into Defendant Sheriff and Nelson was closed, Nelson approved an IA investigation into Plaintiff relative to Deputy Pascher. Plaintiff and his supervisor, Buchhofer, had previously alerted Defendant's agents, including Rowe, about Pascher possibly tipping off suspects in the truck theft and arson investigation. Buchhofer, himself, heard Pascher speaking to her boyfriend who was at the shop where stolen parts were found. Although Buchhofer and Plaintiff reported the involvement, Rowe ignored the reports until the SAO brought the matter to Defendant's attention, and then completed a quick investigation to satisfy the SAO, while manufacturing excuses to investigate Plaintiff instead.

To the extent there were gaps between Plaintiff's protected speech and adverse action, the adverse actions can be viewed as Defendant's "first opportunity" to exact revenge, accounting for any lapse in time between Plaintiff's protected conduct and the adverse action.  See Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004)(holding that plaintiff made prima facie case despite lapse in time in that jury could reasonably conclude failure to hire was the first opportunity to retaliate); Porter v. California Dep't of Corr., 419 F.3d 885, 895 (9th Cir. 2005)(temporal delay due to fact that harasser unable to exact retaliation until promotion to supervisory position); Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997)(stating that temporal gap may be explained through "valid reasons" that do not disprove causation.

Here, Plaintiff's coworkers harassed him from the time that the investigation started, subjected him to name calling, isolated him, subjected him to discipline and investigation to which other Deputies were not subjected for similar or even more egregious complaints. When the

harassment and discipline did not encourage Plaintiff to quit his position, Defendant's agents waited until the corruption investigation was officially closed in May 2018, and within a month, opened an IA investigation on Plaintiff that was supposed to be about his coworker, Pascher, which led to his termination.

Plaintiff has made his *prima facie* case of retaliation.

## VI.  THE FIRST AMENDMENT

"The First Amendment protects a public employee's right, in certain circumstances, to speak (1) as a citizen (2) addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). Expanding on the "as a citizen" requirement, the Garcetti court opined that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." Id., 547 U.S. at 421.

During this first stage of the Pickering analysis, the Court must determine whether Plaintiff's speech may be "fairly characterized as constituting speech on a matter of public concern." Rankin v. McPherson, 483 U.S. 378, 384 (1987) (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)). The Court examines the content, form, and context of the employee's speech to determine whether it addresses a matter of public concern. Bryson, 888 F.2d at 1565; Rankin, 483 U.S. at 384-85; see generally Kurtz v. Vickrey, 855 F.2d 723 (11th Cir. 1988). In doing so, the Court must ask "whether the main thrust of the speech in question is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was." Mitchell v. Hillsborough, County, 468 F.3d 1276, 1282 (11th Cir. 2006) (internal quotation marks and citations omitted).

"Exposing governmental inefficiency and misconduct is a matter of considerable

significance," and here, Plaintiff was concerned that Defendant Sheriff and his agents were interfering with investigations and arrests for individuals whom they knew. Other witnesses have testified that Defendant Sheriff had a history of telling his deputies to let people go, if he knew them. In Plaintiff's case, however, it was not a mere traffic citation for which Richard Smith did not face arrest or prosecution, but the hit and run of a minor walking to the school bus stop, thereby affecting citizens and public safety. Garcetti, 547 U.S. at 425. Indeed, to fall within the realm of the "public concern," an employee's speech must "relat[e] to a[ ] matter of political, social, or other concern to the community." Connick v. Meyers, 461 U.S. 138, 146 (1983). "In determining whether the speech touches on a matter of public concern, courts look to the 'content, form, and context of a given statement, as *revealed by the whole record*, and determine whether the 'main thrust' of the speech in question is essentially public in nature or private.'" Wilbourne v. Forsyth County School Dist., 306 Fed. Appx. 473, 477 (11th Cir. 2009). The entirety of the record supports that Plaintiff spoke on matters of public concern when he reported issues related to government inefficiency and misconduct.

The fact that Plaintiff made his speeches to supervisors and/or to other government agencies, and not in a public setting is not necessarily determinative on the issue of whether Plaintiff's speech related to a matter of public concern. See Cook v. Gwinnett County School Dist., 414 F.3d 1313, 1319 (11th Cir. 2005) (holding that the mere fact that his speech was made to coworkers or to supervisors rather than directed at the general public does not remove the speech from the category of public concern); Anderson, 239 F.3d at 1220 (finding that a questionnaire provided to political candidates addressing concerns about alleged understaffing in the 911 system and of engine companies, physical fitness standards required for certain employees, and public tax

39

consequences of high employee turnovers, did pertain to matters of public concern despite also

containing questions regarding grievance procedures, vacation policies, promotion guidelines, and

pension benefits); Hartwell v. City of Montgomery, 487 F. Supp. 2d 1313, 1323 (M.D. Ala. 2007)

(holding that where a firefighter complained about a coworker's potentially offensive confederate

flag tattoo, his internally filed complaint regarded a matter of public concern).

The issues Plaintiff spoke about – public safety, corruption, harassment by the law

enforcement officers, among others – were clearly matters of public concern. Defendant's

retaliation against Plaintiff for engaging in that speech demonstrates additional misconduct that

"'lies so obviously at the very core of what the [First Amendment] prohibits that the unlawfulness

of the conduct was readily apparent to [Defendant], notwithstanding the lack of fact-specific case

law.'" See Fils v. City of Aventura, 647 F.3d 1272, 1291 (11th Cir. 2011) (cited in Krika v. City of

DeFuniak Springs, Florida, case no. 3:16cv265-RV/CJ, Doc. 38, pgs. 11-12 (N.D. Fla. September

15, 2017)). Moreover, a government employee's reporting of co-employee misconduct constituted

speech on a matter of public concern. Phillips v. City of Dawsonville, 499 F.3d 1239 (11th Cir.

2007).

Following Garcetti, the Eleventh Circuit has modified the analysis of the first step of the

Pickering test, adding the additional requirement that the government employee must speak as a

public citizen, rather than in his capacity as an employee. Boyce, 510 F.3d at 1342 (citing Garcetti

v. Ceballos, 547 U.S. 410 (2006)); Battle v. Board of Regents, 468 F.3d 755, 760 (11th Cir. 2006).

The question under Garcetti is whether the speech at issue is itself ordinarily within the scope of

an employee's duties, not whether it merely concerns those duties." Lane v. Franks, 134 S.Ct.

2369, 2379 (2014); see also, Flora v. County of Luzerne, 776 F.3d 169, 176-77 (3d Cir. 2015)

(noting that <u>Lane</u> made clear that the "related to" test is erroneous and protected speech can relate to plaintiff's job).

First, this case is virtually indistinguishable from the facts in <u>Lane v. Franks</u>, where the plaintiff was an employee who was placed under subpoena by a third party and testified against his employer in a corruption trial. 134 S. Ct. 2373-75.  He was then fired and sued for First Amendment Retaliation.  The Court held that

> "sworn testimony in judicial proceedings is a quintessential example of citizen speech for the simple reason that anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth. That obligation is distinct and independent from any separate obligations a testifying public employee might have to his employer. The Eleventh Circuit read *Garcetti* far too broadly in holding that Lane did not speak as a citizen when he testified simply because he learned of the subject matter of that testimony in the course of his employment."

<u>Id.</u> at 2373.

Plaintiff, like the plaintiff in <u>Lane</u>, was placed under subpoena, he testified against his employer and disclosed corruption by Defendant Whidden, he was then subjected to a series of adverse actions and fired shortly after Whidden commented to Plaintiff's supervisor that he could never forgive Plaintiff for what he did to Whidden's family.  As the court held in <u>Lane</u>, it was not part of his job duties to respond to a subpoena and testify against his agency.  <u>Id.</u> at 2379.

Second, Plaintiff's job duties did not include performing internal affairs investigations, reporting employee misconduct, or supervision of any employee, neither did it include reporting possible policy violations that would leave Defendant open to liability based on supervisors' violations of policy.

Here, Defendant's agents did not question Plaintiff about various complaints that he made, did not investigate the complaints in any way and did not offer Plaintiff advice, information or

instruction in resolving the issues he raised. The result of Plaintiff's complaints was hostility, the IA investigation and then his termination for making the reports of policy, procedural and statutory violations.

"[T]he third stage of the analysis requires [Plaintiff] to show that [his speech] was a substantial motivating factor in his termination." Moss, 782 F.3d at 618 (citation omitted). As shown above, there is considerable evidence disputing Defendant's contentions that Plaintiff was not terminated for reporting abuses by employees and supervisors. Once Plaintiff makes this showing, "the burden shifts to [Defendant] to prove that it would have terminated [Plaintiff] even in the absence of his speech." Id. Importantly, "[b]ecause these final two issues, which address the causal link between [Plaintiff's] speech and his termination, are questions of fact, a jury resolves them unless the evidence is undisputed." Id.

However, as stated above, after ignoring Plaintiff's reports, he was terminated but other employees who engaged in misconduct were not fired. Plaintiff's supervisor, Buchhofer, requested investigations into other employees for such misconduct as misplacing and/or failing to document evidence, but no IA investigation was opened. Buchhofer also reported Pascher as possibly leaking information to suspects, but again, no investigation was opened until the SAO demanded it, and even then, the investigation was perfunctory. Meanwhile, Plaintiff was investigated based on a citizen complaint. While normally citizen complaints are reviewed by a supervisor who determines whether an IA investigation should occur, the citizen complaint against Plaintiff went directly to IA with no supervisor review, and Nelson, himself, solicited the complaint.

And while the IA investigation against Pascher was cursory, Rowe took the opportunity to create evidence against Plaintiff, and then, once again, with Nelson's blessing, he opened another

IA investigation against Plaintiff for claiming that Pascher tipped off suspects through her boyfriend, which was confirmed by Buchhofer.  Moreover, the allegations against Plaintiff in the IA investigation were trumped up and false as shown above.

At the very least, these disputed issues of material fact show that Defendant would not have taken the same action against Plaintiff had he not engaged in protected speech. Summary judgment should be denied.

## VII.   QUALIFIED IMMUNITY

Defendant Sheriff next argues that he is entitled to qualified immunity because Plaintiff's rights were not clearly established. Government officials may be shielded from liability for civil damages on a First Amendment retaliation claim only if their actions did not violate "clearly established . . . constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). First, the court must determine whether the facts "taken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a constitutional right[.]" Cook v. Gwinnett County Sch. Dist., 414 F.3d 1313, 1315 (11th Cir. 2005) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). As demonstrated above, supra, Defendant did indeed violate Plaintiff's First Amendment rights. Second, if a constitutional right was violated under the plaintiff's version of the facts, the court must then determine "whether the right was clearly established." Id.

The law is clearly established, and was in 2018, that a public employer may not retaliate against an employee for an employee's exercise of constitutionally protected speech. Lane v. Franks, 134 S.Ct. 2369 (2014); Boyce v. Andrew, 510 F.3d 1333, 1341 (11th Cir. 2007); Cook, 414 F.3d at 1318; Rankin v. McPherson, 483 U.S. 378, 383 (1987); Connick v. Myers, 461 U.S. 138,

43

140–42 (1983). Indeed, "[t]he law is clearly established that an employer may not demote or discharge a public employee for engaging in protected speech." Travers v. Jones, 323 F.3d 1294, 1295 (11th Cir. 2003); see also Akins v. Fulton Cty., Ga., 420 F.3d 1293, 1308 (11th Cir. 2005) (holding that a defendant had "fair warning . . . that speech whose main thrust is to report bidding irregularities to a public official in a meeting requested for that purpose is protected by the First Amendment" (internal quotation marks omitted)).

Moreover, the Eleventh Circuit has also held that in light of its established precedent, the Court has emphasized that "general statements of the law are perfectly capable of giving clear and fair warning to officers even where the very action in question has [not] previously been held unlawful." Cook, 414 F.3d at 1320 (quoting Harris v. Coweta County, Ga., 406 F.3d 1307, 1318 (11th Cir. 2005)); Hope v. Pelzer, 536 U.S. 730 (2002); see also Holloman v. Harland, 370 F.3d 1252, 1277-79 (11th Cir. 2004). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Hope, 536 U.S. at 739.

It is well settled that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick, 461 U.S. at 142. Moreover, the Eleventh Circuit has stated that "[i]t is hard to imagine any combination of government interests sufficient to outweigh Appellant's strong interest in informing the public about policies he believed were dangerous to the City's citizens." Beckwith v. City of Daytona Beach Shores, Fla., 58 F.3d 1554, 1564 (11th Cir. 1995). Plaintiff's speech clearly falls under this

description. Indeed, Defendants' misconduct "'lies so obviously at the very core of what the [First Amendment] prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law.'" Fils v. City of Aventura, 647 F.3d 1272, 1291 (11th Cir. 2011).

However, even utilizing the "materially similar" method, the "existing case law does not necessarily have to be 'directly on point,'" but "it must be close enough to have put 'the statutory or constitutional question beyond debate.'" Gaines v. Wardynski, 871 F.3d 1203, 1209 (11th Cir. 2017) (citation omitted); Holloman, 370 F.3d at 1265, 1269-1270, 1277-1278 (11th Cir. 2004) ("While officials must have fair warning that their acts are unconstitutional, there need not be a case 'on all fours,' with materially identical facts, before we will allow suits against them. A principal of constitutional law can be 'clearly established' even if there are 'notable factual distinctions between the precedents relied on and the cases then before the court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights.") (emphasis added); see also Cook, 414 F.3d 1313 (holding that where school bus driver voiced concerns about the safety of children due to bus overcrowding, the Pickering balance test "tilted conclusively in favor of Cook such that the defendants had fair and clear warning that their actions were unconstitutional"); Davis v. Phenix City, Alabama, 513 F. Supp. 2d 1241, 1248 (M.D. Ala. 2007)(denying summary judgment as to speech on an issue that could cause problems with recruiting qualified firefighters); Fikes v. City of Daphne, 79 F.3d 1079, 1084 (11th Cir. 1996)(finding a viable First Amendment claim on speech that police department failed to terminate a dangerous, high-speed chase and improperly used a confiscated vehicle); Finch v. City of Vernon, 877 F.2d 1497, 1502 (11th Cir. 1989)(finding that the plaintiff's speech warning that closing a

45

public road would create a safety hazard is speech on a matter of public concern); Rankin, 483 U.S. at 383 ("It is clearly established that a state may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech"); Ratliff v. DeKalb County, 62 F.3d 338, 340 (11th Cir. 1995) ("The right to be free from retaliation is clearly established as a *First Amendment* right"); Travers v. Jones, 323 F.3d 1294, 1295 (11th Cir. 2003), ("The law is clearly established that an employer may not demote or discharge a public employee for engaging in protected speech").

As demonstrated above, Defendant Sheriff did indeed violate Plaintiff's First Amendment rights, on grounds which were, at the time Defendant and his agents committed their retaliatory acts, clearly established. Defendant terminated Plaintiff after he engaged in protected expression, and thus, he is not entitled to qualified immunity. See Lane, supra (law was not clearly established on facts of Lane but has been since Lane was decided in 2014).

## VIII.  PRETEXT

In order to show pretext, Plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision... [Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). In evaluating a summary judgment motion, the district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.1997). "[A] plaintiff

withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." Howard v. BP Oil Co., 32 F.3d 520, 526 (11th Cir.1994).

Defendant argues that it took all adverse actions against Plaintiff for "legitimate reasons" and that Plaintiff cannot question the wisdom of its decisions.  But, the "decision to terminate an employee based upon unlawful considerations does not become legitimate because it can be characterized as a business decision," E.E.O.C. v. Yenkin-Majestic Paint Corp., 112 F.3d 831, 835 (6th Cir. 1997), and the fact that the action is "harsh or unreasonable" is certainly probative evidence that the asserted reason may not be the actual reason animating the employer's decision. See e.g. Burdine, 450 U.S. at 259 (1981) ("[T]he fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination."); Wichmann v. Bd. of Trs. of S. Ill. Univ., 180 F.3d 791, 805 (7th Cir. 1999) ("[A] defendant cannot escape the fact that a jury must use its good common sense in addressing how much, if at all, the foolishness or unfairness of the employer's decision weighs in the evidence of pretext."). By granting even incredible explanations presumptive validity, the "business judgment rule" short-circuits this well-settled means of proving discrimination.

Here, Defendant's "legitimate" reasons for denying Plaintiff a promotion, for refusing him safety equipment, for commencing IA investigation and discipline against Plaintiff and for terminating Plaintiff are belied by the facts.  First, Plaintiff did not violate any policies and did not refuse to complete any duties. Plaintiff's supervisor, Buchhofer, spoke in his favor during both IA investigations, and in fact, raised Pascher's involvement in the truck theft and arson to Rowe well

47

before Rowe ever bothered to investigate her. Buchhofer witnessed Pascher speaking to her boyfriend who was at the shop where stolen parts were found, and Buchhofer assigned Plaintiff to take over the investigation. In addition, Buchhofer testified that the IA investigation about the citizen complaint violated Defendant's policy because it was not sent for a supervisory review prior to starting the IA investigation.

Defendant also claims that Plaintiff scored the lowest of the 3 candidates for the sergeant position, and therefore, he was not promoted. However, after his interview, Plaintiff was told by his supervisor, Shawn Reed, that he had scored the highest on the written exam and had done well on the interview, but that one of the candidates had failed the exam and done poorly on the interview. Despite Lt. Reed's information, the candidate who failed the exam was promoted over Plaintiff.

A reasonable jury could certainly find that these excuses were crafted as pretext for Defendant's discriminatory conduct.  See Tidwell v. Carter Products, 135 F.3d 1422, 1428 (11th Cir. 1998)(observing that identification of inconsistencies can be evidence of pretext); see also EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994)(where there were discrepancies in the defendant's explanations for the plaintiff's layoff, a reasonable juror could infer that the explanations were pretextual, *post hoc*, rationalizations to combat evidence of discrimination); Metzler v. Fed. Home Loan Bank of Topeka, 464 F. 3d 1164, 1177 (10th Cir. 2006)(citing cases for the proposition that "suspicious timing… of documentation - after the fact and in anticipation of litigation - reasonably gave rise to an inference of pretext"). Here, Defendants made Plaintiff's working environment miserable after he was dubbed a whistleblower and snitch for reporting Defendant Sheriff's misconduct in refusing to have Richard Smith arrested for the hit and run of a

minor, and then, for filing memoranda with supervisors about coworkers' misconduct.

Further, where, as here, the Defendant cites violation of work rules or poor performance to justify Plaintiff's discipline, the plaintiff can and has demonstrated that the defense is pretextual if he submits evidence that (1) he did not engage in the work rule or particular poor performance; or (2) if he did violate the rule or engage in that poor performance, other employees outside his protected class engaged in similar acts but were treated differently.  See Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1363 (11th Cir. 1999).

Plaintiff did not violate the workplace rules as he has shown above.  Also, Plaintiff's fellow deputies are "comparable," in that they were all subject to the same policies and discipline. It is well established that a plaintiff generally may show pretext by presenting evidence that a similarly situated employee outside the protected class was treated more favorably. See Berg v. Fla. Dep't of Labor and Employment Sec., Div. of Vocational Rehab., 163 F. 3d 1251, 1255 (11th Cir. 1998)(inconsistent application of policies may be evidence of discrimination). The trier of fact is permitted to consider the evidence establishing a plaintiff's *prima faci*e case and inferences drawn therefrom on the issue of whether the defendant's proffered reason is pretextual. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000).

Supervisors allowed other employees to commit misconduct without subjecting them to IA investigations like Plaintiff. In fact, other citizen complaints went through supervisory review prior to having IA investigations opened, and even when supervisors, like Buchhofer, recommended IA investigations for such things as failing to document or retrieve evidence, IA investigations were not always conducted. Only Plaintiff, who reported corruption and misconduct, was subjected to such extreme discipline by the very individuals whom he reported.

Plaintiff and Buchhofer reported Pascher for disclosing information about an investigation to suspects, but Rowe refused to initiate an investigation until the SAO demanded one. Even then, the investigation was rushed and halfhearted. Meanwhile, Rowe took statements made during the investigation to target Plaintiff, and the ensuing investigation against Plaintiff stretched on for months, resulting in Plaintiff's termination.

In fact, witnesses testified that Rowe used IA investigations as a tool to target and get rid of individuals whom he and/or Defendant deemed undesirable. He twisted statements and made his own false statements and conclusions in his findings. In one case, he determined that a volunteer, earning no money for her contribution, had violated policy by performing outside employment, and failed to acknowledge that the volunteer had disclosed the outside employment on her application in 2008.

> Under F.R.E. 404(b), '[e]vidence of other crimes, wrongs, or acts… may… be admissible for … purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.' The Supreme Court has held that wide evidentiary latitude must be granted to those attempting to prove discriminatory intent and that the trier of evidence should consider all the evidence.  Those discriminated against will often not be able to rebut a plausible cover-up with direct evidence, as there will seldom be eye witness testimony as to the employer's mental processes.  Thus, discriminatory intent may be proven by direct or circumstantial evidence, such as that admitted under 404(b).

Demers v. Adams Homes of Northwest Florida, 321 Fed. Appx. 849, 853-54 (11th Cir. 2009)(internal citations and quotations omitted). In Demers, this Court ruled that the jury could accept such "me too" circumstantial evidence to find discriminatory intent on behalf of the employer.  See id. at 854 (citing Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1285 (11th Cir. 2008)).

Rowe asked Defendant Sheriff to give him a promotion and that he would repay the

promotion by cleaning house and getting rid of problem employees, and Rowe followed through once he made IA investigator to use the IA process to get rid of people that spoke out against misconduct within Defendant's ranks, including targeting Plaintiff.

In the Summer 2018, Rowe told a friend that he had enough to get Plaintiff fired. Then, he proceeded to conduct an IA investigation fraught with false statements, missing evidence and his own opinions. Defendant Whidden told Buchhofer that he could not forgive Plaintiff for the hurt Plaintiff caused him and his family in testifying about Whidden's corruption. Shawn Reed told Buchhofer that Plaintiff was as good as fired, weeks before he sat on Plaintiff's predisciplinary panel and voted to fire him. Plaintiff's termination was a foregone conclusion as soon as the SAO closed the corruption investigation against Defendant Whidden and Chief Nelson in May 2018.

Genuine issues of fact remain as to whether Defendant's articulated non-discriminatory reasons are pretext for retaliation.

## IX. CONCLUSION

Summary judgment should be denied on all claims, for the reasons stated above.

Respectfully submitted,


/s/  Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, Florida 32301
(850) 383-4800 (telephone)
(850) 383-4801 (facsimile)


ATTORNEYS FOR PLAINTIFF

51

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

CM/ECF to all counsel of record this 18th day of September, 2020.


<u>/s/  Marie A. Mattox</u>
Marie A. Mattox