## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

**VERNON SPEAK,**

     **Plaintiff,**

**v.**                             **CASE NO. 2:18-cv-00826-FtM-99UAM**

**STEVE WHIDDEN, in his official
capacity as SHERIFF of HENDRY
COUNTY, FLORIDA, and STEVE
WHIDDEN, in his individual
capacity,**

     **Defendant.**

_____/

### PLAINTIFF'S CORRECTED RESPONSE AND MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
**(Corrected as to date on Certificate of Service)**

Prior to Plaintiff's termination, Defendant Whidden told Plaintiff's immediate supervisor, Lieutenant Buchhofer, that he could never forgive Plaintiff for what he did to him and to his family. Lieutenant Shawn Reed told Lt. Buchhofer weeks before Plaintiff's predisciplinary hearing that Plaintiff would be fired, and thereafter, Lt. Reed sat on the predisciplinary panel, refused Plaintiff a fair hearing, and voted to fire him. Plaintiff's termination was a foregone conclusion even before the predisciplinary hearing because Plaintiff reported Defendants and their agents for statutory and policy violations, including interfering with criminal investigations and arrests. Plaintiff was fired because he spoke out against the corruption in the Sheriff's office, in violation of the exercise of his First Amendment rights to free speech pursuant to 42 U.S.C. §1983, and for reporting mismanagement, misfeasance and/or malfeasance, in violation of Florida's "whistleblowing" statute, §112.3187, Florida Statutes.

## I.  PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

1.  Admitted.

2.  Admitted.

3.  Admitted that Plaintiff investigated a hit-and-run incident on September 11, 2015. Denied that Plaintiff and Defendant Whidden merely had a "difference of opinion," or that Defendant Whidden wanted to protect Plaintiff from making a "bad arrest." On September 11, 2015, a minor was struck on the shoulder by a passing truck while she was walking to a bus stop and well off the road. [Ex. 100, ¶ 4-13; Ex. 9; Ex. 102, p. 6-7; Ex. 11, p. 39-42, 46-56]. See p. 6-7, infra.

4.  Admitted that Plaintiff did not send the case to the State Attorney's Office ("SAO") and admitted that once the SAO reviewed the file, they declined to prosecute Smith. Denied that Plaintiff failed to follow orders. [Ex. 100, ¶ 9-11; Ex. 9; Ex. 103, p. 11-12, 17-18; Ex. 10; Ex. 44; Ex. 52; Ex. 53]. See p. 6-8, infra.

5.  Admitted.

6.  Admitted.

7.  Admitted that deputies are expected to testify during depositions as part of the furtherance of criminal investigations and prosecutions. Denied that Plaintiff's report of Defendant Whidden's interference with Smith's arrest for the September 11, 2015 hit and run incident was a part of Plaintiff's job duties. [Ex. 100, ¶ 21].

8.  Admitted that the August 10, 2016 deposition was the first incident of Plaintiff blowing the whistle on Defendants and their agents and the first incident for which Defendants and their agents retaliated against Plaintiff for exercising his First Amendment rights. However, as described

2

below, Plaintiff engaged in multiple exercises of his rights and reported violations of law and policy for which he was retaliated against for the remainder of his employment with Defendants.

9. Admitted.

10.     Admitted that Plaintiff did not lose rank or pay. However, as described below, Plaintiff was subject to discipline, investigations and termination for his disclosures.

11.     Admitted that Plaintiff only received two (2) verbal reprimands between August, 2016 and his termination on January 25, 2019. However, Plaintiff was the subject of Internal Affairs ("IA") investigations in 2017 and 2018, the latter of which led to his termination. While the 2017 investigation concluded with an unsubstantiated finding, Chief Deputy Nelson ordered that Plaintiff's supervisor, Lieutenant Buchhofer, discipline Plaintiff, although Lt. Buchhofer refused to comply because the IA findings were unsubstantiated. [Ex. 104, p. 54-61; Ex. B7].

12.     Admitted that Plaintiff was subjected to multiple instances of harassment and retaliation for his disclosures of statutory and policy violations, as described below.

13.     Without knowledge, and therefore, denied. [Ex. 100, ¶ 23; Ex. 101, p. 284-287; Ex. 5]. See p. 9, infra.

14.     Admitted.

15.     Admitted as to the requests to keep Butler's identity confidential. Further admitted that Lt. Buchhofer agreed to disclose Butler's name because Plaintiff's investigation uncovered the fact that Butler was a possible co-defendant in the matter. [Ex. 100, ¶ 27-29; Ex. 104, 111-114].

16.     Admitted that Plaintiff was asked to help in the investigation. Denied that Plaintiff intentionally impugned Pascher's integrity. [Ex. 100, ¶ 27, 29, 31; Ex. 101, p. 238-239; Ex. 24]. See p. 10-11, infra.

3

17.     Denied that Plaintiff had authority to investigate Pascher. [Ex. 100, ¶ 31-32; Ex. 104, p. 114, 121-122; Ex. 105, p. 42-46; Ex. 65, p. 267-268]. See Response to ¶ 16. See also p. 10-11, infra.

18.     Admitted that Pascher was the subject of an IA investigation as to her communication with Butler on January 31, 2017. Without knowledge and therefore, denied as to the remainder of the paragraph. See Response to ¶ 16 and 17.

19.     Admitted that Rowe ruled the allegations against Pascher unfounded. Denied that Plaintiff's conduct in investigating the incident violated policy. See Response to ¶ 16 and 17.

20.     Admitted as to Plaintiff's statement. Denied that Plaintiff had the ability to clear Pascher's name after the report was closed. [Ex. 100, ¶ 65; Ex. 26, p. 8-9, 13-15; Ex. 65, IA Investigation, p. 267-268]. See p. 14-16, infra.

21.     Without knowledge, and therefore, denied. See Response to ¶ 15.

22.     Without knowledge, and therefore, denied. See Responses to ¶ 15-18, 20.

23.     Admitted that an IA investigation was opened against Plaintiff. Without knowledge, and therefore, denied as to the remainder of the paragraph. See Responses to ¶ 15-18, 20.

24.     Admitted as to Plaintiff's testimony. See Response to ¶ 20.

25.     Admitted as to Plaintiff's testimony. However, at no time was Butler registered as a confidential informant for Defendants. [Ex. 100, ¶ 29; Ex. 105, p. 40-42]. See Response to ¶ 15.

26.     Without knowledge, and therefore, denied. However, witnesses testified that Plaintiff did a complete and thorough investigation. [Ex. 100, ¶ 64; Ex. 24; Ex. 104, p. 135-136, 168-171, 173-174; Ex. 25].

27.     Without knowledge, and therefore, denied. However, Plaintiff reported what

4

witnesses/suspects told him in the offense report. [Ex. 100, ¶ 28; Ex. 104, p. 170-171; Ex. 24]. <u>See</u> Responses to ¶ 15-18.

28.     Admitted.

29.     Admitted as to Rowe's findings. Denied that the findings were accurate. <u>See</u> Response to ¶ 15-18, 20.

30.     Without knowledge, and therefore, denied. However, the IA investigation was initially commenced with the encouragement of Nelson only about a month after the conclusion of the SAO investigation into Defendants' interference in Smith's arrest for the September 11, 2015 hit and run. [Ex. 53; Ex. 57].

31.     Admitted.

32.     Admitted.

33.     Without knowledge, and therefore, denied.

34.     Without knowledge, and therefore, denied.

35.     Admitted.

36.     Admitted.

37.     Admitted.

38.     Admitted that the panel recommended Plaintiff's dismissal. Without knowledge, and therefore, denied as to the remainder of the paragraph.

39.     Without knowledge, and therefore, denied. However, Lieutenant Shawn Reed told Lt. Buchhofer that Plaintiff would be fired even before the hearing was held. [Ex. 104, p. 138-139].

40.     Admitted that Plaintiff was terminated on January 25, 2019. Without knowledge,

and therefore, denied as to the remainder of the paragraph.

     41.    Without knowledge, and therefore, denied.

## II.  DISPUTED MATERIAL FACTS PERTAINING DIRECTLY TO PLAINTIFF

Plaintiff was initially hired by Defendant Sheriff as a reserve deputy on July 10, 2013. [Ex. 100, ¶ 1-2; Ex. 101, p. 45]. Plaintiff was then hired into a full-time position on March 5, 2014 and was later promoted to Detective Sergeant in the Criminal Investigations Department ("CID"), the position that Plaintiff held at the time of his wrongful termination. [Ex. 100, ¶ 3; Ex. 101, p. 48-49].

On September 11, 2015, Plaintiff was assigned an investigation of a hit and run accident involving a minor walking to a school bus stop who was struck by a vehicle, which the minor identified as a white Ford truck. [Ex. 100, ¶ 4; Ex. 101, p. 68-69; Ex. 8]. The minor reported that the truck did not return to the scene while she waited for the bus or at any time before the bus departed the area, and Plaintiff retrieved evidence at the accident scene, including the fact that the minor's footprints were at least 3 feet from the road and pieces of the broken side mirror. [Ex. 100, ¶ 5; Ex. 101, p. 68-69, 90-91; Ex. 8; Ex. 9]. As part of the investigation, Plaintiff staked out the area with other employees, and on September 22, 2015, Plaintiff was able to effectuate a traffic stop for a white Ford truck, matching the description provided by the minor, which had an obviously new side mirror matching that of the damaged mirror for which Plaintiff retrieved pieces; the driver of the truck had been speeding and did not stop at a stop sign. [Ex. 100, ¶ 6; Ex. 9]. Plaintiff interviewed the driver who admitted that he had struck something a week or two earlier, and confirmed that the accident occurred on September 11, 2015. [Ex. 100, ¶ 7; Ex. 101, p. 90-91; Ex. 9]. While Plaintiff ran the driver's license and plates, the driver, Richard Smith, called

6

Defendant Whidden and asked to have the traffic stop rushed because he was late for work. [Ex. 106, p. 30]. In turn, Defendant Whidden called and told Plaintiff that Smith was a "good guy," and that Plaintiff should rush the traffic stop because Smith was late for work; Whidden also told Plaintiff that he could have Smith come in later that day to interview about the hit and run. [Ex. 100, ¶ 8; Ex. 9; Ex. 11, p. 39-42, 55-56]. Plaintiff spent a few more minutes interviewing Smith who continued to admit he was aware he hit something and that he waited to go back to the scene to try to identify what he had hit; Plaintiff then scheduled Smith to return to the Sheriff's Office for another interview at 4:00 p.m. [Ex. 100, ¶ 9; Ex. 9; Ex. 11, p. 39-42, 55-56]. Smith did not appear for the second interview. [Ex. 100, ¶ 11; Ex. 9].

The following day, September 23, 2015, Defendant Whidden confronted Plaintiff about Smith's traffic stop. [Ex. 100, ¶ 12; Ex. 11, p. 52-53]. Whidden told Plaintiff that he told Smith not to appear for the follow up interview and that he believed Plaintiff understood that the case would go nowhere, that he believed the case was taken care of and that he thought he and Plaintiff understood each other that no further investigation into the incident would occur. [Ex. 100, ¶ 12-13; Ex. 11, p. 52-54]. Whidden, himself, did not investigate the incident and only formed his opinion based on the information verbally provided to him by Smith and Plaintiff. [Ex. 106, p. 33].

Chief Deputy Nelson met with Plaintiff and Sergeant Shawn Reed, and verbally reprimanded them for entering an offense report which included the Sheriff, although the only reference to the Sheriff in the report was the fact that Smith contacted him while Plaintiff was obtaining information about Smith, and did not include any information about Plaintiff's conversation with the Sheriff during the traffic stop. [Ex. 100, ¶ 14; Ex. 101, p. 96-97].

Thereafter, Defendant Whidden met with Plaintiff again and assured Plaintiff that they

were good and that he was no longer mad at Plaintiff about the hit and run investigation. [Ex. 100, ¶ 15; Ex. 101, 96-97].

On September 24, 2015, Lieutenant Woods closed the case for lack of evidence of Smith's intent to leave the scene. [Ex. 103, p. 11-12; 17-18; Ex. 9]. Woods testified that he closed the case at the direction of Defendant Whidden and/or Chief Deputy Nelson and that he did not send the matter to the SAO for review, again at the direction of Whidden and/or Nelson. [Ex. 103, p. 11-12, 17-18; Ex. 9].

In October, 2015, the minor's attorney, Steven Ramunni, representing her in a civil case against Smith, called the SAO to inquire the status of the criminal investigation; the SAO, in turn, contacted Defendants, and obtained the incident report with Lt. Woods' supplement closing the case. [Ex. 44]. In addition, Defendant Whidden spoke with ASA Mirra, personally, to ask why she was requesting the file and to tell her that he did not believe the case merited further investigation. [Ex. 44].

Smith actually contributed to Defendant Whidden's campaign for Sheriff. [Ex. 46; Ex. 58, p. 10-11].

In July, 2016, Plaintiff loaned his traffic vest to another deputy, and despite multiple requests and threats of discipline for misplacing agency equipment, Plaintiff did not receive a replacement until approximately 2018. [Ex. 100, ¶ 16; Ex. 104, p. 75-80; Ex. 56].

On August 10, 2016, Attorney Ramunni placed Plaintiff under subpoena and deposed him in the civil case against Smith, and as part of the sworn testimony, Plaintiff described Defendant Whidden's involvement during and after the traffic stop in September, 2015. [Ex. 100, ¶ 17; Ex. 11, p. 36-60, 101-103]. Thereafter, Attorney Ramunni sent a letter to the SAO asking for an

investigation into Defendants' violation of criminal statutes for interfering in the hit and run investigation. [Ex. 45]. The Governor's Office instructed Palm Beach County SAO to investigate. [Ex. 40].

The Florida Department of Law Enforcement ("FDLE") began an investigation into the Sheriff's involvement in the case. [Ex. 52].

After the investigations began, and Plaintiff's involvement in the investigation was disclosed, Plaintiff's coworkers began harassing him. [Ex. 100, ¶ 19]. In addition, Defendant Whidden ignored Plaintiff and/or treated Plaintiff in an intimidating manner. [Ex. 100, ¶ 20; Ex. 101, p. 318-320].

On September 26, 2016, Plaintiff received an evaluation scoring 98.1%. [Ex. 100, ¶ 22; Ex. 5]. Chief Nelson questioned such a high score and ordered Lt. Morales to lower the score. [Ex. 100, ¶ 23; Ex. 101, p. 284-287].

On September 29, 2016, Plaintiff filed a memorandum reporting that Detective Sergeant Nester Echevarria was calling Plaintiff a snitch, and requesting that Plaintiff be removed from the SRT team because of his testimony during the August 10, 2016 deposition. [Ex. 100, ¶ 24; Ex. 12]. Echevarria received a verbal counseling for referring to Plaintiff as a snitch, but Whidden and Nelson refused to investigate Plaintiff's complaint, and instead, ordered that the matter be handled within the SRT team. [Ex. 107, p. 8; Ex. 104, p. 20-21; Ex. 108, p. 22-25].

On October 31, 2016, Plaintiff gave a sworn statement to FDLE as part of the corruption investigation. [Ex. 100, ¶ 25; Ex. 43].

On January 4, 2017, Plaintiff submitted a memorandum to Nelson requesting that multiple individuals, departments and agencies be recognized; Nelson refused the request. [Ex. 100, ¶ 26;

Ex. 101, p. 139-144; Ex. 13].

On January 31, 2017, Lt. Buchhofer called Plaintiff to assist Deputy Briana Pascher in interviewing individuals at the Sheriff's Office relative to a stolen truck and arson which Lt. Buchhofer was investigating; Lt. Buchhofer overheard a conversation between Deputy Pascher and her boyfriend, Elvin Butler, and Butler provided Pascher with information about the location of parts from the stolen truck. [Ex. 100, ¶ 27; Ex. 104, p. 100-104]. When Plaintiff learned of the location of the stolen parts, he questioned Pascher as to why they were conducting interviews at the Sheriff's Office, rather than the shop where the parts were located, and Pascher and Plaintiff met with witnesses at the shop, where they received consent to search, but many of the parts had already been removed from the shop. [Ex. 100, ¶ 27; Ex. 101, p. 238-240; Ex. 104, p. 105-106; Ex. 24]. Ultimately, Plaintiff was assigned as lead investigator for the case, and in drafting his report, he accurately relayed conversations that he had with the witnesses and/or suspects, including the fact that the suspects received information from Deputy Pascher through her boyfriend, Butler, that law enforcement officers were on the way to the shop, and that was why the stolen parts were moved. [Ex. 100, ¶ 28; Ex. 101, p. 238-239; Ex. 104, p. 107-108, 120-121; Ex. 24]. Initially, at Buchhofer's direction, Plaintiff did not identify Butler in the report, but as the investigation unfurled, Plaintiff was convinced that Butler relayed the information from Deputy Pascher that law enforcement was on the way. [Ex. 100, ¶ 29; Ex. 104, p. 112-114]. Assistant State's Attorney John Dommerich testified that he would have required Plaintiff to name Butler prior to the arrests made in the case. [Ex. 118, p. 24-25, 61].

In addition, because Butler obtained the information from Deputy Pascher, Plaintiff spoke with Lt. Buchhofer about her possible involvement, and together, they spoke with Lt. Rowe in IA.

[Ex. 100, ¶ 31; Ex. 104, p. 111-112]. ASA Dommerich testified that Plaintiff's failure to disclose Pascher's involvement which was confirmed by multiple witnesses would be concerning. [Ex. 118, p. 95-96, 103, 106-107]. Rowe attempted to pass off his responsibility in investigating Pascher to Plaintiff, an investigation that Plaintiff was not authorized to conduct. [Ex. 100, ¶ 32; Ex. 104, p. 114, 121-122]. Rowe refused to investigate Pascher until the SAO requested clarification from Defendants as to Pascher's involvement. [Ex. 100, ¶ 34; Ex. 104, p. 121-123; Ex. 118, p. 18-19, 53-55].

On February 2, 2017, Plaintiff applied for road patrol sergeant. [Ex. 100, ¶ 35; Ex. 14, 2/2/17]. Lieutenant Shawn Reed, told Plaintiff of the 3 applicants for the 2 open positions, Plaintiff scored the highest on the exam, as well as the interview. [Ex. 100, ¶ 37; Ex. 101, p. 147-152]. Although Lt. Reed was related to one of the applicants, he was allowed to sit on the interview panel. [Ex. 100, ¶ 38; Ex. 101, p. 147-152]. Plaintiff was not promoted. [Ex. 100, ¶ 39].

In March, 2017, Plaintiff applied for a position with the Seminole Police Department. [Ex. 100, ¶ 40; Ex. 101, p. 184-186].

On March 21, 2017, Plaintiff and Detective Louis Scowden, were driving on State Road 80 in unmarked vehicles with no lights or sirens installed when they encountered a vehicle doing well below the speed limit in the left lane, and Plaintiff noted that the driver was using a cell phone. [Ex. 100, ¶ 41; Ex. 101, p. 160-163; Ex. 109, p. 23-26; Ex. 17]. When Plaintiff gestured for the car to move out of the passing lane, the driver cursed at Plaintiff and flipped Plaintiff off; then, the driver began following Plaintiff and Detective Scowden, recklessly changing lanes and attempting to video record the incident. [Ex. 100, ¶ 42; Ex. 109, p. 23-26]. Both Plaintiff and Scowden called the encounter in to dispatch, requesting a marked vehicle to respond to the incident, and Plaintiff

11

relayed the incident to Buchhofer while Detective Scowden followed the vehicle. [Ex. 100, ¶ 43; Ex. 101, p. 160-163; Ex. 109, p. 23-26; Ex. 17]. As Scowden attempted to get a statement from the driver, Deputies Lopez and Echevarria responded to the call, and Echevarria dismissed Scowden and while he took the driver's statement. [Ex. 109, p. 26-28; Ex. 17]. The driver, Joe Valdez, filed a citizen complaint against Plaintiff in which he accused Plaintiff of flipping him off and cursing at him during the encounter. [Ex. 15]. Chief Nelson personally went to Valdez' residence to obtain the complaint. [Ex. 111, p. 50-52; Ex. 15].

Nelson then referred the complaint to Sergeant Rowe in IA to investigate Plaintiff, although normal policy is to refer citizen complaints for a supervisor inquiry before commencing an IA investigation. [Ex. 100, ¶ 46; Ex. 104, p. 44-47; Ex. B7]. The allegations against Plaintiff were deemed unsubstantiated, but Nelson instructed Buchhofer to discipline Plaintiff for his driving during the encounter. [Ex. 104, p. 54-61; Ex. B7]. Although Scowden was traveling in a separate vehicle and traveled similar speeds, Scowden was not subject to an investigation or to discipline. [Ex. 104, p. 32-33; Ex. 109, p. 29-31].

As a result of the IA investigation, Plaintiff's application to the Seminole Police Department was not processed. [Ex. 100, ¶ 50; Ex. 101, p. 184-186].

On April 14, 2017, Plaintiff filed a memorandum to report that Sergeant Echevarria refused him back up assistance. [Ex. 100, ¶ 51; Ex. 101, p. 195-201; Ex. 18]. Although Deputy Hunter Kearns told Plaintiff he would bring a jack right away, within minutes, Deputy Kearns texted Plaintiff to say that he was told not to come, and Deputy Kearns later told Plaintiff that Sgt. Echevarria ordered him not to assist Plaintiff. [Ex. 100, ¶ 52; Ex. 101, p. 195-201; Ex. 107, p. 13-16]. Only after Lt. Reed called and ordered that someone assist Plaintiff did Deputy Hudson

respond to Plaintiff's call. [Ex. 100, ¶ 53; Ex. 107, p. 16-17; Ex. 18].

On May 5, 2017, Plaintiff filed a written request to meet with Chief Nelson. [Ex. 100, ¶ 54; Ex. 19]. Although Chief Nelson had an open-door policy, he refused Plaintiff's request. [Ex. 100, ¶ 55; Ex. 19; Ex. 110, p. 46-49].

On July 19, 2017, Lt. Buchhofer issued Plaintiff an evaluation scored 93.3%; Chief Nelson again questioned Buchhofer. [Ex. 100, ¶ 57; Ex. 104, p. 34-35; Ex. 6].

On September 18, 2017, Chief Nelson told a family that Plaintiff was a horrible detective; Chief Nelson relayed to Lt. Buchhofer, that the family was irate with Plaintiff. [Ex. 100, ¶ 58; Ex. 101, p. 213-218; Ex. 104, p. 85-88; Ex. 20]. At no time did the family indicate to Plaintiff that they were upset with him. [Ex. 101, p. 213-218; Ex. 20].

On December 11, 2017, Plaintiff filed a memorandum after Plaintiff requested a backup for a traffic stop. [Ex. 100, ¶ 60; Ex. 21]. After Plaintiff requested backup, Deputy Germane Garcia told Plaintiff he would respond, but Sgt. Nick Reed intervened and asked Plaintiff why he needed backup; later, Deputy Garcia told Plaintiff that Sgt. Reed instructed him not to respond. [Ex. 100, ¶ 61; Ex. 101, p. 223-229]. Reed informed Plaintiff that his subordinates were not to assist with traffic stops and accused Plaintiff of disrespecting him and his authority. [Ex. 100, ¶ 62; Ex. 101, p. 223-229; Ex. 21]. Reed told Plaintiff he had recorded the encounter without Plaintiff's knowledge or permission, in violation of statute and Defendants' policies. [Ex. 100, ¶ 63; Ex. 21].

In March, 2018, Plaintiff closed his investigation for the stolen and burned truck, and sought the arrest of 3 suspects; the SAO determined that there was sufficient evidence to bring charges against 6 other individuals, and therefore, Plaintiff completed additional warrant affidavits for all 9 suspects. [Ex. 100, ¶ 64; Ex. 101, p. 240-243; Ex. 104, p. 110-111, 126-127; Ex. 118, p.

9-12, 31-36, 43-47, 67-68, 96-97, 100; Ex. 65, p. 1-13, 52-101].

Only after Plaintiff sought arrest warrants for the suspects and the SAO demanded clarification as to Pascher's involvement in the incident did Defendants open an IA investigation against Pascher; Lt. Rowe interviewed Plaintiff multiple times relative to the investigation. [Ex. 100, ¶ 65; Ex. 104, p. 109-112, 121-123; Ex. 118, p. 18-20, 22-23, 53-55, 75-76, 82-83; Ex. 26].

On May 16, 2018, the Palm Beach County SAO closed the corruption investigation. [Ex. 53].

In June, 2018, Plaintiff applied for a position with the Palm Beach County Sheriff's Office ("PBCSO"). [Ex. 100, ¶ 66; Ex. 101, p. 229-230].

On June 25, 2018, Lt. Rowe sought authorization from Chief Deputy Nelson to bring an IA investigation against Plaintiff for including Pascher's and Butler's names in the offense report. [Ex. 54]. Chief Nelson granted permission on June 27, 2018, suggesting a number of charges against Plaintiff, including Plaintiff's failure to report his suspicions of Pascher's wrongdoing to the agency. [Ex. 100, ¶ 31-34, 65; Ex. 104, p. 109-112; Ex. 57].

On June 28, 2018, Lt. Rowe served Plaintiff with a notice of the investigation. [Ex. 100, ¶ 67; Ex. 27]. Rowe interviewed Plaintiff on July 30, 2018, and Plaintiff supplied Rowe with the same information which he provided during Pascher's IA investigation. [Ex. 100, ¶ 68; Ex. 26, p. 7-8; Ex. 29, p. 11-12]. Rowe failed to inform Plaintiff's supervisor, who was actually part of the stolen truck investigation, of the allegations against Plaintiff, and no supervisor inquiry occurred prior to the IA investigation. [Ex. 100, ¶ 69; Ex. 101, p. 246-249].

After Rowe initiated the IA investigation, ASA Dommerich dropped all charges against the suspects because Plaintiff's integrity was questioned by the investigation. [Ex. 118, Dommerich's

14

Dep., p. 14-15, 45-46, 66, 83].

In the summer of 2018, Rowe told a coworker, Nicholas Todd, that he had everything in place to get rid of Plaintiff. [Ex. 111, p. 46-47].

Because of the IA investigation, Plaintiff was not hired by PBCSO. [Ex. 100, ¶ 70; Ex. 101, p. 231].

Rowe scheduled a tentative second interview with Plaintiff for August 20, 2018, but Plaintiff and his attorney asked for a different date; when no final date was reached, Rowe demanded Plaintiff appear on August 20, 2018, but eventually agreed to reschedule for August 27, 2018. [Ex. 100, ¶ 72-73; Ex. 30; Ex. 37, p. 6; Ex. 35; Ex. 65, p. 15-16].

On September 7, 2018, Rowe served Plaintiff with an amended notice of investigation including a charge that Plaintiff failed to comply with a direct order of an IA Investigator for his failure to appear during the tentatively scheduled August 20, 2018 interview. [Ex. 100, ¶ 74; Ex. 31].

On November 27, 2018, Defendants served Plaintiff with a notice of proposed discipline, terminating Plaintiff, based on Rowe's IA findings. [Ex. 100, ¶ 75; Ex. 32; Ex. 65, IA p. 14-22]. In rendering his findings, Rowe determined that Plaintiff did not violate policy for failing to timely report his suspicions of Pascher's involvement. [Ex. 57; Ex. 65, p. 14; Ex. 104, p. 109-112].

The SAO had no concerns or criticisms with Plaintiff's investigation. [Ex. 118, p. 7-9, 12-14, 23-24, 36-38, 79-80, 87-89, 91-93]. In fact, ASA Dommerich challenged many of Rowe's findings. [Ex. 118, p. 8-9, 12-14, 24-25, 27-28, 30-31, 34-36, 40-45, 61, 67-68, 74-75, 79, 87-89, 96-97; Ex. 65, p. 15-19].

Rowe determined that Plaintiff violated policy by failing to supplement his investigation

15

with information he obtained from Pascher after the investigation was completed and Plaintiff had submitted the warrant affidavits to the SAO; ASA Dommerich testified that Plaintiff had no obligation to update him with Pascher's denial of her involvement in the case, and that he expected that Pascher would deny any involvement. [Ex. 118, p. 25-26, 53-55, 94-96, 106-107].

In fact, Rowe interviewed ASA Dommerich allegedly "off the record," but then, Rowe used statements made by ASA Dommerich in his investigation finding that Plaintiff violated policies, but failed to include all information ASA Dommerich provided. [Ex. 118, p. 50-51, 93-96; Ex. 65, p. 23; Ex. 119, p. 23].

Plaintiff was placed on administrative leave November 27, 2018. [Ex. 100, ¶ 77]. Before leaving the office, Lt. Buchhofer inventoried Plaintiff's patrol vehicle, against Rowe's wishes. [Ex. 104, p. 137; Ex. 112, p. 113-118].

Plaintiff filed a rebuttal to Rowe's findings on November 27, 2018. [Ex. 100, ¶ 79; Ex. 35]. In his rebuttal, Plaintiff disputed every allegation made by Rowe. [Ex. 100, ¶ 80-96; Ex. 35, p. 4-6, 9-23].

In December, 2018, Defendant Whidden told Lt. Buchhofer that he could not forgive Plaintiff for what he did to Defendant Whidden and his family. [Ex. 104, p. 155-158]. In addition, Lt. Shawn Reed told Lt. Buchhofer he would need a replacement for Plaintiff because Plaintiff was "pretty much gone." [Ex. 104, p. 138-139; Ex. D].

In January, 2019, Plaintiff attended a predisciplinary hearing before a panel, including Lt. Shawn Reed, and the panel voted unanimously to terminate Plaintiff. [Ex. 100, ¶ 80-97; Ex. 101, p. 262; Ex. 102, p. 15-16].

On January 25, 2019, Defendant terminated Plaintiff. [Ex. 100, ¶ 98; Ex. 33].

16

Nelson continued to find fault with Plaintiff even after his termination. [Ex. 104, p. 81-83].

Although Lt. Buchhofer recommended Plaintiff for multiple commendations, Defendants refused to issue them. [Ex. 104, p. 165-168].

Rowe told Defendant Whidden that if he made lieutenant and investigator, Rowe would go after certain individuals. [Ex. 113, p. 19-20]. Shortly after Rowe was promoted, he began targeting individuals who were vocal in their criticism of Defendants. [Ex. 113, p. 19-21; Ex. 114, p. 7-11; Ex. 115, p. 7-11, 14, 17-18; Ex. 111, p. 4-5, 27].

Rowe also investigated employees for applying to outside agencies. [Ex. 114, p. 7-11; Ex. 113, p. 25-26; Ex. 116, p. 3-4, 14-15; Ex. 109, p. 9-10, 12]. Rowe had a history of conducting flawed investigations and lying within his findings. [Ex. 117, p. 4, 8, 22-23, 33; Ex. 112, p. 85-88; Ex. N].

Defendant Whidden had a reputation for getting people whom he knew out of trouble. [Ex. 103, p. 22-24].

Other employees committed similar or more egregious violations and were not subjected to termination or even an IA investigation, including Sergeant Michael Favara. [Ex. 106, p. 81-82].

Lt. Buchhofer filed a complaint Detective Moore failed to secure a crime scene and then lied about his activities; no IA investigation occurred. [Ex. 63; Ex. 112, p. 25-28].

Rowe referred for a supervisory inquiry a citizen complaint to Lt. Buchhofer in which the complainant claimed that Detective Sergeant Moorehead documented a false confession; no IA investigation was initiated. [Ex. 60].

Lt. Buchhofer filed a complaint against Deputy Norwood for failing to search and properly

17

document evidence; again, no IA investigation was opened. [Ex. 61; Ex. 112, p. 25-28].

### III.  STANDARD FOR SUMMARY JUDGMENT

A plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. Smith v. Lockheed-Martin Corporation, 644 F.3d 1321, 1328 (11th Cir. 2011).

### IV.    PLAINTIFF EXHAUSTED ADMINISTRATIVE REMEDIES

Defendant Sheriff asserts that Plaintiff failed to preserve his claims regarding any adverse employment action prior to 180 days from the date that he filed his initial lawsuit on December 21, 2018.  First, this is not true.  Second, this matter was put to rest in ECF 39.  Plaintiff filed a Motion for Leave to Amend [ECF 26] to file an Amended Complaint, which was granted.  At the time Plaintiff filed his original complaint, he had been told he was going to be fired.  Around a month later, his termination was confirmed.  Defendants' argument that no adverse action occurred within 180 days prior to the date the original complaint was filed is specious.

Third, in addition to being told he was going to be fired, within the 180 days prior to Plaintiff filing this case, he was subjected to continuing harassment and retaliatory actions, including IA investigations, and termination that stemmed from the time that Plaintiff first spoke out against Defendant Sheriff and his agents. Rowe and Nelson, Defendant's agents, commenced an IA investigation into Plaintiff in late June, 2018, after summarily dismissing such an investigation against Deputy Pascher for tipping off suspects. The investigation was opened only about a month after the Palm Beach County SAO finally closed the corruption investigation into Defendant Sheriff and Nelson.

Moreover, the continuing violations doctrine allows for plaintiffs to present disparate

18

treatment or incidents of discrimination that fall outside the typical statute of limitations if the incidents show an ongoing unlawful employment practice. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002). Continuing violations are exceptions to the rule that one must file a claim. Short v. Immokalee Water & Sewer Dist., 165 F. Supp. 3d 1129, 1142 (M.D. Fla. 2016).

Here, Plaintiff filed his lawsuit in December, 2018, less than 180 days after Rowe started the final IA investigation into Plaintiff allegedly making false statements about Deputy Pascher. The investigation ended with Plaintiff receiving notice of his termination in November 2018 followed by his actual termination in January, 2019. Therefore, even for claims that predate 180 days before he filed his original lawsuit in December 2018, Defendant's retaliatory acts against Plaintiff represent continuing violations, and all acts by Defendant against Plaintiff fall under the continuing violations exception to the statute of limitations.

Defendant Sheriff also claims that Plaintiff's termination is subject to dismissal because Plaintiff failed to timely amend his complaint within 180 days after his termination, waiting until March, 2020 to amend the complaint to include the termination as an adverse employment action.

This was addressed in Plaintiff's Motion for Leave to Amend, ECF 26.  In his amended complaint, Plaintiff retained all factual allegations and claims he had filed originally. However, Plaintiff included the fact that his termination was finalized on January 25, 2019, a termination that he mentioned as recommended in the original complaint.

An amended complaint, even when filed after a statute of limitations has expired, relates back to an originally filed claim where "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original

pleading." Fed. R. Civ. P. 15(c)(1)(b). "If the claim asserted in the amendment arises out of the conduct or occurrence set forth in the original complaint, the amendment is given retroactive effect to the date the original complaint was filed." Sessions v. Rusk State Hosp., 648 F.2d 1066, 1070 (5th Cir. 1981)(citing FRCP 15(c)).

Although not explicitly required in Rule 15(c)(1)(B), courts inquire into whether the opposing party has been put on notice of the newly-asserted claim or claims raised in the amended pleading. The central purpose behind the relation back doctrine is fair notice of the possibility of new claims being asserted based on the same underlying conduct alleged in the initial complaint. "Although the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " Baldwin Cty. Welcome Ctr. v. Brown, 466 U.S. 147, 149 n. 3 (1984)(quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). As such, "[t]he critical issue in Rule 15(c) determinations," the Eleventh Circuit wrote, "is whether the original complaint gave notice to the defendant of the claim now being asserted." Moore v. Baker, 989 F.2d 1129, 1131 (11th Cir. 1993) (citing Woods Expl. & Producing Co., Inc. v. Aluminum Co. of Am., 438 F.2d 1286, 1299-1300 (5th Cir. 1971)).

Without question, Plaintiff's notice of proposed termination is in his original complaint and Plaintiff, quite frankly, thought that this matter was put to rest by this Court in ECF 39. Defendant cannot in good faith argue that it was not on notice of Plaintiff's termination in his original complaint.  [See ECF 26, 39].  Plaintiff invokes the relation back doctrine for his termination to his original complaint filed in December, 2018.

## V.  WHISTLEBLOWER RETALIATION

The intent of the Florida Legislature in enacting the Whistleblower Act was to prevent the government from retaliating against employees who report any abuse or neglect of duty by a public employee. See Ujcic v. City of Apopka, 581 So.2d 218, 219 (Fla. 5th DCA 1991). The Florida Supreme Court made it clear that the Act should be interpreted liberally, holding that it is a "remedial statute designed to encourage the elimination of public corruption by protecting public employees who 'blow the whistle'… the statute should be construed liberally in favor of granting access to the remedy." Irven v. Department of Health and Rehabilitative Services, 790 So.2d 403, 405-06 (Fla. 2001)(quoting Martin County v. Edenfield, 609 So.2d 27, 29 (Fla. 1992)). In overturning the lower court's narrow interpretation of §112.3187, the Court in Irven stated, "The statute could not have been more broadly worded." Irven at 406(internal citations omitted).

To establish a prima facie case of whistleblower retaliation, a plaintiff must show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) a causal relationship between the two events. See Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008).[1] The burden then shifts to the employer to articulate a non-retaliatory basis for its employment action. See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). If the employer meets this burden, the inference of retaliation drops out of the case and the plaintiff must show by a preponderance of the evidence that the proffered reasons are pretextual. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).

**A.  Protected Speech**

The "Whistle-blower's Act" requires that Plaintiff disclose one or more of the violations or

---

[1]  Plaintiff's whistleblower claim is analyzed under the same standard as Title VII retaliation claims. See Allocco v. City of Coral Gables, 221 F.Supp.2d 1317, 1367 (S.D. Fla. 2002).

21

actions enumerated in the statute in order to have whistle-blower protection. § 112.3187(5), Fla. Stat.; Rosa v. Dept. of Children and Families, 915 So.2d 210 (Fla. 1st DCA 2005). Protection is also given if a public employee discloses "any other abuse." §112.3187(2), Florida Statutes. The "nature of information disclosed" is a question of fact. Rice-Lamar v. City of Fort Lauderdale, 853 So.2d 1125, 1133 (Fla. 4th DCA 2003) (reversing order of summary judgment on basis of, among other things, whether plaintiff disclosed any item required under §112.3187(5)).

Plaintiff reported the Defendants' illegal interference in a legitimate arrest when he was initially deposed in the civil hit and run case in August, 2016. Plaintiff then went on to participate in the FDLE and SAO investigations which arose from his original testimony. Thereafter, when Plaintiff began experiencing harassment from supervisors and coworkers, he filed written complaints with his chain of command.

The disclosure of information related to possible abuse and/or retaliation by Plaintiff's supervisors clearly falls within §112.3187(5). As important, it was the supervisors' ultimate decision to terminate Plaintiff, the very people whom Plaintiff reported for corruption and interference with his arrest and investigation of Richard Smith.

Plaintiff's disclosures related to safety violations by supervisors and corruption by officials are certainly actionable and make this case materially indistinguishable from Hussey v. City of Marianna, Fla., 2011 WL 3294827 (N.D. Fla. 2011). In Hussey, the Court held that an agency's violation of its own policies is "gross mismanagement" under § 112.3187. "At a minimum, a [governmental entity's] personnel policies guide [its] personnel decisions. Straying from those policies may be an indication of managerial abuse and because of the [Whistle-blower's Act] policy in favor of a broad interpretation of the statute, employees are afforded protection for

22

reporting suspected violations of those policies." Id. at *1.

Actionable disclosures under §112.3187(5), Florida Statutes, are not restricted to acts which threaten "the health, safety, or welfare of the public at large." Hutchison v. Prudential Insurance Co., 645 So.2d 1047, 1049 n.4 (Fla. 3d DCA 1994); see also King v. State of Florida, 650 F.Supp.2d 1157, 1164 (N.D. Fla. 2009)(plaintiff's complaint about a supervisor's alleged bias in defendant's hiring process for law enforcement officers was a protected whistle-blower disclosure.

The court in Shuck v. Clark, 2007 WL 676198 (M.D. Fla. 2007), also recognized that verbally disclosing actual or suspected violations of laws or rules during an investigation is whistle-blowing activity. Shuck, the plaintiff, was interviewed by the defendant's City's Employee Relations Department. Id. at *2. During the interview, Shuck disclosed that her supervisor refused to permit employees to record compensatory time, implicating the Fair Labor Standards Act. Id. The court ruled that her divulging this information while participating in a governmental inquiry was protected under the Whistle-blower's Act. Id. at *4-5.

Defendant not only challenges the content of the information that Plaintiff disclosed, but also to whom the information was disclosed. Defendant claims that Plaintiff's participation in the original deposition was not protected activity because the deposition was taken in a private civil matter and the information was not given to the Sheriff, himself, or to another "appropriate local governmental official." §112.3187(6), Fla. Stat. However, Defendant ignores the fact that Plaintiff's original testimony led to a corruption investigation conducted by the SAO, and to that end, Plaintiff participated by giving statements to FDLE, the oversight agency of Defendant Sheriff.

23

Moreover, Defendant ignores the many other instances of protected activity, including the memoranda Plaintiff filed.

Clearly, reporting circumstances which have absolutely no effect on the public - even those which solely affect the plaintiff - can be protected activity under the Act.  But here, Plaintiff identified severe safety violations and corruption by Defendant Sheriff and his agents. Those disclosures are protected.

Plaintiff has satisfied the first element of his *prima facie* case.

## C.  Causal Connection

To establish a causal connection, a plaintiff must show that the protected activity and the adverse action "are not completely unrelated." Wideman v. Wal-Mart Stores, Inc., 141 F. 3d 1453, 1457 (11th Cir. 1998). Where the protected speech and adverse employment action are close in time, causation may be inferred.  See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)("burden of causation can be met by showing close temporal proximity). Plaintiff filed complaints against supervisors. Thereafter, the supervisors about whom Plaintiff complained treated Plaintiff coldly, allowed his coworkers to harass him, disciplined him, investigated him, and then fired him. This period of retaliatory harassment, from his initial reporting through subsequent written complaints prepared through November 2018, ended only after he was actually fired in January 2019. These retaliatory actions are actionable. Wideman, 141 F. 3d 1456-57; Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010)(en banc)("workplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context.").

24

Only about a month after the SAO investigation into Defendant Sheriff and Nelson was closed, Nelson approved an IA investigation into Plaintiff relative to Deputy Pascher. Although Buchhofer and Plaintiff reported the involvement, Rowe ignored the reports until the SAO brought the matter to Defendant's attention, and then completed a quick investigation to satisfy the SAO, while manufacturing excuses to investigate Plaintiff instead.

To the extent there were gaps between Plaintiff's protected speech and adverse action, the adverse actions can be viewed as Defendant's "first opportunity" to exact revenge, accounting for any lapse in time between Plaintiff's protected conduct and the adverse action.  See Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004)(holding that plaintiff made prima facie case despite lapse in time in that jury could reasonably conclude failure to hire was the first opportunity to retaliate); Porter v. California Dep't of Corr., 419 F.3d 885, 895 (9th Cir. 2005)(temporal delay due to fact that harasser unable to exact retaliation until promotion to supervisory position); Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997)(stating that temporal gap may be explained through "valid reasons" that do not disprove causation).

Here, Plaintiff's coworkers and supervisors harassed him from the time that the investigation started. Defendant's agents waited until the corruption investigation was officially closed in May 2018, and within a month, opened an IA investigation on Plaintiff that was supposed to be about his coworker, Pascher, and which led to his termination.

Plaintiff has made his *prima facie* case of retaliation.

## VI.  THE FIRST AMENDMENT

"The First Amendment protects a public employee's right, in certain circumstances, to speak (1) as a citizen (2) addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410,

417 (2006). Expanding on the "as a citizen" requirement, the <u>Garcetti</u> court opined that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." <u>Id.</u>, 547 U.S. at 421.

During this first stage of the <u>Pickering</u> analysis, the Court must determine whether Plaintiff's speech may be "fairly characterized as constituting speech on a matter of public concern." <u>Rankin v. McPherson</u>, 483 U.S. 378, 384 (1987) (quoting <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983)). The Court examines the content, form, and context of the employee's speech to determine whether it addresses a matter of public concern. <u>Bryson</u>, 888 F.2d at 1565; <u>Rankin</u>, 483 U.S. at 384-85; <u>see</u> <u>generally</u> <u>Kurtz v. Vickrey</u>, 855 F.2d 723 (11th Cir. 1988). In doing so, the Court must ask "whether the main thrust of the speech in question is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was." <u>Mitchell v. Hillsborough, County</u>, 468 F.3d 1276, 1282 (11th Cir. 2006) (internal quotation marks and citations omitted).

"Exposing governmental inefficiency and misconduct is a matter of considerable significance," and here, Plaintiff was concerned that Defendant Sheriff was interfering with investigations and arrests. Other witnesses testified that the Sheriff had a history of telling his deputies to let people go, if he knew them. In Plaintiff's case, however, it was not a mere traffic citation for which Richard Smith did not face arrest or prosecution, but the hit and run of a minor. <u>Garcetti</u>, 547 U.S. at 425. To fall within the realm of the "public concern," an employee's speech must "relat[e] to a[ ] matter of political, social, or other concern to the community." <u>Connick v. Meyers</u>, 461 U.S. 138, 146 (1983). "In determining whether the speech touches on a matter of public concern, courts look to the 'content, form, and context of a given statement, as *revealed by*

*the whole record*, and determine whether the 'main thrust' of the speech in question is essentially public in nature or private.'" Wilbourne v. Forsyth County School Dist., 306 Fed. Appx. 473, 477 (11th Cir. 2009). The entirety of the record supports that Plaintiff spoke on matters of public concern when he reported issues related to government misconduct.

The fact that Plaintiff made his speeches to other government agencies, and not in a public setting is not necessarily determinative on the issue of whether Plaintiff's speech related to a matter of public concern. See Cook v. Gwinnett County School Dist., 414 F.3d 1313, 1319 (11th Cir. 2005) (holding that the mere fact that his speech was made to coworkers or to supervisors rather than directed at the general public does not remove the speech from the category of public concern); Hartwell v. City of Montgomery, 487 F. Supp. 2d 1313, 1323 (M.D. Ala. 2007) (holding that where a firefighter complained about a coworker's potentially offensive confederate flag tattoo, his internally filed complaint regarded a matter of public concern).

The issues Plaintiff spoke about – public safety, corruption, harassment by law enforcement officers – were clearly matters of public concern. Defendant's retaliation against Plaintiff for engaging in that speech demonstrates additional misconduct that "'lies so obviously at the very core of what the [First Amendment] prohibits that the unlawfulness of the conduct was readily apparent to [Defendant], notwithstanding the lack of fact-specific case law.'" See Fils v. City of Aventura, 647 F.3d 1272, 1291 (11th Cir. 2011) (cited in Krika v. City of DeFuniak Springs, Florida, case no. 3:16cv265-RV/CJ, Doc. 38, pgs. 11-12 (N.D. Fla. September 15, 2017)). Moreover, a government employee's reporting of co-employee misconduct constituted speech on a matter of public concern. Phillips v. City of Dawsonville, 499 F.3d 1239 (11th Cir. 2007).

Following Garcetti, the Eleventh Circuit has modified the analysis of the first step of the

Pickering test, adding the additional requirement that the government employee must speak as a

public citizen, rather than in his capacity as an employee. Boyce, 510 F.3d at 1342 (citing Garcetti

v. Ceballos, 547 U.S. 410 (2006)); Battle v. Board of Regents, 468 F.3d 755, 760 (11th Cir. 2006).

The question under Garcetti is whether the speech at issue is itself ordinarily within the scope of

an employee's duties, not whether it merely concerns those duties."  Lane v. Franks, 134 S.Ct.

2369, 2379 (2014); see also, Flora v. County of Luzerne, 776 F.3d 169, 176-77 (3d Cir. 2015)

(noting that Lane made clear that the "related to" test is erroneous and protected speech can relate

to plaintiff's job).

First, this case is virtually indistinguishable from the facts in Lane v. Franks, where the

plaintiff was an employee who was placed under subpoena by a third party and testified against

his employer in a corruption trial. 134 S. Ct. 2373-75.   He was then fired and sued for First

Amendment Retaliation.  The Court held that

> sworn testimony in judicial proceedings is a quintessential example of citizen speech for
> the simple reason that anyone who testifies in court bears an obligation, to the court and
> society at large, to tell the truth. That obligation is distinct and independent from any
> separate obligations a testifying public employee might have to his employer. The Eleventh
> Circuit read *Garcetti* far too broadly in holding that Lane did not speak as a citizen when
> he testified simply because he learned of the subject matter of that testimony in the course
> of his employment.

Id. at 2373.

Plaintiff, like the plaintiff in Lane, was placed under subpoena, he testified against his

employer and disclosed corruption by Defendant Whidden, he was then subjected to a series of

adverse actions and fired shortly after Whidden commented to Plaintiff's supervisor that he could

never forgive Plaintiff for what he did to Whidden's family.  As the court held in Lane, it was not

part of his job duties to respond to a subpoena and testify against his agency.  Id. at 2379.

28

Second, Plaintiff's job duties did not include performing internal affairs investigations, reporting employee misconduct, or supervision of any employee.

Here, Defendant's agents did not question Plaintiff about various complaints that he made, did not investigate the complaints in any way. The result of Plaintiff's complaints was hostility, the IA investigation and then his termination for making the reports of policy, procedural and statutory violations.

"[T]he third stage of the analysis requires [Plaintiff] to show that [his speech] was a substantial motivating factor in his termination." Moss, 782 F.3d at 618 (citation omitted). As shown above, there is considerable evidence disputing Defendant's contentions that Plaintiff was not terminated for reporting abuses by employees and supervisors. Once Plaintiff makes this showing, "the burden shifts to [Defendant] to prove that it would have terminated [Plaintiff] even in the absence of his speech." Id. Importantly, "[b]ecause these final two issues, which address the causal link between [Plaintiff's] speech and his termination, are questions of fact, a jury resolves them unless the evidence is undisputed." Id.

However, as stated above, after ignoring Plaintiff's reports, he was terminated but other employees who engaged in misconduct were not fired. Plaintiff's supervisor, Buchhofer, requested investigations into other employees for such misconduct as misplacing and/or failing to document evidence, but no IA investigation was opened. Buchhofer also reported Pascher as possibly leaking information to suspects, but again, no investigation was opened until the SAO demanded it, and even then, the investigation was perfunctory. Meanwhile, Plaintiff was investigated based on a citizen complaint solicited by Nelson, while normally citizen complaints are reviewed by a supervisor.

29

While the IA investigation against Pascher was cursory, Rowe used it to create evidence against Plaintiff, and then, with Nelson's blessing, opened another IA investigation against Plaintiff based on trumped up and false allegations, as shown above.

At the very least, these disputed issues of material fact show that Defendant would not have taken the same action against Plaintiff had he not engaged in protected speech. Summary judgment should be denied.

## VII.   QUALIFIED IMMUNITY

Defendant Sheriff next argues that he is entitled to qualified immunity because Plaintiff's rights were not clearly established. Government officials may be shielded from liability for civil damages on a First Amendment retaliation claim <u>only</u> if their actions did not violate "clearly established . . . constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). First, the court must determine whether the facts "taken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a constitutional right[.]" <u>Cook v. Gwinnett County Sch. Dist.</u>, 414 F.3d 1313, 1315 (11th Cir. 2005) (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)). As demonstrated above, <u>supra</u>, Defendant did indeed violate Plaintiff's First Amendment rights. Second, if a constitutional right was violated under the plaintiff's version of the facts, the court must then determine "whether the right was clearly established." <u>Id.</u>

The law is clearly established, and was in 2018, that a public employer may not retaliate against an employee for an employee's exercise of constitutionally protected speech. <u>Lane v. Franks</u>, 134 S.Ct. 2369 (2014); <u>Boyce v. Andrew</u>, 510 F.3d 1333, 1341 (11th Cir. 2007); <u>Cook</u>, 414 F.3d at 1318; <u>Rankin v. McPherson</u>, 483 U.S. 378, 383 (1987); <u>Connick v. Myers</u>, 461 U.S. 138,

140–42 (1983). Indeed, "[t]he law is clearly established that an employer may not demote or discharge a public employee for engaging in protected speech." Travers v. Jones, 323 F.3d 1294, 1295 (11th Cir. 2003).

It is well settled that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick, 461 U.S. at 142. Moreover, the Eleventh Circuit has stated that "[i]t is hard to imagine any combination of government interests sufficient to outweigh Appellant's strong interest in informing the public about policies he believed were dangerous to the City's citizens." Beckwith v. City of Daytona Beach Shores, Fla., 58 F.3d 1554, 1564 (11th Cir. 1995). Plaintiff's speech clearly falls under this description. Indeed, Defendants' misconduct "'lies so obviously at the very core of what the [First Amendment] prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law.'" Fils v. City of Aventura, 647 F.3d 1272, 1291 (11th Cir. 2011).

However, even utilizing the "materially similar" method, the "existing case law does not necessarily have to be 'directly on point,'" but "it must be close enough to have put 'the statutory or constitutional question beyond debate.'" Gaines v. Wardynski, 871 F.3d 1203, 1209 (11th Cir. 2017) (citation omitted); see also Ratliff v. DeKalb County, 62 F.3d 338, 340 (11th Cir. 1995) ("The right to be free from retaliation is clearly established as a *First Amendment* right"); Travers v. Jones, 323 F.3d 1294, 1295 (11th Cir. 2003), ("The law is clearly established that an employer may not demote or discharge a public employee for engaging in protected speech").

As demonstrated above, Defendant Sheriff did indeed violate Plaintiff's First Amendment rights, on grounds which were, at the time Defendant and his agents committed their retaliatory

acts, clearly established. Defendant terminated Plaintiff after he engaged in protected expression, and thus, he is not entitled to qualified immunity.  <u>See</u> <u>Lane</u>, <u>supra</u>  (law was not clearly established on facts of <u>Lane</u> but has been since <u>Lane</u> was decided in 2014).

## VIII.  <u>PRETEXT</u>

In order to show pretext, Plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision… [Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981). In evaluating a summary judgment motion, the district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1538 (11th Cir.1997). "[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." <u>Howard v. BP Oil Co.</u>, 32 F.3d 520, 526 (11th Cir.1994).

Here, Defendant's "legitimate" reasons for denying Plaintiff a promotion, for refusing him safety equipment, for commencing IA investigations and discipline against him and for terminating him are belied by the facts. First, Plaintiff did not violate any policies and did not refuse to complete any duties. Plaintiff's supervisor, Buchhofer, spoke in his favor during both IA investigations, and in fact, raised Pascher's involvement in the truck theft to Rowe well before Rowe ever bothered to investigate her. Buchhofer witnessed Pascher speaking to her boyfriend

who was at the shop where stolen parts were found, and Buchhofer assigned Plaintiff to take over the investigation. ASA Dommerich also testified that there were no errors in Plaintiff's investigation. In addition, Buchhofer testified that the IA investigation about the citizen complaint violated Defendant's policy because it was not sent for a supervisory review prior to starting the IA investigation.

Defendant also claims that Plaintiff scored the lowest of the 3 candidates for the sergeant position. However, Plaintiff was told by Shawn Reed that he had scored the highest on the written exam and had done well on the interview, while one candidate failed the exam. Despite Lt. Reed's information, the candidate who failed the exam was promoted over Plaintiff.

A reasonable jury could certainly find that these excuses were crafted as pretext for Defendant's discriminatory conduct.  See Tidwell v. Carter Products, 135 F.3d 1422, 1428 (11th Cir. 1998)(observing that identification of inconsistencies can be evidence of pretext); see also EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994)(where there were discrepancies in the defendant's explanations for the plaintiff's layoff, a reasonable juror could infer that the explanations were pretextual, *post hoc*, rationalizations to combat evidence of discrimination); Metzler v. Fed. Home Loan Bank of Topeka, 464 F. 3d 1164, 1177 (10th Cir. 2006)(citing cases for the proposition that "suspicious timing… of documentation - after the fact and in anticipation of litigation - reasonably gave rise to an inference of pretext"). Here, Defendants made Plaintiff's working environment miserable after he was dubbed a whistleblower and snitch.

The Defendant cites violation of work rules or poor performance to justify Plaintiff's discipline, the plaintiff can and has demonstrated that the defense is pretextual if he submits evidence that (1) he did not engage in the work rule or particular poor performance; or (2) if he

33

did violate the rule or engage in that poor performance, other employees outside his protected class engaged in similar acts but were treated differently. See Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1363 (11th Cir. 1999).

Plaintiff did not violate workplace rules as he has shown above. Also, Plaintiff's fellow deputies are "comparable," in that they were all subject to the same policies and discipline. It is well established that a plaintiff generally may show pretext by presenting evidence that a similarly situated employee outside the protected class was treated more favorably. See Berg v. Fla. Dep't of Labor and Employment Sec., Div. of Vocational Rehab., 163 F. 3d 1251, 1255 (11th Cir. 1998)(inconsistent application of policies may be evidence of discrimination). The trier of fact is permitted to consider the evidence establishing a plaintiff's *prima faci*e case and inferences drawn therefrom on the issue of whether the defendant's proffered reason is pretextual. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000).

Supervisors allowed other employees to commit misconduct without subjecting them to IA investigations like Plaintiff. In fact, other citizen complaints went through supervisory review prior to having IA investigations opened, and even when supervisors, like Buchhofer, recommended IA investigations for such things as failing to document or retrieve evidence, IA investigations were not always conducted. Only Plaintiff, who reported corruption and misconduct, was subjected to such extreme discipline by the very individuals whom he reported.

Plaintiff and Buchhofer reported Pascher for disclosing information about an investigation to suspects, but Rowe refused to initiate an investigation until the SAO demanded one. Even then, the investigation was rushed. Meanwhile, Rowe took statements made during the investigation to target Plaintiff, and the ensuing investigation resulted in Plaintiff's termination.

Witnesses testified that Rowe used IA investigations as a tool to target and get rid of undesirable individuals. He twisted statements, made his own false statements and conclusions in his findings. In one case, he determined that a volunteer, had violated policy by performing outside employment, and ignored the outside employment listed on her application in 2008.

In Demers v. Adams Homes of Northwest Florida, 321 Fed. Appx. 849, 853-54 (11th Cir. 2009), this Court ruled that the jury could accept such "me too" circumstantial evidence to find discriminatory intent on behalf of the employer.  See id. at 854 (citing Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1285 (11th Cir. 2008)).

Rowe asked Defendant Sheriff to give him a promotion and that he would clean house, and Rowe followed through once he made IA investigator.

In the Summer 2018, Rowe told a friend that he had enough to get Plaintiff fired. Then, he proceeded to conduct an IA investigation fraught with false statements, missing evidence and his own opinions. Defendant Whidden told Buchhofer that he could not forgive Plaintiff for the hurt Plaintiff caused him and his family. Shawn Reed told Buchhofer that Plaintiff was as good as fired, weeks before he sat on Plaintiff's predisciplinary panel and voted to fire him. Plaintiff's termination was a foregone conclusion as soon as the SAO closed the corruption investigation against Defendant Whidden and Chief Nelson in May 2018.

Genuine issues of fact remain as to whether Defendant's articulated non-discriminatory reasons are pretext for retaliation.

## IX. CONCLUSION

Summary judgment should be denied on all claims, for the reasons stated above.

Respectfully submitted,


/s/  Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, Florida 32301
(850) 383-4800 (telephone)
(850) 383-4801 (facsimile)

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

CM/ECF to all counsel of record this 6th day of October 2020.


/s/  Marie A. Mattox
Marie A. Mattox

36