**AFFIDAVIT**

STATE OF FLORIDA            )
COUNTY OF HENDRY            )

BEFORE ME, the undersigned authority, personally appeared **Sgt. Joshua Woods**, who, being first duly sworn, states the following:

1.      I am over 18 years of age and am providing this statement voluntarily based upon my personal knowledge.

2.      I am currently employed as a Sergeant in the Criminal Investigations Division ("CID") for the Hendry County Sheriff's Office.

3.      In the fall of 2015, I was the West District Road Patrol Lieutenant. As lieutenant, Vernon Speak was a subordinate deputy within my chain of command. Speak reported to then Sgt. Shawn Reed, and Sgt. Reed reported to me.

4.      In September of 2015, I learned that Speak was involved as the primary patrol deputy in an alleged hit and run. I was not involved in the incident nor was I present on-scene.

5.      I do not recall how I learned of the incident but, as Speak's supervising lieutenant, I would have reviewed Speak's report. I also recall speaking with Speak about his investigation after he prepared his report. During my conversations with Speak, he expressed to me that he was upset because Sheriff Whidden had instructed him not to arrest the driver.

6.      After speaking with Speak, I spoke with Sheriff Whidden. During my conversation with Sheriff Whidden, he expressed that Speak did not have probable cause to arrest the driver and appeared upset at how Speak had handled the incident. I never asked Sheriff Whidden why he was upset, but I believed it related to Speak's insistence that he had probable cause to arrest the driver.

1

**HCSO/SPEAK
DEF002726**

7.     During my conversation with the Sheriff, I offered my assistance since Speak was one of my subordinates. Sheriff Whidden declined and stated he would handle it.

8.     Shortly thereafter, I spoke with Chief Nelson in his office and expressed my belief that the case should be sent to the State Attorney's Office for review. At the time, Chief Nelson told me that the sheriff did not feel like it needed to go to the State Attorney's Office due to a lack of probable cause and told me to close the case.

9.     Though I had no personal knowledge of the case, based on my conversations with Speak and my review of his report, I believed there was sufficient probable cause and thus did not feel comfortable closing the case out on that basis. However, I did believe the case was weak on the requisite element of intent and thus chose to close the case under a "beyond reasonable doubt standard" from Florida's pattern jury instructions.

10.     A few days later, I received a call from the State Attorney's Office asking about the report. After speaking with Chief Nelson, I instructed our records division to send the report to the State Attorney's Office at Chief Nelson's direction.

11.     It is my understanding that the State Attorney's Office declined to prosecute. I never spoken with the State Attorney's Office in regards to the case and thus have no personal knowledge as to why they declined to prosecute. Their decision did not surprise me based upon the weak nature of the case.

12.     On November 8, 2016, I testified under subpoena from the Florida Department of Law Enforcement during the FDLE's investigation into Sheriff Whidden's involvement with the alleged hit and run case. A true and correct copy of my sworn testimony is attached as Exhibit 1.

13.     I have not experienced retaliation based upon my testimony or my supplemental report to the alleged hit and run incident. I have never been subject to retaliation during my

2

HCSO/SPEAK
DEF002727

employment at the Sheriff's Office and have no personal knowledge of anyone else being subject to retaliatory treatment, including Speak.

14.     Though Speak frequently referred to himself as a whistleblower during his employment, I have never heard Sheriff Whidden, Chief Nelson, or any member of command staff (lieutenant and above) refer to Speak as a "whistleblower" or speak negatively about Speak.

15.     During my employment at the Sheriff's Office, I have never witnessed Speak be targeted for discipline or mistreatment by the Sheriff's Office. I have never heard Sheriff Whidden, Chief Nelson, or Lt. Ben Rowe make any statements which would suggest that Speak was a target for disciplinary action.

16.     After the election, the alleged hit and run incident and the Sheriff's involvement in the case was not a frequent topic of discussion at the Sheriff's Office. I never heard Sheriff Whidden, Chief Nelson, or any member of command staff speak about the pending FDLE investigation. The only person who ever discussed it that I can specifically remember is Speak himself.

17.     I have no personal knowledge of any internal affairs investigation that Speak was subject to during his employment. I have no personal knowledge of the reasons for his dismissal and have never spoken with Sheriff Whidden, Chief Nelson, Lt. Rowe, or any other member of command staff regarding the same.

18.     While I considered Speak to be a good detective, I found him to be a toxic individual who frequently tried to involve other deputies in matters personal to him. The gossip amongst other deputies was that he often created issues over minor occurrences in the workplace. As a result, I have heard Speak referred to as the "memo man" by other deputies. I never heard anyone above the rank of sergeant refer to him by that name.

HCSO/SPEAK
DEF002728

I have read the foregoing and it is true and correct to the best of my knowledge.

DATED THIS _12_ day of March, 2020.

_____
Sgt. Joshua Woods

Sworn to and subscribed before me this _12th_ day of March, 2020.

_____
Signature of Notary Public - State of Florida

LISA  JONES
_____
Print, Type, or Stamp Commissioned Name of Notary Public
Personally Known _____ OR Produced Identification __✓__
Type of Identification Produced _FL Driv LIC_ and who did
take an oath.    W 320-428-85-380 0
                 EXP: 10/20/2026

LISA A. JONES
Commission # GG 183346
Expires February 19, 2022
Bonded Thru Budget Notary Services

4

HCSO/SPEAK
DEF002729

1

```
 1        (INTERVIEW OF JOSH WOODS, #EI-14-0156, 11/08/16)
 2
 3   (The following may contain unintelligible or misunderstood
 4   words due to the recording quality.)
 5
 6        JS = INSPECTOR JULIAN SALDANHA
 7        JW = LIEUTENANT JOSH WOODS
 8        DK = INSPECTOR DAMIEN KELLY
 9
10   JS:  You're on.  Today's date's November 8th, 2016.  The
11        time now is approximately 11 a.m.  Location of the
12        interview is at Fort Myers Regional Operations
13        Center.  The address is 4700 Terminal Drive, Fort
14        Myers, Florida.  I am Inspector Julian Saldanha of
15        the Office of Executive Investigations.  I will be
16        questioning Lieutenant Josh Woods as a witness in an
17        official FDLE investigation: case number EI-14-0156.
18        And I am the inspector in charge of this
19        investigation.  This investigation concerns possible
20        misconduct on the part of Hendry County Sheriff
21        Steve Whidden, W-H-I-D-D-E-N.  Also present for this
22        interview is Inspector Damien Kelly.
23
24        Prior to beginning this interview you should be
25        aware of the following: this interview is being
26        recorded.  As a sworn law enforcement officer I am
27        empowered to administer oaths and take statements.
28        In a moment I'll be taking a sworn statement from
29        you.  You will be under oath, and if you knowingly
30        provide false statements, you can be criminally
31        charged with perjury.  Do you understand each of the
32        items I have just informed you?
33
34   JW:  I understand.
35
36   JS:  Okay.  Please raise your right hand.  Let the record
37        reflect that Lieutenant Woods has raised his right
38        hand.  Do you solemnly swear or affirm that the
39        information you're about to give today is the truth,
40        the whole truth and nothing but the truth, so help
41        you God?
42
43   JW:  I do.
44
45   JS:  Okay.  Please state your name and the last four
46        digits of your Social Security number.
47
48   JW:  Joshua Woods; 5707.
49
50   JS:  Okay.  And the reason we're here is 'cause Damien
```

**EXHIBIT 1**

2

```
 1          and I have been mandated to conduct an investigation
 2          into allegations that Sheriff Whidden interfered
 3          directly with an investigation, i.e. being a hit-
 4          and-run accident that was investigated by Deputy --
 5          then Deputy Vernon Speak.  Now is Detective Vernon
 6          Speak.  Are you familiar with the case I'm talking
 7          about?
 8
 9    JW:   I am.
10
11    JS:   Okay.  Take us from the beginning, how you became
12          involved, what role you played.  And as -- as you go
13          on, I'm probably gonna let you continue the whole
14          way through, and then when I see a break I'll pause
15          you, and then Damien and I will bring you back a
16          little bit --
17
18    JW:   Okay.
19
20    JS:   -- and ask you questions to fill in some blanks.
21          And then we'll continue with the story.
22
23    JW:   Okay.  Um, as far as -- as far as dates go -- I
24          mean, other than the -- you know, the date of the
25          incident as far as I'm gonna talk about some
26          conversation stuff, I don't know the exact dates of
27          certain conversations.
28
29    JS:   Okay.
30
31    JW:   Um, but, um, I -- I -- I became aware as the, um --
32          I'm -- at the time I was, and still am the -- the
33          district lieutenant for Road Patrol.
34
35    JS:   Actually, stop you for a second.  Just one second.
36          There's a whole part that I missed.
37
38    JW:   Okay.
39
40    JS:   Actually it's just four questions.  So we pause now
41          at you were Road Patrol supervisor.
42
43    JW:   Yes, sir.
44
45    JS:   Okay.  Stopping for minute, let's go back to the
46          preamble that I was reading earlier.  It says, "What
47          is your place of employment?"
48
49    JW:   Hendry County Sheriff's Office.
50
```

HCSO/SPEAK
DEF001720

3

```
 1  JS:  How long have you been there?
 2
 3  JW:  Thirteen years.
 4
 5  JS:  In what capacity?
 6
 7  JW:  I am currently the, uh, West District Road Patrol
 8       lieutenant.
 9
10  JS:  Lieutenant.  That's a supervisor position?
11
12  JW:  Yes.
13
14  JS:  Okay.  I needed to get that on the record.
15
16  JW:  Okay.
17
18  JS:  Okay.  Now, continue, please.  And again, I
19       apologize --
20
21  JW:  That's okay.
22
23  JS:  -- for cutting you off.
24
25  JW:  No.  No problem.  Um, I became aware of it, um, as,
26       um, the -- the, uh, incident progressed.  And I
27       don't remember who originally -- obviously I would -
28       - I would approve the report.  But I became aware of
29       it before, um, I would've approved the report, and I
30       don't remember if it was from Vernon Speak's
31       sergeant at the time or if it was from Vernon Speak
32       --
33
34  JS:  Uh-huh.
35
36  JW:  -- um, who was upset that, um, Sheriff Whidden had
37       gotten involved in this -- in this investigation.
38
39  JS:  Uh-huh.
40
41  JW:  Um, they obviously came to me first.  Um, so then I
42       -- I -- I went up to, um, the sheriff and the chief
43       deputy to inquire, um, the particulars of it.
44
45  JS:  Uh-huh.
46
47  JW:  Um, and that's when, um, the -- you know, the -- the
48       sheriff had told me that he had -- he had talked to
49       Speak about it and that he was -- and that he was
50       gonna -- he -- he was gonna take care of it.  And --
```

4

```
 1        and I offered to handle -- I offered to handle --
 2
 3   JS:  Uh-huh.
 4
 5   JW:  -- handle the incident and the case and, um, Sheriff
 6        Whidden advised me that he -- he wanted to take care
 7        of it.
 8
 9   JS:  Wanted to take care of it.  When you became aware
10        that Vernon Speak was upset about it, what -- what
11        was he saying?
12
13   JW:  Um, he was -- he was saying that -- how, um -- um,
14        he had been doing this hit-and-run investigation and
15        he, um, conducted a traffic stop on a suspect.  And
16        the -- the guy had said Miranda that -- that he, um
17        -- said, you know, in Miranda that he had -- he had
18        hit the, um -- that he had crashed.  And, uh, while
19        he was on scene, the sheriff had -- had called him
20        and he had talked a phone call to sheriff.  And, uh
21        -- and the sheriff, um, was basically telling him,
22        you know, not -- not to arrest him.
23
24   JS:  Not to arrest him.  That's what upset Vernon Speak?
25
26   JW:  Yeah.
27
28   JS:  Okay.  When you went to the sheriff, and the
29        undersheriff -- you went -- you went to both or you
30        went to the sheriff?  I wanna clarify that.
31
32   JW:  I -- I believe I went to, um, the chief first.
33
34   JS:  Uh-huh.
35
36   JW:  Um --
37
38   JS:  Chief deputy being --
39
40   JW:  Kevin Nelson.
41
42   JS:  -- Kevin Nelson?
43
44   JW:  Yes, sir.
45
46   JS:  Okay.
47
48   JW:  Um, and I don't believe at the time he had the
49        particulars of the whole case.  I don't -- I don't -
50        - I don't remember.  I -- I remember talking to the
```

HCSO/SPEAK
DEF001722

5

```
 1        sheriff in our conference room at the Sheriff's
 2        Office.  'Cause he had got -- I know the sheriff was
 3        upset about something that Vernon Speak had put in
 4        his report.
 5
 6   JS:  Uh-huh.
 7
 8   JW:  Um, I don't know if it was something relating to the
 9        sheriff being involved or it was something.  And I -
10        - I offered to, you know -- if -- I said, you know,
11        "Sheriff, I'll handle it," you know?
12
13   JS:  Right.
14
15   JW:  "Want me to handle it?"  He said, "No, um, I'll --
16        I'll take care of it."
17
18   JS:  Okay.
19
20   JW:  Um, and I don't know exactly -- a couple days later
21        -- no, I'm sorry.  It -- it was that same day, I
22        went into, um -- to Chief Nelson's office and I
23        says, you know, "Chief, I don't, um -- I don't know
24        the particulars of the case, but if this is the
25        sheriff's friend, you know, we should probably at
26        least send it to the State Attorney's Office --"
27
28   JS:  Uh-huh.
29
30   JW:  -- "so, you know -- so that it eliminates the bias
31        and the sheriff's out of it and we'll let the State
32        Attorney's Office make -- make that decision." Um,
33        Chief Nelson told me that the sheriff had said that
34        he didn't -- he didn't want it sent to the State --
35        the State Attorney's Office and, um -- and told me
36        to, um -- so -- and -- and said that -- that, uh, we
37        wasn't gonna send it to the State Attorney's Office.
38
39   JS:  So the sheriff told him, We're not gonna send it to
40        the State Attorney's Office?
41
42   JW:  Correct.
43
44   JS:  That's what Nelson --
45
46   JW:  That's what -- yeah.
47
48   JS:  -- Chief Deputy Nelson told you.
49
50   JW:  Nelson relayed to me.  Yes, sir.  Um, and then, um,
```

HCSO/SPEAK
DEF001723

```
 1        I had returned back to -- to my office, and Speak
 2        had -- had came in later on.  I guess -- I don't
 3        know if it was the same day or if it was the next
 4        day.  I don't remember.  He -- he had came in and he
 5        was basically, you know, "LT, you know, what do I
 6        do, you know?"
 7
 8   JS:  Uh-huh.
 9
10   JW:  Um, "You know, this has never happened to me before.
11        This is, you know -- the family needs justice," and
12        so on and so forth.  And that's when I -- that's
13        when I instructed him, um -- at -- at the time I
14        said, you know, "The -- the sheriff -- the sheriff
15        is the sheriff.  If the sheriff doesn't wanna, you
16        know, do anything with it, then we're not gonna do
17        anything with it."
18
19        But I said -- I said, "However, um, you need to make
20        sure that the traffic crash report was conducted and
21        the, you know -- the at fault vehicle and everything
22        is put in the crash report, then that way, you know,
23        the family at least has the crash report there so
24        the -- the family can go after civilly if they wish
25        to or however they wish to, uh -- to --"
26
27   JS:  Uh-huh.
28
29   JW:  -- "to do it."  Um, and -- and I -- I instructed
30        Speak, I says, "You know, I would -- I would advise
31        you to, uh, tell the family to call the State
32        Attorney's Office every day --"
33
34   JS:  Uh-huh.
35
36   JW:  -- "you know, until they inquire to get the case."
37
38   JS:  Right.
39
40   JW:  Um, and then, uh -- and then he -- you know, we --
41        we had a conversation and I said -- I said, "You
42        know if, um, I -- I felt that the probable cause,
43        what was there."
44
45   JS:  Uh-huh.
46
47   JW:  Um, and that's what I told Speak.  I said, "I wasn't
48        on scene --"
49
50   JS:  Uh-huh.
```

HCSO/SPEAK
DEF001724

7

```
1
2    JW:   -- "um, but I -- I -- from reading your -- your
3          narrative, I felt that -- that there was -- there
4          was probable cause."  So we went back to, um -- and,
5          uh, we had some other conversations.  Nothing of --
6          of -- of any importance, um, that I can remember.
7          Um, he left.  Um, couple days later I got a phone
8          call at my office from I think it was Nicole Mirra,
9          the head of the -- our State Attorney's Office --
10
11   JS:   Uh-huh.
12
13   JW:   -- over -- over in LaBelle.  I think it was her that
14         called from the State Attorney's Office, inquiring
15         about the, uh, report.  And I told her, I says, "Let
16         me check on it.  'Cause it was -- some people got
17         involved in it.  Let me -- let me, uh -- let me --
18         let me check on it to see if it's okay if I -- if --
19         if I send it to you guys."  So I called, um, Chief--
20         Chief Nelson and I says, "Hey, the State Attorney's
21         Office is here wanting the report.  What do you want
22         me to do?"
23
24   JS:   Uh-huh.
25
26   JW:   And, um -- and he said, you know -- he said
27         basically, you know, "The sheriff doesn't, you know,
28         feel like it needs to go there, and it should, you
29         know -- it should probably be, uh -- be, uh, closed
30         out.  Um, but go ahead and sent it -- send it."
31
32   JS:   Uh-huh.
33
34   JW:   So that's when I, um, contacted our Records Division
35         and gave 'em the case number.  I said, "Hey, send
36         this to the State Attorney's Office for me.  Um --"
37
38   JS:   Uh-huh.
39
40   JW:   -- "they're -- they're expecting this report."  Um,
41         and that was the end of -- of that, um,
42         conversation. Now I know some of the stuff had came
43         -- and I don't know if our records ever sent it.
44
45   JS:   Uh-huh.
46
47   JW:   Um, from -- that was the end of my involvement as
48         far as how the State Attorney's Office got it.  I
49         mean, I've heard stuff that the -- the -- the
50         family's attorney made aware of it.  So I -- I'm not
```

HCSO/SPEAK
DEF001725

8

```
 1        sure.  Um, I -- I do know that later down the road
 2        we got a warrant denial back from the State
 3        Attorney's Office for that case.
 4
 5   JS:  Right.
 6
 7   JW:  Um, and then somewhere in between of me sending it
 8        over there, um, had -- had a conversation with, um,
 9        Chief Nelson.  Uh, most of my -- obviously he's my
10        direct supervisor so most of my conversations were
11        with him.
12
13   JS:  Uh-huh.
14
15   JW:  You know, from the sheriff, through him to me,
16        basically is how it works.  Um, and, I -- I was
17        kind of inquiring on, "What are we doing with the
18        case, you know?"  Um -- um, and, um, he said, "Well,
19        you know, the -- the sheriff didn't, you know --
20        didn't find that -- that there was probable cause
21        for -- for the arrest or whatever, so go ahead and
22        close it out."
23
24   JS:  Uh-huh.
25
26   JW:  Um, in -- in my -- in my narrative you'll see that
27        my closeout of it was more of beyond a reasonable
28        doubt aspect of it --
29
30   JS:  Yeah.
31
32   JW:  -- than it was probable cause, which is what we
33        usually work on.  'Cause I felt that there was
34        probable cause for it.
35
36   JS:  Uh-huh.
37
38   JW:  So, um, I'm a lieutenant being at-will personnel
39        trying to stay on both sides of the --
40
41   JS:  I understand.
42
43   JW:  -- stay on both sides of the corn and -- and so
44        that's -- my closeout was of --
45
46   JS:  Uh-huh.
47
48   JW:  -- you know, basically beyond a reasonable doubt
49        based on the jury instructions.
50
```

9

```
 1   JS:  Yeah.
 2
 3   JW:  So --
 4
 5   JS:  But when -- and that -- that's -- that's what I was
 6        gonna ask you.  Um, when Damien and I saw the
 7        report, your report was written actually on the 24th
 8        --
 9
10   JW:  Yeah.
11
12   JS:  -- of September, which is a couple days after Deputy
13        Speak (unintelligible) and washed his hands.
14
15   JW:  Right.
16
17   JS:  You're saying in between the 22nd and the 24th is when
18        you got a call from the State Attorney's Office?
19
20   JW:  I don't -- I don't -- I don't -- like I said, I
21        don't -- I don't remember the dates.
22
23   JS:  Dates.  Okay.
24
25   JW:  Um, I -- I do know I got a call from the State
26        Attorney's Office.
27
28   JS:  Uh-huh.
29
30   JW:  Um, and I don't know -- only from -- not from
31        personnel, it was only from hearing this stuff that
32        the State Attorney's Office said they couldn't file
33        because of my -- my, uh -- my narrative.  Now, if
34        that's the case, then -- then obviously that's the
35        case.  However, um, I don't remember.  I -- I do
36        know it was a -- it was a -- a while after.
37
38   JS:  Uh-huh.
39
40   JW:  Um, but I -- I don't -- I don't know -- I don't know
41        the timeline.
42
43   JS:  The exact chronological order for --
44
45   JW:  Yeah.  And I'm sorry for that.  I just don't know.
46
47   JS:  No, that's okay.  That's okay.
48
49   JW:  Um --
50
```

10

```
 1   JS:   It's -- it's been a year.
 2
 3   JW:   Yeah.  Yeah.
 4
 5   JS:   You know?
 6
 7   JW:   Um --
 8
 9   DK:   Let me -- let me just throw something in there while
10         I'm thinking of it in my head.
11
12   JS:   Yeah.
13
14   DK:   The -- so the -- when the State Attorney's Office
15         contacted you -- you and said, um, "We've been
16         notified about this case, you know, where -- where
17         is the report?" --
18
19   JS:   Uh-huh.
20
21   DK:   -- and you talked to -- to Chief Deputy Nelson and
22         he said, "Send it on to 'em," did he tell you to
23         close it out?  Because the -- the one -- the report
24         we saw already had your information in there --
25
26   JW:   Right.
27
28   DK:   -- and you had listed the stipulations, why you've
29         made this determination.  Did he tell you to close
30         that out?
31
32   JW:   I, um -- he -- he did.  Um, I -- I don't know at
33         what time.  I don't know if it was before the, um --
34         I sent the report to the State Attorney's Office or
35         if it was after.  Um, I'm assuming that, um, based
36         on the time that the -- that, you know -- that
37         Vernon Speak has transferred over and I got involved
38         with -- with my -- my narrative -- and this just
39         assumption to me.  I'm not -- I'm not really sure.
40
41   JS:   Uh-huh.
42
43   JW:   But, um, I don't foresee the State Attorney's Office
44         contacting us that fast wanting -- wanting it.  So I
45         could've closed it out first --
46
47   DK:   Uh-huh.
48
49   JW:   -- and then the State Attorney's Office called
50         later.
```

11

```
 1
 2   JS:   Okay.
 3
 4   JW:   Um, that's probably more practical.  That's usually
 5         how it works.  Um, I -- I don't know the dates.  I
 6         apologize.
 7
 8   JS:   That's -- that's -- that's fine.  But the -- I think
 9         the point is that we're trying to reach at is you
10         were told to close it out.
11
12   JW:   Yes.
13
14   JS:   And that was by Kevin Nelson --
15
16   JW:   Yeah.
17
18   JS:   -- the deputy --
19
20   JW:   Yeah.
21
22   JS:   -- chief deputy.
23
24   JW:   Chief Deputy said, you know, "Sherriff doesn't --
25         doesn't think this case needs to go
26         (unintelligible), that there's --" and, um, I don't
27         know his exact words but basically he's saying that
28         there's, um -- you know, according to the sheriff,
29         there's no probable cause here and he wanted me to
30         close the report.
31
32   JS:   Okay.  And when you do close out  report, um, how do
33         you determine if it goes to the State Attorney's
34         Office or if it stays in-house or what becomes of
35         it?
36
37   JW:   Um, usually if -- if, um, an -- an arrest, if it's -
38         - if we have solid, um -- solid probable cause for -
39         - and -- and even most -- most misdemeanors --
40
41   JS:   Uh-huh.
42
43   JW:   -- um, most misdemeanors we will -- we'll -- we'll
44         go ahead, you know, if it's domestic or something
45         like that.  Basically everything from a criminal
46         nature --
47
48   JS:   Uh-huh.
49
50   JW:   -- if somebody wants to press charges, we either
```

American High-Tech Transcription and Reporting, Inc.

12

```
 1        arrest or it gets sent to the State Attorney's
 2        Office.
 3
 4   JS:  Okay.
 5
 6   JW:  Um, most -- most felonies that don't go to, um, CID
 7        --
 8
 9   JS:  Uh-huh.
10
11   JW:  -- um, and that require additional follow-up or
12        additional review, um, go -- go to the State
13        Attorney's Office.  Um, based on my experience, a
14        case like this --
15
16   JS:  Uh-huh.
17
18   JW:  -- would have been handled from a Road Patrol level
19        --
20
21   JS:  Uh-huh.
22
23   JW:  -- you know, and not -- and not sent to the State
24        Attorney's office.  My -- my reasoning for wanting
25        to send it to the State Attorney's Office was
26        because --
27
28   JS:  Uh-huh.
29
30   JW:  -- of the -- of the sheriff's, you know, alleged or
31        whatever -- perceived relationship with -- with the
32        guy that was involved.  So that's why I recommended
33        send it to the state.
34
35   JS:  Okay.  So what you're saying is, using this case as
36        an example, with the hit-and-run and with physical
37        injuries, it's handled by Patrol.
38
39   JW:  Yes.
40
41   JS:  And then -- but it's not sent to the State
42        Attorney's Office --
43
44   JW:  If --
45
46   JS:  -- when you have --
47
48   JW:  Most -- most --
49
50   JS:  -- probably cause.
```

HCSO/SPEAK
DEF001730

13

```
 1
 2   JW:   Yeah.  Well, most traffic crash investigations with
 3         -- with significant injuries, like serious bodily
 4         injuries --
 5
 6   JS:   Uh-huh.
 7
 8   JW:   -- the Florida Highway Patrol does them.
 9
10   JS:   Uh-huh.
11
12   JW:   We don't have a Traffic Homicide or Serious Major
13         Crimes Unit, um, Traffic Crash Unit to -- to handle
14         that.  That's -- that's handled by, um, Florida
15         Highway Patrol.  Um, this obviously wasn't 'cause
16         there was a delay in the -- in, you know -- in --
17
18   JS:   Uh-huh.
19
20   JW:   -- in -- in the -- in the crash process.  That's why
21         FHP wasn't originally called 'cause we didn't know
22         at the time -- didn't know the vehicle, didn't know
23         the suspect or the --
24
25   JS:   Right.
26
27   JW:   -- whatever.  Um, a case like this would have been,
28         um -- would've been handled in -- in-house, would've
29         been handled by Road Patrol.  Yes.
30
31   JS:   Okay.  And then once -- like this case, the suspect
32         -- the -- the driver was identified --
33
34   JW:   Yes.
35
36   JS:   -- probable cause was developed and an admission was
37         obtained.
38
39   JW:   Yes.
40
41   JS:   Why wouldn't you send this to the State Attorney's
42         Office?  Given -- let's say the sheriff was -- was
43         not involved and did not know the driver of the
44         vehicle, you just said that normally handed in-house
45         and it doesn't go the State Attorney's Office.  But
46         when you have identified a suspect and you develop
47         your probable cause, under what circumstances would
48         it not go?
49
50   JW:   Well, this -- this -- this case would have -- would
```

```
 1        have, um, probably went anyway because of the delay,
 2        a delay of the developing the -- finding the
 3        vehicle, the delay of, you know, um, finding the
 4        suspect because of the delay, this would probably
 5        have went to the State Attorney's Office anyway.  A
 6        normal hit-and-run, um, you know, if the guy crashes
 7        and we find him down the road a little while later,
 8        that would've all -- all been handled with us.
 9
10   JS:  I see.  And by that you mean -- now what you're
11        talking about is on view arrest.
12
13   JW:  Right.  Right.
14
15   JS:  Okay.  So --
16
17   JW:  Yeah.
18
19   JS:  -- you would've arrested him on the spot and go.
20
21   JW:  Right.
22
23   JS:  This -- I -- I -- I understand now.
24
25   DK:  Let me -- let me --
26
27   JW:  Are you tracking?
28
29   DK:  -- throw something in there --
30
31   JS:  Yeah.
32
33   DK:  -- while -- while we're there, 'cause you're --
34        you're right at a spot that I wanna be at.
35
36   JW:  Okay.
37
38   DK:  The -- and we've done a little investigating and
39        we've talked to some people --
40
41   JW:  Uh-huh.
42
43   DK:  -- and -- but we don't know the ins and outs of your
44        agency.  You do.
45
46   JW:  Okay.
47
48   DK:  You're the supervisor.  But if -- if we have it
49        right, the -- because the -- the investigation that
50        followed after this happened was happening -- was
```

HCSO/SPEAK
DEF001732

15

```
 1        being done by uniform patrol because it was
 2        happening before the hours that CID come to work.
 3        It was early morning hours and they were trying to
 4        find a vehicle matching the description, so they're
 5        out -- these guys are out there, um, in -- in
 6        uniform patrol and they're trying to locate this
 7        vehicle.  And they do locate it.  And they -- they
 8        do a little investigation.  And they get the -- the
 9        guy to admit, Yes, I -- I -- I did -- was involved
10        in -- in some sort of a -- a wreck, but I don't know
11        what I hit and -- and blah, blah, blah.
12
13  JW:   Yes, sir.
14
15  DK:   When -- okay.  Once that had happened, is this
16        normal the way this investigation went on that day?
17        Like is it normal that a guy would've been allowed
18        to just leave the scene of that, um, or would they
19        normally have said, You're gonna come down and, you
20        know, we're gonna take a statement from you right
21        now?
22
23  JW:   That -- we usually don't allow -- that's -- it's not
24        normal for them to go leave, go about their business
25        and --
26
27  DK:   Okay.
28
29  JW:   -- and -- and then return later.  Um, I've -- I've
30        never been in the criminal investigation aspect of
31        it, the CID aspect --
32
33  JS:   Uh-huh.
34
35  JW:   -- of it so, um, I don't know if that's how they
36        work.  Um, but this was all handled by -- by Road
37        Patrol, and that's not how Road Patrol does it.
38
39  DK:   Okay.
40
41  JW:   Um, CID didn't get -- I mean, they did kind of, and
42        then it went back to us because, uh, CID doesn't
43        work traffic crashes.
44
45  DK:   Uh-huh.
46
47  JW:   Um, that's all handled by Road Patrol or Florida
48        Highway Patrol.  So that's why it was sent to them
49        and then sent back to us.  And that's why that
50        little blip of criminal investigative was in there,
```

HCSO/SPEAK
DEF001733

16

```
 1        but, um, Road Patrol does traffic crashes if FHP
 2        doesn't work it.
 3
 4   DK:  So from -- from what our -- out understanding, and -
 5        - and I know you probably hashed it out a bunch a
 6        time, the, um -- when they were on the scene and,
 7        uh, Deputy Speaks was -- was talking to the driver
 8        of the vehicle, um, his partner that was on the
 9        scene with him --
10
11   JS:  Cameron.
12
13   DK:  -- uh, Cameron --
14
15   JW:  Cameron.
16
17   DK:  -- he received -- he's speaking on his -- on his
18        phone, and it's the sheriff that's on the phone.
19        And he's asking about the call.  And basically he
20        has received a call from the driver of the vehicle
21        saying, "I've been stopped by deputies," blah, blah,
22        blah.  So, um, once it was brought to your
23        attention, did you ever establish any relationship
24        between the driver of that vehicle and Sheriff
25        Whidden?
26
27   JW:  Um, the only thing that Sheriff, um, Whidden said --
28        and once again, um, Hendry County is small.  It's a
29        small town.  Everybody knows our sheriff.  Um, it's
30        not uncommon for the sheriff to say, Yes, I -- I --
31        I know him or whatever.  Um, the only relationship I
32        was able to establish with him is that he knew the
33        sheriff.  Um, that's it.  And he's the sheriff.  I
34        don't ask any more questions than that usually.
35
36   DK:  (Unintelligible).
37
38   JW:  You know what I mean?  So, um, I was never -- any
39        other type of relationship, no I was never, um -- I
40        did -- I did -- I did find out, obviously, that he
41        had the -- the -- the felony charges and all that
42        stuff.  Um, I didn't know at that time.  But --
43
44   JS:  Right.
45
46   JW:  -- I did find out later on that he had them.  But --
47
48   JS:  Okay.  Is it common for the sheriff to contact a
49        deputy on -- on patrol or get involved in an
50        investigation and steer it in the direction that he
```

17

```
 1        wants?  And let me give you an example.  Like with
 2        this one here where he called Deputy Speak and told
 3        him to release the subject right there because
 4        there's no intent or probable cause --
 5
 6   JW:  Uh-huh.
 7
 8   JS:  -- is it common for him to do in -- for other cases?
 9
10   JW:  He -- yeah, he --
11
12   JS:  Has he done it before?
13
14   JW:  -- he -- he -- he -- he contacts us. Um, he contacts
15        deputies quite frequently.  I -- I can't put a
16        number on it.  Um --
17
18   JS:  Well, can you give us some examples?
19
20   JW:  Um, sure.  We had a, um -- we had a, um, battery out
21        in, um, one of our areas of -- of LaBelle when I was
22        a Road Patrol sergeant at the time.  And, uh, we
23        arrested a -- I didn't arrest, one of the deputies
24        that worked for me arrested a girl for a fray, for
25        fighting there.
26
27   JS:  Uh-huh.
28
29   JW:  Um, we took her to the jail.  Um, and we got a phone
30        call -- the deputy -- I didn't as a sergeant --
31
32   JS:  Uh-huh.
33
34   JW:  -- the deputy got a phone call wanting to know why
35        she got arrested.  And the deputy said, "Well, you
36        know, arrested for a fray," you know?
37
38   JS:  Uh-huh.
39
40   JW:  Sheriff basically said, "Well, in order to charge
41        somebody with a fray, you have to have both parties
42        that was engaged in the fight."  Um, and, um,
43        basically didn't agree with the arrest.  And he --
44        the sheriff went and -- and, um, uh -- I think we
45        ROR'd her --
46
47   JS:  Uh-huh.
48
49   JW:  -- and the sheriff picked her up from the jail and
50        took her back home.
```

HCSO/SPEAK
DEF001735

18

```
 1
 2   JS:   How 'bout a case involving Tim's Towing?
 3
 4   JW:   Um --
 5
 6   JS:   You remember that one?
 7
 8   JW:   As far as -- um --
 9
10   JS:   Where, um, the owner of Tim's Towing --
11
12   JW:   Uh-huh.
13
14   JS:   -- I -- I don't know his last name.
15
16   JW:   Howard.
17
18   JS:   Howard.  Tim Howard.
19
20   JW:   Uh-huh.
21
22   JS:   Where Mr. Howard's son was arrested.
23
24   JW:   Derreck.
25
26   JS:   Derreck Howard.
27
28   JW:   Yes, sir.
29
30   JS:   Do you know if the sheriff became involved in that -
31         - in that case?
32
33   JW:   His -- his son's been -- been arrested, um, a couple
34         times.  Um, I do know there was one, um, yes, where
35         the sheriff, um, met with some of us in CID -- or at
36         -- at the annex in the Criminal Investigations
37         Division and was discussing a case, um, as far as,
38         um, for -- as far as Derreck was concerned in
39         reference to some -- was like a stolen vehicle or
40         some property --
41
42   JS:   Uh-huh.
43
44   JW:   -- or some parts to a stolen vehicle --
45
46   JS:   Yeah.
47
48   JW:   -- or something like that.
49
50   JS:   Okay.
```

HCSO/SPEAK
DEF001736

19

```
1
2    JW:   Yeah.  Um --
3
4    JS:   That -- that's the one.
5
6    JW:   Yeah.  Yeah.
7
8    JS:   What'd the sheriff wanna know?  And what did he want
9          done?
10
11   JW:   Um -- um, my -- in my involvement with it, he, um --
12         he wanted to know -- he called a couple of us in --
13         he was -- he was at the scene -- um, to find out
14         what happened.  I guess, um, uh, Tim Howard was
15         upset because somebody came there and removed some
16         parts off of -- off of -- somebody came to his tow
17         yard and removed some parts off of a vehicle.
18
19   JS:   Uh-huh.
20
21   JW:   Um, and Tim didn't feel like that they were supposed
22         to be taken off  And there was a deputy there
23         standing by, but the deputy wasn't involved with the
24         case so he didn't know what parts of the vehicle
25         were supposed to come off, whatever.
26
27   JS:   Uh-huh.
28
29   JW:   Um, so the, um, long -- the long story short of it
30         was the sheriff, um, had -- basically had the deputy
31         call the guy who took the parts back and tell him he
32         needs to return the parts.
33
34   JS:   Uh-huh.
35
36   JW:   Um, the guy on the phone with the deputy was giving
37         him a hard time as the sheriff got on the phone and
38         said, "Hey, if you don't bring the parts back, you
39         know, you're basically gonna go to jail
40         (unintelligible).  You need to bring the parts
41         back."  That was my involvement with -- with that
42         case.
43
44   JS:   Okay.  Let's go back to, um, the hit-and-run case
45         for now.
46
47   JW:   Okay.
48
49   JS:   So the chief deputy -- Chief Deputy Nelson --
50
```

20

```
 1   JW:  Yes.
 2
 3   JS:  -- told you to close the case.
 4
 5   JW:  Yes.
 6
 7   JS:  And that's why you closed it the way you did.
 8
 9   JW:  Yes.
10
11   JS:  Because you said that there was probable cause in
12        your mind.
13
14   JW:  I -- I felt there was.  Yes.
15
16   JS:  Felt there was.  And you didn't wanna write that
17        there was no probable cause --
18
19   JW:  Correct.
20
21   JS:  -- which is why you wrote the report the way you
22        did.
23
24   JW:  Correct.
25
26   JS:  And that was under Nelson's orders --
27
28   JW:  Yes.
29
30   JS:  -- well, instructions.
31
32   JW:  Instructions.
33
34   JS:  Is it common for them to tell you to close out
35        somebody else's case?
36
37   JW:  No.
38
39   JS:  Is there --
40
41   JW:  No, it's not.
42
43   JS:  Has it happened before?
44
45   JW:  Myself, no.  That was the -- that's the only time
46        it's ever happened to me.
47
48   JS:  'Cause normally it should've been the deputy who
49        closed out the case.
50
```

HCSO/SPEAK
DEF001738

21

```
 1   JW:  That's correct.
 2
 3   JS:  Why didn't you choose to take it back to the deputy?
 4
 5   JW:  I -- I felt I kind of needed to -- he didn't need to
 6        have to deal with it again.  So I -- I said, "I'll -
 7        - I'll -- let me deal with it.  I'll -- I'll take
 8        the brunt of it if it comes back."  So --
 9
10   JS:  There was --
11
12   JW:  Type thing.
13
14   JS:  -- there was also another issue with that report, um
15        --
16
17   JW:  Uh-huh.
18
19   JS:  -- that Chief Nelson brought to your attention.  You
20        wanna take a break?
21
22   JW:  No, no.  No, I'm good. I'm good.
23
24   JS:  Okay.  Um, where --
25
26   JW:  I got allergies to like everything.  So --
27
28   JS:  Yeah.  Where was, um -- the sheriff's name was put
29        in the report.
30
31   JW:  Yes.
32
33   JS:  Can you tell me about that?
34
35   JW:  Um, yeah.  The, um -- there was a meeting.  I -- I
36        wasn't present during the meeting.  I do know there
37        was a meeting with Speak and his sergeant, um --
38
39   JS:  Uh-huh.
40
41   JW:  -- that sat down about the report.  Um, I spoke to
42        Kevin -- I spoke to Chief Nelson later about it and
43        he said that, um, Speak had put the sheriff's name
44        on the report and, um, basically the sheriff's name
45        shouldn't -- shouldn't be in the -- shouldn't be in
46        the, uh -- in -- in the report, basically.
47
48   JS:  And that was it?
49
50   JW:  And Vernon Speak -- you know, and Speak had talked
```

HCSO/SPEAK
DEF001739

22

```
1        to me and he's like, "I didn't have a choice.  I
2        mean, that's why we did what we did."  So, um -- but
3        that was -- there was a meeting with Vernon and --
4        and, um, his sergeant --
5
6   JS:  Uh-huh.
7
8   JW:  -- in reference to that.  But I -- I wasn't in that
9        meeting.
10
11  JS:  Okay.
12
13  JW:  Yeah.
14
15  JS:  And who was the sergeant at the time?
16
17  JW:  Uh, Shawn Reed.
18
19  JS:  Shawn Reed.  That's why I remember the name.
20
21  JW:  Yeah.
22
23  JS:  Shawn Reed.  Okay.  And I just wanna go back again
24       'cause I -- I think you mentioned it but I wanna be
25       clear about that.  When -- when Chief Deputy Nelson
26       advised you to close out the -- the -- the report,
27       he -- he said that's what the sheriff wants?
28
29  JW:  Yes.
30
31  JS:  And did he explain why that's what the sheriff
32       wanted?
33
34  JW:  I -- I didn't ask.
35
36  JS:  You didn't ask?  Just that the sheriff wants this
37       case --
38
39  JW:  Yeah.
40
41  JS:  -- closed.
42
43  JW:  Yes, sir.  Uh, well, he -- I mean, I -- I -- I knew
44       it's what the sheriff -- because he had -- the
45       sheriff had said before that he didn't feel that
46       there was intent, he didn't feel that there was
47       probably cause for it.  So when he said, "Close the
48       case out," --
49
50  JS:  Uh-hug.
```

American High-Tech Transcription and Reporting, Inc.

HCSO/SPEAK
DEF001740

23

```
 1
 2    JW:  -- I -- I assumed that that's why the sheriff felt
 3         like the case needed to be closed out.
 4
 5    JS:  Got you.  And since the case was closed out it was
 6         never sent to the State Attorney's Office.
 7
 8    JW:  It was send.  Well --
 9
10    JS:  Upon the request.
11
12    JW:  Yes.  Correct.
13
14    JS:  Excuse me.  I'm sorry.  But it was not -- at the
15         time when it was closed out, it became an in-house
16         report.
17
18    JW:  That's correct.
19
20    JS:  Just subject to Public Records Law.
21
22    JW:  That's correct.  Um, and then when the State
23         Attorney's Office called to, um -- called me
24         requesting it, then that's when I sent it over
25         there.  Like I said, I contacted our record.  Had
26         records send it.
27
28    JS:  Uh-huh.
29
30    JW:  Um, I -- I tried to look, uh, um -- I wasn't sure if
31         I called 'em or if I looked on email.  Um, I tried
32         to look on the email, I didn't find it.  It was a
33         year ago.  So -- um, so I -- I -- I contacted
34         records.  Whether it was -- whether it was by phone
35         -- I don't wanna say it was by phone if it was by
36         email.  But --
37
38    JS:  Okay.
39
40    JW:  -- I contacted records and said, "Here's the offense
41         number.  This report needs to go into the State
42         Attorney's Office portal to be sent to them.
43         They're expecting it."  Um, that's the last I -- I
44         knew of it until the warrant denial came back.  And
45         then --
46
47    JS:  Uh-huh.
48
49    JW:  -- all this stuff came up.  And then the State
50         Attorney's Office -- or I -- I heard that the State
```

HCSO/SPEAK
DEF001741

24

```
 1        Attorney's Office said that they heard about it
 2        from, um, Steve Ramunni, from the private attorney
 3        that that's how they got -- that -- that's how they
 4        got the report.  So --
 5
 6   JS:  Um, who's your Evidence clerk?
 7
 8   JW:  Um, Evidence, uh, Corey Mundy.
 9
10   JS:  Corey Mundy.  That's --
11
12   JW:  Yeah.
13
14   JS:  -- yeah, that's it.
15
16   JW:  Yeah.
17
18   JS:  Um, Vernon Speak -- Deputy Speak --
19
20   JW:  Yes.
21
22   JS:  -- had sent some items over to FDLE to be analyzed
23        and fingerprinted basically.
24
25   JW:  Yes, sir.
26
27   JS:  Um, FDLE returned the -- returned the evidence
28        sometime later.  And the reason they returned it --
29        they stated that they returned it was because Corey
30        Mundy had requested that the evidence not be
31        processed.  Does Corey Mundy have the authority to
32        decline us to process your agency's evidence that
33        you sent to us asking that -- that we process it?
34
35   JW:  No.  That authority would've had to come from
36        somebody else.
37
38   JS:  Somebody else.  Either Vernon Speak or somebody
39        higher?
40
41   JW:  Vernon Speak -- yeah, Vernon Speak or, um, one of
42        his supervisors or somebody --
43
44   JS:  Uh-huh.
45
46   JW:  -- like that.  He's -- he's -- um, Corey Mundy's a
47        civilian personnel.  He's -- he's Evidence.  Um, he
48        doesn't -- he doesn't have that authority.  Um,
49        usually -- usually any time there's evidence issues,
50        Corey's been really good about sending emails or
```

HCSO/SPEAK
DEF001742

```
1        something saying --
2
3   JS:  Uh-huh.
4
5   JW:  -- Hey, I got this issue.  What do you want me to do
6        with it?  Um, I was actually surprised when I heard
7        about that -- that them got denied because I --
8        that's not Corey -- Corey usually doesn't do that.
9        I've never heard of him doing that.
10
11  JS:  Would you know who told Corey to put a stop to the
12       processing of the evidence?
13
14  JW:  No.
15
16  JS:  No?
17
18  JW:  No.  No, I don't.
19
20  JS:  You only heard about it later when it was sent back?
21
22  JW:  Uh, yeah.  Well, I -- I -- I heard about it just a
23       couple weeks ago.  Uh, Speak -- Vernon Speak told
24       me.  I -- I didn't know -- I didn't know about it
25       any other time than that.
26
27  JS:  Okay.  Damien?
28
29  DK:  Um, what -- what's the -- what's the atmosphere like
30       at -- at the Sheriff's Office with -- like with --
31       with this case? You know, this case has obviously
32       been in the media quite a bit.
33
34  JW:  Um, it's -- it's a very -- it's a very non-
35       productive and slow environment right now.  Um, the
36       -- the morale is not well.  Um, and it's, um -- no,
37       I don't know.  That's -- that's pretty much --
38       that's pretty much, you know, the way it is right
39       now.
40
41  JS:  Uh-huh.
42
43  JW:  I -- um, you know, it's -- it's just with this.  You
44       know, this was in the media.  And the other stuff
45       has hit, you know, in the media that -- the
46       allegations that the sheriff has done.  And it's
47       just -- Hendry County's not used to that spotlight.
48       So all of our deputies are kind of -- kind of
49       nervous right now.  Especially today.  So --
50
```

HCSO/SPEAK
DEF001743

26

```
 1   JS:   Oh, yeah.
 2
 3   JW:   It's Election Day.
 4
 5   JS:   Election Day.
 6
 7   JW:   Yeah.  So --
 8
 9   JS:   Election Day.  And just go over the -- the -- the
10         procedures one last time.  If a deputy or an
11         investigator has probable cause to ask -- to
12         petition for a warrant -- and there's a dropdown box
13         from what I understand --
14
15   JW:   Yes.
16
17   JS:   -- that you gotta check off.
18
19   JW:   Uh-huh.
20
21   JS:   Okay.  That deputy will -- or investigator will take
22         off on what they want.  If they want it send to the
23         State Attorney's Office for -- to apply for a
24         warrant, then it goes to a supervisor.  And the
25         supervisor's the one who authorizes that, correct?
26
27   JW:   That is correct.  Yes.
28
29   JS:   So that -- that's normal procedure.
30
31   JW:   Yes.
32
33   JS:   In -- in this case it wasn't going anywhere.  So
34         what was checked off on the little dropdown box?
35
36   JW:   Um, I can't, um, remember exactly how it happened.
37         I don't know if you guys got the transitional logs
38         on that report or not.
39
40   JS:   No, we don't.
41
42   JW:   I don't --
43
44   JS:   Not yet.
45
46   JW:   -- I don't know -- I don't know if, um -- I -- I
47         don't know how to get 'em either.  So -- um -- um,
48         but it went from Road Patrol to CID, and then back
49         to Road Patrol.  And then that's when all this stuff
50         happened.  I don't believe it was approved, uh, for
```

27

```
 1        a while.  Um, I don't remember -- I think -- I'm --
 2        I'm -- I'm -- I'm gonna say I think, 'cause I don't
 3        know for sure -- I think it was listed as records --
 4        HCSO records.
 5
 6   JS:  HCSO records.
 7
 8   JW:  Yeah.  Um, and -- 'cause even when I did my -- even
 9        when I did my narrative --
10
11   JS:  Uh-huh.
12
13   JW:  -- um, it wasn't -- it wasn't SAO.  Um, that I can
14        remember.  So --
15
16   JS:  So now it goes to Records.  And the records
17        custodian, they review that dropdown box.
18
19   JW:  Right.
20
21   JS:  Let's say it is a case that is remanded or sent to
22        the Sheriff -- the State Attorney's Office --
23
24   JW:  Uh-huh.
25
26   JS:  -- what's the records clerk's role in that?
27
28   JW:  Once the -- Records reviews all the cases -- all the
29        acting cases that have been approved.  Records can't
30        --
31
32   JS:  Uh-huh.
33
34   JW:  -- won't review anything if it's not approved yet.
35
36   JS:  Uh-huh.
37
38   JW:  Once it gets approved, they go down and they look to
39        see where it's gonna go.  Okay.  Is Records gonna
40        keep it or is it going to the State Attorney's
41        Office?  Once it has SAO -- if it has "SAO" on the
42        bottom, they'll put it in a portal, send it to SAO
43        and then they'll change that box to Records so that
44        they already know it's already been sent.  If
45        there's any updates or anything like that, then we
46        have to let 'em know, Hey, send this update to the
47        SAO.
48
49   JS:  Gotcha.  And what's the portal?
50
```

HCSO/SPEAK
DEF001745

28

1   JW:   That's the State Attorney's Office -- it's like a --
2         where they send all the paperwork and everything to
3         the State Attorney's Office.   It's on like --
4
5   JS:   Is it the, uh --
6
7   JW:   -- like the CJIS portal or something.
8
9   JS:   Okay.   So it's via database?
10
11  JW:   Right.   Yes, sir.
12
13  JS:   It's electronically transmitted.
14
15  JW:   Right.   Yes, sir.
16
17  JS:   The whole report.
18
19  JW:   Yes, sir.
20
21  JS:   Okay.   Can you think of anything?
22
23  DK:   No.
24
25  JS:   Well, I do actually.   Um, Lieutenant Reed, what's
26        his first name again?   Or Sergeant Reed, what's his
27        first name?
28
29  JW:   Shawn.   He's a -- he's a lieutenant now.   Shawn is
30        his first name.
31
32  JS:   Lieutenant now.   Shawn -- Shawn Reed?
33
34  JW:   Yes, sir.
35
36  JS:   Who'd the detective captain?
37
38  JW:   Uh, Captain Dave Harney.
39
40  JS:   Harney.   And how 'bout -- give me the command staff,
41        sergeant and lieutenant.
42
43  JW:   For CID?
44
45  JS:   Yes.
46
47  JW:   Um, it's, um, detective sergeant and then there's a
48        sergeant.   Um, if you're talking about basically
49        Speak's chain of command it would be --
50

29

```
 1  JS:  Uh-huh.
 2
 3  JW:  -- um, detective sergeant, which are all the
 4       detectives, and then a sergeant which is Mary Ann
 5       Bryant.
 6
 7  JS:  Uh-huh.
 8
 9  JW:  She's the West Side detective sergeant.  Sergeant,
10       detective sergeant, however you wanna --
11
12  JS:  Uh-huh.
13
14  JW:  And then there's Lieutenant Luis Morales.
15
16  JS:  Uh-huh.
17
18  JW:  And then Captain Dave Harney.
19
20  JS:  Captain Dave Harney.  And what position is Captain
21       Dave Harney with the agency?  Is he first -- is he
22       third, fourth, fifth in command?
23
24  JW:  Third.
25
26  JS:  Third in command.  So --
27
28  JW:  Yes, sir.
29
30  JS:  -- Wilson -- Sheriff Whidden, the -- the deputy --
31       the Chief Deputy Nelson, to -- to Hardy.
32
33  JW:  Yes, sir.  Yes, sir.  Captain Dave Harney.
34
35  JS:  Harney.  Harney.  Harney.  Harney.  Okay.  That's --
36       that's all I have, really.  I see you brought some
37       paperwork with you.  What is that?
38
39  JW:  Um, this is just the, um -- this is the crash
40       report.
41
42  JS:  Uh-huh.
43
44  JW:  Um, the crash report transaction log and just the --
45       the offense report.  I don't know if you guys
46       already have it already.
47
48  JS:  We do.
49
50  JW:  Um --
```

HCSO/SPEAK
DEF001747

30

```
 1
 2    JS:   I can always take another copy.  And --
 3
 4    JW:   Sure.  Sure.
 5
 6    JS:   -- so this is the full report?
 7
 8    JW:   That's the -- the crash report --
 9
10    JS:   Uh-huh.
11
12    JW:   -- the transaction log for the crash report.
13
14    JS:   And what is the transaction log?
15
16    JW:   Um, basically who's been in there and edited or
17          entered stuff.  Um, there's only -- there's only me
18          -- myself and Speak in there.  Um, when the -- when
19          the crash report was sent to me, um, judging by the
20          transaction log -- and I didn't know this until I
21          read the transaction log, 'cause it's been a year
22          ago --
23
24    JS:   Uh-huh.
25
26    JW:   -- um, apparently I'm the one that inputted all the
27          -- all the -- Mr. Smith's info into it.  Um, so --
28
29    JS:   Okay.  Damien and I will go over it later.
30
31    JW:   Yeah.  And then that's just the offense report that
32          I'm sure you guys already have.
33
34    JS:   Yes.  This -- we didn't have the crash report.  So
35          the crash report was generated by --
36
37    JW:   Speak.
38
39    JS:   -- Speak?
40
41    JW:   Yes, sir.  I don't know if -- I could kind of show
42          you --
43
44    JS:   Sure.
45
46    JW:   -- I mean, if you guys wanna know how -- if you kind
47          of wanna know how this transaction log -- it has, um
48          -- these are just the dates.  And the -- the -- the
49          way it printed out it's kind -- it's kind of hard to
50          read.  But, um, obviously that's me --
```

HCSO/SPEAK
DEF001748

31

```
 1
 2  JS:  Uh-huh.
 3
 4  JW:  -- and that's Speak.
 5
 6  JS:  How -- how do I know it's you?  Because JW?
 7
 8  JW:  J. -- J. Woods.  Yes, sir.  And then V. Speak.
 9
10  JS:  J. Woods.  Okay.  I don't have my glasses.  It's
11       kind of difficult.
12
13  JW:  Yeah.  Um, basically what -- and the way it printed
14       out is kind of awkward.  But it's -- like over here
15       would -- would have these.  So it basically shows,
16       um, you know, new -- if it was new, then that's --
17
18  JS:  Uh-huh.
19
20  JW:  -- what they put in.  Um, something that was entered
21       was new.
22
23  JS:  Uh-huh.
24
25  JW:  Um, and then, um, column name.  And that's just, you
26       know, what they would put in -- in certain columns.
27
28  JS:  Uh-huh.
29
30  JW:  Um --
31
32  JS:  And this is for the offense incident or this is for
33       --
34
35  JW:  This is for the crash report.
36
37  JS:  The crash report.
38
39  JW:  Yeah.  Um, I don't -- I don't -- I'm not able to
40       pull the offense incident transaction logs.
41
42  JS:  Okay.
43
44  JW:  Me personally.  I mean, I could --
45
46  JS:  Right.
47
48  JW:  -- pull 'em from -- through somebody.
49
50  JS:  I wouldn't.
```

HCSO/SPEAK
DEF001749

32

```
 1
 2    JW:  Yeah.  Um --
 3
 4    JS:  Let us do that.
 5
 6    JW:  Yeah.  Yeah.  Um, so that's, um -- that's -- that's
 7         pretty much it.  I didn't know -- I didn't know at
 8         the time until I reviewed the transaction logs that
 9         I was the one that put Carlton Smith's name and
10         information into the crash report.  But, um --
11
12    JS:  Okay.  I think that's it.  Anything else?
13
14    JW:  And I -- and I -- I do wanna say kind of that I --
15         I, uh -- I had a feeling that this case was gonna
16         come back.
17
18    JS:  Uh-huh.
19
20    JW:  Um, which is why I closed that out the way I did,
21         because I knew, you know, law enforcement
22         (unintelligible), you know?
23
24    JS:  Uh-huh.
25
26    JW:  Deputies don't -- without --
27
28    JS:  Right.
29
30    JW:  -- a reasonable doubt (unintelligible).
31
32    JS:  Yeah.  And we had discussed that.
33
34    JW:  Yeah.
35
36    JS:  We -- we kind of -- we don't -- that's not our
37         purview.  That's not --
38
39    JW:  Yeah.
40
41    JS:  -- it's state attorney.
42
43    JW:  Yeah.  So --
44
45    JS:  So -- but that's why you did that, because --
46
47    JW:  I -- ethically I -- I couldn't -- I couldn't close
48         it out with PC.
49
50    JS:  Right.
```

American High-Tech Transcription and Reporting, Inc.

HCSO/SPEAK
DEF001750

33

```
 1
 2   JW:   I just -- I -- I couldn't.  So the only way I could
 3         kind of stay on both sides, ethics and please the
 4         boss was to do it that way.
 5
 6   JS:   Okay.
 7
 8   JW:   So --
 9
10   JS:   Did you get any flack for closing it out that way?
11
12   JW:   Um, I -- I did not.  Um, I did not until I asked, um
13         -- somebody had asked me why I -- why I closed it
14         out that way.
15
16   JS:   From -- from your -- the agency?
17
18   JW:   No, it was after the news and after everything.
19         Somebody had asked me about it but I -- I don't --
20
21   JS:   Uh-huh.
22
23   JW:   -- I don't remember who it was.
24
25   JS:   Okay.  Well, I think that's all the questions I have
26         for now.  And we -- Damien and I might reach out to
27         you later.
28
29   JW:   Okay.
30
31   JS:   And we'll do it the same we did this time.  We'll
32         call you directly.
33
34   JW:   Okay.
35
36   JS:   Okay.
37
38   DK:   And we appreciate --
39
40   JW:   Yes, sir.
41
42   DK:   -- you taking -- taking the time --
43
44   JW:   Yes, sir.  No problem.
45
46   DK:   -- to come in and talk to us.
47
48   JS:   Yes, yes, yes.  Okay. So, in regards to this
49         investigation, is there anything that I either
50         failed to ask or anything that you would like to add
```

```
 1        or clarify in your statement today?
 2
 3   JW:  Um, just I -- the -- about, you know -- about Chief
 4        Nelson --
 5
 6   JS:  Uh-huh.
 7
 8   JW:  -- you know, telling me to close the case out, it
 9        was -- I mean, he -- he -- he did tell me that, but
10        I think it was more of a, This is what the sheriff
11        wants.  You need to close the case out.  You know
12        what I mean?
13
14   JS:  Yeah.
15
16   JW:  It was -- it was kind of that type of --
17
18   JS:  And did the sheriff himself ever tell you to --
19
20   JW:  No.
21
22   JS:  -- that he wanted the case closed?
23
24   JW:  No.
25
26   JS:  Okay.
27
28   JW:  So that's it.
29
30   JS:  Okay.
31
32   DK:  When -- let me just add something in here.  When --
33        when you did get to the point where you made the
34        decision, Okay, I'm -- I'm closing this case out,
35        you close the case out because you -- you had been
36        ordered by somebody up the -- up the ladder --
37
38   JW:  Yes.
39
40   DK:  -- from you, Close the case out, so you closed the
41        case out --
42
43   JW:  Yes, sir.
44
45   DK:  -- right?
46
47   JS:  And that being Chief Nelson --
48
49   JW:  Yes, sir.
50
```

35

```
 1   JS:  -- Chief Deputy Nelson.
 2
 3   JW:  Uh-huh.
 4
 5   JS:  Okay.  Did you voluntarily provide a statement
 6        today?
 7
 8   JW:  Yes.
 9
10   JS:   Okay.  Have you been promised anything in exchange
11        for providing this statement today?
12
13   JW:  No, sir.
14
15   JS:  Okay.  Has the information that you have provided
16        during this interview been the truth to the best of
17        your knowledge or recollection?
18
19   JW:  Yes.
20
21   JS:  Okay.  This interview is concluded at 11:40 a.m., on
22        November 8th, 2016.  With your permission, can Damien
23        turn off his recorder?
24
25   JW:  Yes.
26
27   JS:  Thank you.
28
29                  (CONCLUSION OF INTERVIEW)
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45   Transcribed by: jak/jak/ms
```

HCSO/SPEAK
DEF001753