UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

VERNON SPEAK,

        Plaintiff,

v.                                           Case No. 2:18-cv-826-JLB-NPM

STEVE WHIDDEN, in this official capacity
as Sheriff of Hendry County, Florida, and
STEVE WHIDDEN, in his individual
capacity,

        Defendants.

_____/

## **ORDER**

Plaintiff Vernon Speak ("Sgt. Speak") is a former detective-sergeant with the Hendry County Sheriff's Office ("HCSO").  In January 2019, he was fired from his job by the Sheriff of Hendry County, Steve Whidden.[1]  Sgt. Speak alleges that Sheriff Whidden fired him because he blew the whistle on Sheriff Whidden's improper interference in a hit-and-run investigation in 2016.  He sues Sheriff Whidden for: (1) violating the Florida Whistle-blower's Act ("FWA"), Fla. Stat § 112.3187 (2018); and (2) violating 42 U.S.C. § 1983 by retaliating against Sgt. Speak for speech he claims is protected by the First Amendment.  (Doc. 40.)  Sheriff Whidden moves for summary judgment, arguing that he fired Sgt. Speak for misconduct in a completely unrelated investigation that took place years after the

---

[1] Sgt. Speak's claim under 42 U.S.C. § 1983 is against Sheriff Whidden in both his individual and official capacity.  For ease of reference, the Court will refer to both Defendants collectively as "Sheriff Whidden" or "the Sheriff."

alleged whistleblowing. (Doc. 60.) He also claims that the speech at issue in this case is not protected by either the FWA or the First Amendment, and that he is entitled to qualified immunity in his individual capacity. (Id.) Each side has a drastically different story to tell, and each side disputes virtually every relevant fact. After carefully studying the extensive record in this case, the Court concludes that there are too many questions of fact for this matter to be resolved at the summary judgment stage. Accordingly, the Court **DENIES** Sheriff Whidden's motion for summary judgment. (Doc. 60.)

<u>BACKGROUND</u>

Many of the facts are vehemently disputed. The discussion below describes the facts in the light most favorable to the non-moving party—Sgt. Speak.[2]

## I. Sheriff Whidden Intervenes in Sgt. Speak's Hit-and-Run Investigation.

In the early morning hours of September 11, 2015, a minor was struck by the side mirror of a passing pickup truck while she was walking to her school bus stop in LaBell, Florida. (Doc. 63-1 at ¶ 4; Doc. 72-2 at 1.) Sgt. Speak was assigned to the

---

[2] Sheriff Whidden claims that Sgt. Speak has inadvertently admitted many damaging facts laid out in the motion for summary judgment because he responded that he was "without knowledge" of them. (Doc. 88, 3–6.) When an assertion in a motion for summary judgment is supported by testimony and documentary evidence, a plaintiff must do more than deny it based on lack of knowledge—they must controvert it when their own evidence. See, e.g., Christensen v. City of Warner Robins, No. 5:16-CV-76(MTT), 2018 WL 1177250, at *7, n 6. (M.D. Ga. Mar. 6, 2018). But Sgt. Speak has provided ample evidence to controvert Sheriff Whidden's assertions, at least in the mind of a reasonable trier of fact. To be sure, Sheriff Whidden's broader point about the organization of Sgt. Speak's response is well-taken—it could have been drafted in a much clearer manner, and with far fewer than 119 exhibits appended. But the Court will not resolve this motion on hyper-technical "gotcha" admissions.

hit-and-run investigation.  (Doc. 72-2 at 2.)  Based on pieces of the truck's mirror recovered from the scene, Sgt. Speak was able to identify the truck's make and model.  (Doc. 69-9 at 2.)  Eleven days later, while staking out the scene of the hit-and-run with another officer, Sgt. Speak observed a pickup truck of the same make and model driving above the speed limit.  (Doc. 69-9 at 3.)  After stopping the truck, Sgt. Speak noticed that one of its mirrors looked brand new.  (Id. at 4.)

The driver of the truck told Sgt. Speak that he was sorry for speeding, but he was in a hurry and late for work.  (Id. at 3–4.)  Sgt. Speak asked the driver whether he hit something with his truck on or about September 11, and the driver admitted that he had (although he assumed it was a mailbox or garbage can).  (Id.)  When Sgt. Speak returned to his patrol car to run the vehicle's license plate, the driver directly called Sheriff Whidden and asked him to hurry the traffic stop.[3]  (Id. at 4.)  In turn, Sheriff Whidden called the phone of the other officer working the stop and asked him to pass his phone to Sgt. Speak.  (Doc. 71-12 at 4:23–45.)

During their conversation, Sheriff Whidden allegedly told Sgt. Speak that the driver was a "good guy" who needed to get to work, so Sgt. Speak should "try to get him out of there."  (Doc. 71-12 at 5:4–12.)  Sgt. Speak told Sheriff Whidden that he wanted to interview the driver because he was a suspect in a felony hit-and-run, but Sheriff Whidden responded that an interview was not "necessary."  (Id. at 5:11.)  As a compromise, Sheriff Whidden allegedly agreed that Sgt. Speak could have the

---

[3] This is apparently not unusual in a small, rural county like Hendry, where many residents personally know the Sheriff.  (Doc. 61 at 76:24–77:7.)

driver come back to the station for an interview later that day.  (Doc. 76-11 at ¶ 8.)
Sgt. Speak agreed that he would try to hurry the stop and hung up.  (Doc. 71-12 at
5:15–16.)  But instead of immediately ending the stop, Sgt. Speak walked back to
the truck and spent a few more minutes taking a statement from the driver (who,
according to Sgt. Speak, was visibly upset when he realized that his call to the
Sheriff did not resolve the situation).  (Doc. 69-9 at 4; Doc. 71-11 at ¶ 9.)  According
to Sgt. Speak, the driver gave inconsistent and evasive answers during the
questioning.  (Doc. 69-9 at 6.)  Sgt. Speak and the driver ultimately agreed that the
driver would come down to the station for a second interview that same day at 4:00
p.m., but the driver never showed up.  (Doc. 76-11 at ¶ 11.)

Later that evening, Sgt. Speak drafted and submitted an offense report in
which he concluded that the driver had, in fact, committed the hit-and-run.  (Doc.
69-9 at 3–5.)  In the report, Sgt. Speak specifically mentioned that the driver called
Sheriff Whidden during the traffic stop and asked him to speed it up.  (Id. at 3.)  In
the final sentence of the report, Sgt. Speak referred the matter to the HCSO's
Criminal Investigations Division for further review.  (Id. at 5.)

The next day, Sgt. Speak went to a shooting competition hosted by the
HCSO's SWAT team to raise money.  (Doc. 71-12 at 10:8–15.)  After he arrived at
the shooting range, Sgt. Speak alleges that Sheriff Whidden confronted him about
the offense report he submitted the previous night.  (Doc. 76-11 at ¶ 12.)  The
Sheriff allegedly told Sgt. Speak that his report was highly embarrassing (using
much stronger, profanity-laced language).  (Doc. 61 at 99:3–9; Doc. 76-11 at ¶ 12.)

During this heated discussion, Sheriff Whidden allegedly said, "I thought we understood each other," and told Sgt. Speak that he assumed the hit-and-run would not be investigated further. (Doc. 69-11 at 54:4–8; Doc. 71-12 at 10:40.) Sheriff Whidden also told Sgt. Speak that he knew the driver of the white pickup truck, and he was a "good guy" who was facing unrelated criminal charges, so Sheriff Whidden did not want to "make it any worse on him." (Doc. 71-12 at 14:11–22.)

Sgt. Speak explained that he was simply being as detailed as possible because the driver did not appear for his second interview. (Doc. 71-12 at 20:25–39.) Sheriff Whidden allegedly responded that he himself told the driver not to come for the second interview because he did not think Sgt. Speak had any evidence of a crime. (Id. at 20:35–21:19.) Sheriff Whidden and Sgt. Speak also disagreed on whether the driver acted with criminal intent. (Id. at 11:12–18.) Sheriff Whidden believed that the driver did not have such intent and told Sgt. Speak that he wanted to "keep [him] from making a bad arrest." (Id.) Ultimately, Sgt. Speak and Sheriff Whidden did not resolve their differences at the range that day.[4]

On September 24, 2015—two days after Sgt. Speak submitted the offense report—Lieutenant Joshua Woods closed the criminal investigation of the hit-and-run incident due to lack of evidence of criminal intent. (Doc. 69-9 at 5–6.) Lt.

---

[4] In his later civil deposition, Sgt. Speak described a similar encounter with Sheriff Whidden the same day as the traffic stop, where Sheriff Whidden also told Sgt. Speak that the driver of the truck was a "good guy" who was "about to go to prison" and there was "no reason to go after this case." (Doc. 69-11 at 55:14–57:11.) This event is not among the facts set forth in Sgt. Speak's memorandum opposing summary judgment. (Doc. 82 at 7.)

Woods testified that he closed the investigation at the direction of Sheriff Whidden and Chief Deputy Kevin Nelson.  (Doc. 76-14 at 11:16–12:4, 17:19–18:3.)

At some point (either before or after the investigation was closed), Chief Deputy Nelson told Sgt. Speak that he was "disappointed" in him for using the Sheriff's name in the offense report.  (Doc. 71-12 at 22:16–39.)  Chief Deputy Nelson also told Sgt. Speak that he needed to "fix this" because the Sheriff was "upset."  (Id. at 23:8–16.)  Sgt. Speak could not alter the offense report because that would have been illegal, so he decided "to just let it go."  (Id. at 23:36–47.)

A few days after his talk with Chief Deputy Nelson, Sgt. Speak was called into Sheriff Whidden's office.  Sgt. Speak was expecting to be fired, but the Sheriff jovially told him that he was "not mad" and "[e]verything's fine," but "[y]ou just can't do that [kind of] thing"—referring to Sgt. Speak's narrative about the Sheriff in the offense report.  (Id. at 24:37–46.)  Sgt. Speak told Chief Deputy Nelson about the positive conversation.  Chief Deputy Nelson was pleased and reminded Sgt. Speak to "take care" of the offense report.  (Id. at 25:1–10.)  Not knowing that the hit-and-run case was already closed, Sgt. Speak decided to do nothing further and let the Criminal Investigations Division handle it.  (Id. at 25:21–26.)

## II.    Sgt. Speak "Blows the Whistle" on Sheriff Whidden's Intervention.

Meanwhile, the parents of the minor who was struck by the side-mirror hired Attorney Steve Ramunni to represent them.  On October 21, 2015, Attorney Ramunni contacted the Office of the State Attorney ("SAO") for the Twelfth Judicial

Circuit Court of Florida to inquire about the criminal case against the driver, but he was told that no such case existed.  (Doc. 72-2 at 2; Doc. 71-13.)

An assistant state attorney ("ASA") told Attorney Ramunni that she would check whether there was a case on his behalf.  (Doc. 71-13.)  In turn, the ASA contacted the HCSO and requested all documentation about the hit-and-run.  (Id.) The same day she received these documents, the ASA claims that Sheriff Whidden called her personal cellphone and asked why she was reviewing this incident.  (Id.) Sheriff Whidden advised the ASA that he believed the matter was non-criminal, but the ASA responded that she would be reviewing the facts of the case to determine whether it was criminal or not.  (Id.)  Ultimately, however, the ASA issued a disposition notice to the HCSO on November 9, 2015, declining to prosecute the case because evidence of criminal intent was lacking.[5]  (Doc. 63-2 at Ex.1.)

The ASA's disposition notice defused the situation until the following year, when Attorney Ramunni commenced a civil lawsuit against the driver of the white pickup truck.  On August 10, 2016, Attorney Ramunni deposed Sgt. Speak under subpoena in the civil case.  (Doc. 69-11.)  During the deposition, Sgt. Speak essentially told the same story as the one outlined above, including the details about: (a) Sheriff Whidden's phone call during the traffic stop, (b) his hostile encounter with the Sheriff at the shooting range, and (c) his fear that he was going

---

[5] The ASA's disposition notice cited State v. Dorsett, where the Florida Supreme Court held that, under Florida law, the felony of "leaving the scene of a crash resulting in injury" requires actual knowledge of the crash.  158 So. 3d 557, 560–62 (Fla. 2015).  In other words, because the driver of the pickup truck did not know that he hit a person, no felony could be charged.

to be fired because of how he drafted the offense report.  (Id. at 41:16–43:5, 52:18–57:16, 71:21–74:3, 83:7–85:23, 129:23–130:11.)  Sgt. Speak also made very clear that he disagreed with how Sheriff Whidden handled the case, and that he would have arrested the driver of the pickup truck during the traffic stop had Sheriff Whidden not gotten involved.  (Id. at 91:18–92:17, 130:12–17.)

Five days after the deposition, on August 15, 2016, Attorney Ramunni sent a letter to the SAO, stating that he "represent[ed] Vernon J. Speak" and asking the SAO to investigate "several violations of Florida's Criminal Statutes" by Sheriff Whidden and Chief Deputy Nelson due to their interference in the hit-and-run case that Sgt. Speak had investigated.  (Doc. 63-2 at Ex. 3.)  Attached to the letter was a transcript of Sgt. Speak's deposition testimony.  (Id.)

The letter from Attorney Rammuni sparked a lengthy investigation by the SAO for the Fifteenth Judicial Circuit Court of Florida and the Florida Department of Law Enforcement ("FDLE") into Sheriff Whidden's handling of the hit-and-run.[6] As part of the investigation, Sgt. Speak gave a sworn statement to FDLE.  (Doc. 71-12.)  Eventually, on May 16, 2018, the SAO for the Fifteenth Judicial Circuit concluded (based on the FDLE's investigative findings) that Sheriff Whidden's handling of the hit-and-run was not improper because: (a) there was no evidence of a quid pro quo; (b) there was no evidence that any official records were altered, fabricated, or destroyed; and (c) the evidence showed that the Sheriff's decision was

_____

[6] The SAO for the Twelfth Judicial Circuit recused itself from investigating the HCSO due to their working relationship, and the Governor of Florida assigned the investigation to a different SAO by executive order.  (Doc. 71-9.)

authorized by Florida law because he believed that the driver lacked criminal intent—a conclusion that was bolstered by the disposition notice from the SAO for the Twelfth Judicial Circuit.[7]  (Docs. 72-2, 72-3.)

### III.   Sgt. Speak Allegedly Experiences Retaliation for His Whistleblowing.

Sgt. Speak alleges that he experienced multiple instances of retaliation and general antagonism due to his whistleblowing from August 2016 (when he triggered the investigation against Sheriff Whidden) to January 2019 (when he was ultimately terminated from the HCSO).  All these disputed incidents are briefly summarized as follows:

1.  July 2016: Sgt. Speak alleges that he loaned his traffic vest to another officer and was not given a replacement until two years later, after threats of discipline for "losing" the vest.  (Doc. 72-6; Doc. 76-11 at ¶ 16.)  Lieutenant Christian Buchhofer, one of Sgt. Speak's former supervisors, testified that Speak was never actually disciplined, but a replacement vest was "withheld."  (Doc. 76-15 at 78:12–23.)

2.  September 2016: Sgt. Speak reported that another officer called him a "snitch" due to his whistleblowing.  (Doc. 69-12.)  The officer received a verbal reprimand and a two-day suspension, but Sgt. Speak believes the matter should have been investigated further.  (Doc. 63-2 at ¶ 12.)

---

[7] The SAO's memorandum did note that the driver of the pickup truck had made campaign contributions to Sheriff Whidden the past, but the contributions were made years before the traffic stop.  (Doc. 72-3 at 4.)

3.   January 2017: Sgt. Speak alleges that he asked Chief Deputy Nelson
to circulate a thank-you memo to recognize multiple individuals and
departments of the HCSO for their contribution to a successful
homicide investigation, but Chief Deputy Nelson denied the
request.  (Doc. 63-2 at Ex. 4; Doc. 76-11 at ¶ 25.)  Chief Deputy Nelson
does not recall receiving the memo but testified that he would have
denied the request because Sgt. Speak wanted to recognize whole
departments rather than specifying individuals who should have
received the thank-you memo.  (Doc. 63-2 at ¶14.)

4.   February 2017: Sgt. Speak alleges that he was denied a promotion to
road patrol sergeant despite being the top-ranked applicant for the
job.  (Doc. 76-11 at ¶¶36–38.)  Sgt. Speak's belief that he was the best
applicant stems from a conversation he had with Lieutenant Shawn
Reed, who told him that he scored the highest on both the written
exam and the interview.  (Id.)  Sheriff Whidden counters that Sgt.
Speak did not receive the promotion because he was, in fact, the
lowest-ranked applicant.  (Doc. 63-2 at Ex. 5.)

5.   April 2017: Sgt. Speak claims that he was unfairly placed under an
internal investigation due to an incident where he was falsely accused
of making inappropriate hand gestures and shouting obscenities at a
driver who he pulled over.  (Doc. 76-11 at ¶¶45–49.)  The investigation
eventually concluded that these allegations were unsubstantiated, but

Lt. Buchhofer was instructed to follow up with "progressive discipline" against Sgt. Speak for going above the speed limit during this incident. (Doc. 76-15 at 55:1–5, 57:3–23.) Lt. Buchhofer ultimately chose not to issue any discipline. (Id. at 62:5–63:1.) Another officer involved in the incident allegedly drove as fast as Sgt. Speak, but there was no request to discipline him. (Id. at 154:4–23.) Sgt. Speak alleges that due to the internal investigation, his application for a new job with the Seminole Police Department could not be processed. (Doc. 61 at 185:10–186:3.)

6.   April 2017: Sgt. Speak alleges that the same officer who previously called him a "snitch" instructed a lower-ranking officer not to assist him when he got a flat tire. (Doc. 76-11 at ¶¶ 50–52.) The lower-ranking officer signed a sworn declaration that he could not assist Sgt. Speak with the flat tire because he was involved with a search for a subject with an active warrant and did not have room in his car for the type of jack that Sgt. Speak needed. (Doc. 63-4.) The other officer who allegedly directed the lower-ranking officer not to respond testified that he allowed his subordinates to "make up their own mind, [and he] was not getting involved in it." (Doc. 76-18 at 13:25–14:2.)

7.   September 2017: Sgt. Speak missed an appointment to meet with the family of a decedent due to a scheduling error. (Doc. 69-20.) Sgt. Speak alleges that Chief Deputy Nelson told the family that Sgt. Speak

was a horrible detective and falsely relayed to Lieutenant Buchhofer that the family was irate due to the missed appointment.  (Doc. 76-11 at ¶ 57.)  Chief Deputy Nelson denies calling Sgt. Speak a horrible detective.  (Doc. 63-2 at ¶ 21.)  During his deposition, Sgt. Speak could not recall anything Lt. Buchhofer said regarding Chief Deputy Nelson's reaction to the incident.  (Doc. 61 at 215:16–23.)

8.   <u>December 2017</u>: Sgt. Speak alleges that another officer refused to send a road unit to assist him with a traffic stop.  (Doc. 76-11 at ¶¶ 59–62; Doc. 74-14.)  In his deposition, Sgt. Speak clarified that the other officer was concerned about his road unit deputies being burdened with traffic stops that Sgt. Speak should be doing himself.  (Doc. 61 at 224:4–226:21.)  Lt. Buchhofer also testified that this was the other officer's main concern.  (Doc. 62 at 89:8–90:8.)

Finally, Sgt. Speak claims that Chief Deputy Nelson questioned his consistently positive performance evaluations and even ordered that his evaluation scores be lowered.  (Doc. 76-11 at ¶ 21–22.)  Lt. Buchhofer testified that after he gave Sgt. Speak a positive evaluation, Chief Deputy Nelson held up the evaluation at a meeting and said, "This again?"  (Doc. 76-15 at 35:2–12.)  Lt. Buchhofer responded that the evaluation reflected Sgt. Speak's performance, and Chief Deputy Nelson did not further discuss the matter, but Lt. Buchhofer noted that "you could tell that he . . . disapproved of the high score that [Sgt. Speak] received."  (<u>Id.</u>)

IV. **Sgt. Speak is Terminated After an Internal Investigation That Ostensibly Arose Out of His Conduct in an Auto-Theft Case**.

   A. **The Auto Theft Investigation.**

In January 2017, Sgt. Speak was asked to assist Detective Brianna Pascher with an investigation stemming from a burned truck cab that was discovered on the side of a road in LaBell, Florida.  (Doc. 73-1 at 71–72.)  Sgt. Speak met with Det. Pascher at the HSCO's headquarters, where she was interviewing the wife of a local auto shop owner.  (Id. at 72.)  Det. Pascher advised Sgt. Speak that she had a lead from a "concerned citizen," suggesting the truck to which the cab belonged was stolen and being disassembled in a local auto shop (a possible "chop shop").  (Doc. 70-4 at 5.)  Sgt. Speak told Det. Pascher to stop what she was doing and go secure the auto shop.  (Doc. 73-1 at 72.)  Eventually. Sgt. Speak joined Det. Pascher at the shop, and the two began interviewing people at the scene.

One of the suspects present at the shop—who would eventually be charged in connection with the theft of the truck—allegedly pointed at Det. Pascher and implied that she tipped off the suspects that police were on their way.  In his probable cause report, Sgt. Speak described this incident as follows:

> [T]his is when "you" (pointing at [Det. Pascher]) "called me and, (pause) "my dad called me and told me the cops were coming."

(Doc. 73-1 at 72.)

As it turned out, the "concerned citizen" who gave Det. Pascher the lead on the stolen truck was her then-boyfriend.  (Id. at 75.)  Det. Pascher asked Sgt. Speak not to use her boyfriend's name in his probable cause report because he was friends with some of the people involved in the theft of the truck and was concerned that

13

they may retaliate against him.  (Doc. 63-5 ¶ 5; Doc. 76-15 at 127:19–3.)
Ultimately, however, Sgt. Speak included the boyfriend's name in his report
because he believed the boyfriend was involved in the crime.  (Doc. 76-11 at ¶¶ 27–
28; Doc. 76-15 at 131:2–10.)  Sgt. Speak alleges that several suspects who he
interviewed claimed that Det. Pascher's boyfriend warned them that police were
coming after he spoke with her.  (Doc. 76-11 at ¶ 30.)  Sgt. Speak and Lt. Buchhofer
both claim that they referred their concerns about Det. Pascher for an internal
investigation but did not receive an immediate response.  (Doc. 76-11 at ¶33; Doc.
76-15 at 121:22–122:6.)

Sgt. Speak closed his investigation of the truck in March 2018 and sought
arrest warrants for multiple suspects.  (Doc. 76-11 ¶ 63.)  Sometime in late April or
early May 2018, the ASA reviewing the case grew concerned that Det. Pascher may
have tipped off the suspects based on Sgt. Speak's account of the facts.  (Doc. 76-29
at 55:7–12.)  The SAO communicated its concerns about Det. Pascher to Sheriff
Whidden and Chief Deputy Nelson.  (Doc. 63-1 at ¶ 9; Doc. 63-2 at ¶ 22.)  On May 4,
2018, Chief Deputy Nelson directed Lieutenant Ben Rowe to begin an internal
investigation of Det. Pascher.  (Doc. 63-2 at ¶ 23; Doc. 63-3 at Ex. 3.)

During his investigation of Det. Pascher, Lt. Rowe interviewed Sgt. Speak on
several occasions.  (Doc. 70-4.)  Among other things, Lt. Rowe asked Sgt. Speak if he
requested clarification from Det. Pascher about her allegedly tipping off the
suspects.  Sgt. Speak responded that he spoke to Det. Pascher toward the end of the
investigation, and she told him that the suspect who gestured toward her at the

14

auto shop could have just as easily gestured to the auto shop owner's wife, who was standing next to Det. Pascher.  (Id. at 9–10).  Sgt. Speak told her that he understood; he then stated, in an aside to Lt. Rowe, "[Y]ou know what[?]  I wish I could have been more specific in what I wrote."  (Id. at 10.)  Sgt. Speak also talked to Det. Pascher about other suspects claiming that she had tipped off her boyfriend, and she responded that these accusations were "malarkey."  (Id.)  According to Sgt. Speak, Det. Pascher told him that when her boyfriend gave her the tip on the stolen car, he himself may have "picked up on the fact that there's more going on . . . so he went back to tell his buddies."  (Id.)  Sgt. Speak further noted that, after discussing the issue with Det. Pascher, he had "no concerns."  (Id.)

Lt. Rowe also interviewed the boyfriend, who stated that he was upset about his identity being revealed and claimed that he was accosted at a local gas station by people involved in the chop shop case.  (Doc. 63-3 at Ex. 4.)

On June 25, 2018, Lt. Rowe wrote a memo to Chief Deputy Nelson, stating that he had "concerns of possible policy violations" committed by Sgt. Speak in implicating Det. Pascher and exposing her boyfriend's identity.  (Id. at Ex. 5.)  Two days later, Chief Deputy Nelson wrote a response memorandum concurring that Sgt. Speak may have violated multiple HCSO policies and ordered him to conduct an internal investigation into Sgt. Speak.  (Id. at Ex. 6.)

### B.    Sgt. Speak's Internal Investigation and Termination.

Pursuant to the new internal investigation, Lt. Rowe interviewed Sgt. Speak two more times on July 30, 2018, and August 27, 2018.  (Docs. 70-7, 70-8.)  Based on

the content of these interviews, Lt. Rowe took issue with the fact that Sgt. Speak did not update his probable cause report after he no longer believed Det. Pascher had tipped off any suspects, did not adequately protect the identity of Det. Pascher's boyfriend, and generally did not conduct a thorough enough investigation into the auto theft.  (Doc. 63-3 at ¶¶ 16–18.)  Lt. Rowe also took issue with the fact that Sgt. Speak's description of the pointing incident with Det. Pascher seemed inconsistent and contradictory.  (Id. ¶ 18.)  On September 28, 2018, Lt. Rowe concluded his investigation with a lengthy "Finding of Facts" and "Close-Out Memorandum," in which he found that Sgt. Speak had violated multiple HCSO policies during his investigation of the auto theft/chop shop case.[8]  (Doc. 63-3 at Exs. 7, 8.)  These violations stemmed mostly from Sgt. Speak's allegedly sloppy handling of the investigation (e.g., failing to follow leads), but there were also violations arising from his statements about Det. Pascher and her boyfriend.  (Id.)

After reviewing Lt. Rowe's findings, Sheriff Whidden served Sgt. Speak with a Notice of Proposed Discipline on November 27, 2018, recommending that Sgt. Speak's employment be terminated.  (Doc. 71-2.)  In response, Sgt. Speak requested a Loudermill hearing[9] before a pre-disciplinary panel consisting of three HCSO

---

[8] Among the alleged violations was failure to comply with a direct order of an internal affairs investigator because Sgt. Speak allegedly failed to properly respond to Lt. Rowe's request for a second interview.  (Doc. 63-3 at ¶ 19.)  Sgt. Speak alleges that he simply wanted a different interview date, and he eventually got one, but not before an additional charge for noncompliance was added.  (Doc. 76-11 at ¶¶ 71–74.)

[9] See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985) (requiring "some kind of hearing prior to the discharge of an employee who has a

officers, so that he could have an opportunity to explain why he should not be terminated.  (Id.; Doc. 63-2 at ¶¶ 28–29.)  Sgt. Speak also wrote a twenty-four-page inter-office memorandum to Sheriff Whidden in which he contested all the policy violations alleged by Lt. Rowe.  (Doc. 71-5.)

Before the Loudermill hearing took place, Sgt. Speak—apparently assuming that the result of the hearing was a foregone conclusion—filed his first complaint in this case.  (Doc. 1.)  Although he had not yet officially been terminated, Sgt. Speak's original complaint alleged that he had been "the victim of retaliatory actions . . . including without limitation his termination."  (Id. at ¶ 42.)

Sgt. Speak and his counsel attended the Loudermill hearing on January 16, 2019.[10]  (Doc. 63-6 at ¶ 10.)  After reconvening on January 24 and 25, the panel unanimously sustained all the policy violations found by Lt. Rowe's investigation and recommended Sgt. Speak's termination.  (Id. at Ex. 4.)  Sheriff Whidden agreed with the panel's unanimous recommendation, and Sgt. Speak was officially terminated on January 25, 2019.  (Doc. 63-2 at Ex. 10.)

## C.    The Alleged Pretext Behind Sgt. Speak's Termination.

Sgt. Speak alleges that his termination in January 2019 was retaliation for his whistleblowing activity in October 2015, and that any nondiscriminatory reason

---

constitutionally protected property interest in his employment" (internal quotations and citations omitted)).

[10] Sgt. Speak alleges that the panel refused to allow him to present evidence of Lt. Rowe's dishonesty, but Sheriff Whidden contends that the panel did allow Sgt. Speak to read a statement that he prepared in advance as a rebuttal to Lt. Rowe's investigation.

for the firing is pretextual.  To prove up these claims, Sgt. Speak points to several pieces of evidence.

First, Lt. Buchhofer testified that he had a conversation with Sheriff Whidden in December 2018—after Lt. Rowe's findings but before the <u>Loudermill</u> hearing—at a "post-Christmas party."  (Doc. 76-15 at 155:10–14.)  During this conversation, the subject of Sgt. Speak came up, and Sheriff Whidden allegedly told Lt. Buchhofer some version of the following:

> Look, I know you are supporting [Sgt. Speak] on all that's going on, that you are on [Sgt. Speak's] side.  <u>What he did to me and my family, I can't forgive him for that</u>, but when all is said and done, I want to sit down with you and tell you what happened, what my side of it is.

(<u>Id.</u> at 160:12–17) (emphasis added).

Second, Lt. Buchhofer claimed that on December 11, 2018, he had a conversation with Lieutenant Shawn Reed, who was one of the three members of Sgt. Speak's <u>Loudermill</u> panel.  (Doc. 76-15 at 137:23–138:1.)  The subject of Sgt. Speak's internal investigation came up, and Lt. Reed allegedly told Lt. Buchhofer something to the extent of, "Well . . . he's pretty much gone."  (<u>Id.</u> at 138:21.)  Lt. Buchhofer responded that he believed there were numerous problems with the internal investigation into Sgt. Speak's conduct, to which Lt. Reed replied that Sgt. Speak had "lied during his deposition on Sheriff Whidden."  (Doc. 75-17 at 2.)  This discussion—assuming it did occur—would have taken place a month before Sgt.

Speak's <u>Loudermill</u> hearing.  Lt. Buchhofer wrote an inter-office memo to document this incident.[11]  (<u>Id.</u>)

Third, Sgt. Speak points to deposition testimony by former HCSO officers regarding Lt. Rowe's motivations.  One officer testified that he used to be friends with Lt. Rowe, but the two drifted apart after the officer expressed some support for Sgt. Speak.  (Doc. 76-22 at 23:19–24:10.)  When this officer discussed Sgt. Speak's involvement in the hit-and-run matter, Lt. Rowe allegedly responded "[t]hat it was pretty cut and dry that [Sgt. Speak] was lying," and that Sgt. Speak was "terminated because everything lined up.  <u>He lied in his depo, and then lied about lying in his depo, so this is what happened</u>."  (<u>Id.</u> at 8:23–9:5, 48:3–21) (emphasis added).  Another officer testified that he also was the subject of an internal investigation by Lt. Rowe shortly after he wrote an anonymous report criticizing the HCSO's logistical response to Hurricane Irma.  (Doc. 76-26 at 7:8–11:7, 13:13–14:15.)  The investigation was supposedly due to an unlawful arrest incident that happened months before the Hurricane Irma report, and when the officer asked Lt. Rowe what policies he had violated, Lt. Rowe allegedly answered that "he didn't know, [and] he would have to look into it."  (<u>Id.</u> at 14:12–15.)

Fourth, Sgt. Speak believes that other officers who had committed similar misconduct were not subjected to similar investigation or punishment.  He points to

---

[11] The memo clearly states that Lt. Reed believed Sgt. Speak had lied during civil deposition in the hit-and-run case, but Lt. Buchhofer took a more equivocal view during his own deposition, claiming that he was not sure what exactly Lt. Reed meant, and that he took the statement to mean that Sgt. Speak had lied regarding the "totality" of the hit-and-run case.  (Doc. 76-15 at 141:4–10.)

various memoranda by Lt. Buchhofer documenting misconduct which was never the subject of an internal investigation (let alone one that led to termination), including failure to secure a crime scene, documenting a false confession, and failing to document evidence.  (Docs. 72-10, 72-11, 72-12.)

### SUMMARY JUDGMENT STANDARD

Summary judgment is only proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "In other words, summary judgment is warranted if a jury, viewing all facts and any reasonable inferences therefrom in the light most favorable to plaintiffs, could not reasonably return a verdict in plaintiffs' favor."  Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1581 (11th Cir. 1995) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact . . . ." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Id.

### DISCUSSION

**I.    Sgt. Speak's Whistleblower Claim Is Not Untimely**.

Sheriff Whidden first argues that Sgt. Speak's FWA claim is untimely under the statute's 180-day limitations period.  (Doc. 60 at 13–14.)  While the Court agrees that much of the retaliatory conduct alleged by Sgt. Speak is beyond the statutory limitations period, his termination (and the investigation leading up to it) is not.

The FWA provides that, in order to bring a civil action under the statute, an employee of a "local government authority" must file suit either: (a) within 180 days of the authority's final decision on the employee's administrative whistleblower complaint, assuming the employer has established an administrative procedure for handling such complaints; or (b) if there is no administrative procedure, within 180 days of any action prohibited by the statute.  Fla. Stat. § 112.3187(8)(b).

The parties do not dispute that the HCSO is a "local government authority" under the FWA.  See Bradshaw v. Bott, 205 So. 3d 815, 819 (Fla. 4th DCA 2016) ("As the Sheriff is considered part of a political subdivision, we conclude that the Sheriff falls within the definition of "local governmental authority" under the Act."); see also Fla. Const. Art. VIII, § 1(d) (classifying a sheriff as a "county officer").  And there is no indication that the HCSO has established an administrative procedure for handling whistleblower complaints.  See Fla. Stat. § 112.3187(b).  Thus, the time for Sgt. Speak to bring a civil claim under the FWA would have been within 180 days of an action the FWA prohibits.  Florida courts routinely refer to this period as a "statute of limitations."  See, e.g., Bridges v. City of Boynton Beach, 927 So. 2d 1061, 1062 (Fla. 4th DCA 2006); Dausman v. Hillsborough Area Reg'l Transit, 898 So. 2d 213, 214 (Fla. 2d DCA 2005).[12]

Sgt. Speak filed his original complaint in this case on December 21, 2018.  (Doc. 1.)  Therefore, to be actionable under the FWA, Sheriff Whidden's

---

[12] But they appear to have taken this cue from federal courts.  See Harris v. Dist. Bd. of Trs., 9 F. Supp. 2d 1319, 1328 (M.D. Fla. 1998).

allegedly retaliatory conduct against Sgt. Speak must have taken place in the 180 days preceding the original complaint—on or after June 24, 2018. Fla. Stat. § 112.3187(b). Virtually all the retaliatory conduct alleged by Sgt. Speak occurred before this date. But the internal investigation leading to Sgt. Speak's eventual termination occurred afterwards. (Doc. 63-3 at Ex. 6.) In fact, the termination occurred <u>after the original complaint was already filed</u>. (Doc. 63-2 at Ex. 10.)

Sheriff Whidden argues that the termination is also barred by the 180-day statute of limitations because Sgt. Speak did not amend his complaint to address his termination. This argument misses the point; the termination was already addressed in the original complaint. Apparently assuming that his firing was a foregone conclusion, Sgt. Speak's initial complaint provides that he was a victim of retaliatory actions by Sheriff Whidden, "including without limitation <u>his termination</u>." (Doc. 1 at ¶ 42) (emphasis added).

While a whistleblower retaliation claim based on Sgt. Speak's termination may not have been ripe at the inception of this case, Sheriff Whidden never made a ripeness argument, and there is no dispute that Sgt. Speak has since been terminated. <u>See</u> <u>Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal</u>., 522 U.S. 192, 201 (1997) (explaining that ripeness and accrual for statute-of-limitations purposes occur simultaneously unless the statute indicates otherwise); <u>see also</u> <u>Progressive Mountain Ins. Co. v. Middlebrooks</u>, 805 F. App'x 731, 734 (11th Cir. 2020) ("[S]ubsequent events may be able to ripen a case or

controversy for decision. Such events typically take place during the district court proceedings." (citing Henley v. Herring, 779 F.2d 1553, 1555 (11th Cir. 1986))).[13]

Moreover, Sgt. Speak's initial complaint alleged that Lt. Rowe's internal investigation in 2018 was also retaliatory. (Doc. 1 at ¶¶ 31–32.) An internal investigation launched in response to whistleblower activity may potentially constitute retaliation under the FWA. See Fla. Stat. § 112.3187(3)(c) ("'Adverse personnel action' means the discharge, suspension, transfer, or demotion of any employee or the withholding of bonuses, the reduction in salary or benefits, or any other adverse action taken against an employee within the terms and conditions of employment by an agency or independent contractor." (emphasis added)).[14]

Accordingly, Sheriff Whidden is incorrect to suggest that none of the allegedly retaliatory conduct in this case falls within the 180-day statute of limitations.[15] Sgt. Speak's FWA claim is therefore timely.

---

[13] The Eleventh Circuit's unpublished opinion in Middlebrooks addressed a possible intra-circuit conflict as to whether a complaint must be ripe at the time a complaint is filed or whether ripeness may occur later. But even if the former proposition is correct, the Eleventh Circuit has explained that events after the complaint may be considered if an amendment is permitted by the court under Federal Rule of Civil Procedure 15(d). See Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co., 68 F.3d 409, 415 n.12 (11th Cir. 1995). Here, an amended complaint that also addressed Sgt. Speak's termination was permitted. (Docs. 39, 40.)

[14] To the extent Sheriff Whidden argues that an internal investigation cannot be an adverse employment action per se, the Court disagrees. See Henderson v. City of Birmingham, 826 F. App'x 736, 742 (11th Cir. 2020); Entrekin v. City of Panama City, 376 F. App'x 987, 995–96 (11th Cir. 2010).

[15] The Court declines to apply Title VII's "continuing violation doctrine" to Sgt. Speak's FWA claim. There is no Florida case applying this doctrine to the FWA, and this Court finds it instructive that another judge in this district has previously declined to apply it to a series of "discrete" retaliatory acts that would

## II.   Sgt. Speak's reporting of Sheriff Whidden's alleged interference in the hit-and-run investigation is protected under the FWA and the First Amendment.

Sheriff Whidden next argues that Sgt. Speak's conduct is not protected under either the FWA or the First Amendment.   The Court disagrees with Sheriff Whidden on both fronts because his argument is erroneously premised on the idea that the protected conduct at issue is the testimony Sgt. Speak gave in the civil case brought by the parents of the minor victim of the hit-and-run.   In fact, the protected conduct in this case is—and always has been—Sgt. Speak's incitement of an investigation against Sheriff Whidden through his attorney.   (Doc. 63-2 at Ex. 3.)

To qualify for FWA protection, whistleblower information must be disclosed to "any agency or federal government entity having the authority to investigate, police, manage, or otherwise remedy the violation or act."   Fla. Stat. § 112.3187(6). For disclosures concerning local government entities, "the information must be disclosed to a chief executive officer as defined in s. 447.203(9) <u>or other appropriate local official</u>."   <u>Id.</u> (emphasis added).   Sheriff Whidden contends that Sgt. Speak's deposition testimony in the civil suit does not fall within the scope of section 112.3187(6).   And he may very well be right.   But the operative complaint also alleges that Sgt. Speak "reported and disclosed violations of rules . . . to others having the authority to investigate, police, manage, and otherwise remedy the violations of [said] rules."   (Doc. 40 at ¶ 41.)   The complaint further provides that

---

each support a cause of action (as opposed to a continuing violation from one action).   <u>See</u> <u>Reese v. City of Crystal River</u>, No. 5:03-cv-232-Oc-10GRJ, 2006 WL 1360903, at *2–3 (M.D. Fla. May 18, 2006).

Sgt. Speak "disclosed [whistleblower] information when he participated in investigations, hearings, [and] other agency inquiries." (Id.)

The undisputed facts show that five days after his civil deposition, Sgt. Speak—through his attorney—sent a letter to the SAO for the Twelfth Judicial Circuit, asking it to investigate "several violations of Florida's Criminal Statutes" by Sheriff Whidden and Chief Deputy Nelson (Doc. 63-2 at Ex. 3.)  Attached to the letter was Sgt. Speak's transcribed deposition testimony.  (Id.)  The parties do not dispute that the SAO was an "appropriate local official."  See Rustowicz v. N. Broward Hosp. Dist., 174 So. 3d 414, 424 (Fla. 4th DCA 2015) (holding that an "appropriate local official" for purposes of the FWA is a person or entity "who is affiliated with the violating governmental entity and has the authority to investigate, police, manage, or otherwise remedy the violation or act by the violating governmental entity"); see also Laird v. Bd. of Cnty. Comm'rs, No. 3:15cv394-MCR-CJK, 2017 WL 1147472, at *9 (N.D. Fla. Mar. 26, 2017) (finding that a party requested to participate in an investigation by SAO was engaging in protected conduct under a different provision of the FWA.

Sheriff Whidden also argues that Sgt. Speak's deposition testimony was not protected by the First Amendment.  To be protected from retaliation under the First Amendment, a public employee must speak "as a citizen on a matter of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).  Conversely, "[r]estricting speech that owes its

existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." Id. at 421–22.

Sheriff Whidden claims that it was part of Sgt. Speak's job duties to give deposition testimony in the civil case, and that he was compensated for his time. That may be true, but it does not change the fact that there is an entirely different category of protected speech here: Sgt. Speak reported Sheriff Whidden's alleged wrongdoing to the SAO and gave a sworn statement to the FDLE.  (Doc. 63-2 at Ex. 3; Doc. 71-12.)  This conduct is obviously protected by the First Amendment.  See Lane v. Franks, 573 U.S. 228, 238 (2014) ("Truthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes.  That is so even when the testimony relates to his public employment or concerns information learned during that employment.").[16]

Thus, the Court rejects Sheriff Whidden's contention that there is no protected speech at issue in this case.

### III.   Sgt. Speak Has Established a Prima Facie Case for FWA Retaliation and First Amendment Retaliation.

Sheriff Whidden argues that Sgt. Speak has failed establish prima facie causation for both his FWA claim and his First Amendment claim.  Because the claims are governed by different standards, the Court addresses them separately.

---

[16] The Eleventh Circuit's unpublished opinion in Bott v. Bradshaw, 791 F. App'x 41, 43 (11th Cir. 2019), where the only speech at issue was a police officer's compensated deposition testimony, is inapposite to the facts here.  Sgt. Speak's deposition testimony is not the only speech for which he seeks protection.

A.      **Causation under the FWA**.

To make a prima facie showing of causation for an FWA claim, a plaintiff

must show "that the protected activity and the adverse action were not wholly

unrelated." See Fla. Dep't of Children & Families v. Shapiro, 68 So. 3d 298, 306

(Fla. 4th DCA 2011) (quoting Brungart v. BellSouth Telecomms, Inc., 231 F.3d 791,

799 (11th Cir.2000)).  If all elements of a prima facie whistleblower retaliation case

(including causation) are satisfied, the FWA provides:

> It shall be an affirmative defense to any action brought pursuant to this section
> that the adverse action was predicated upon grounds other than, and would
> have been taken absent, the employee's or person's exercise of rights protected
> by this section.

Fla. Stat. § 112.3187(10).

Moreover, when reviewing summary judgment motions in FWA cases based

on circumstantial evidence, Florida courts generally apply the McDonnell Douglas[17]

burden-shifting framework.  See, e.g., Griffin v. Deloach, 259 So. 3d 929, 931 (Fla.

5th DCA 2018); Rustowicz, 174 So. 3d at 424.[18]  Under this familiar framework,

once the plaintiff has established a prima facie case for retaliation, a defendant may

proffer a legitimate, non-discriminatory reason for the termination.  This shifts the

burden back to plaintiff to show by a preponderance of the evidence that the

legitimate, non-discriminatory reason is pretextual.  See generally Castro v. Sch.

---

[17] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1993).

[18] In at least one instance, a Florida appellate court refused to apply
McDonnell Douglas to a Florida whistleblower case.  See Competelli v. City of
Belleair Bluffs, 113 So. 3d 92, 93 (Fla. 2d DCA 2013).  But the parties do not
question McDonnell Douglas's applicability, and neither will the Court.

Bd. of Manatee Cnty., 903 F. Supp. 2d 1290, 1302 (M.D. Fla. 2012) (applying

McDonnell Douglas framework to FWA claim).

A plaintiff satisfies the "not wholly unrelated" standard if they can show a

"close temporal proximity between the statutorily protected activity and the adverse

employment action." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th

Cir. 2007) (citing Brungart, 231 F.3d at 798–99).  Sheriff Whidden alleges that

there is too large of a temporal gap between Sgt. Speak's protected conduct (in

August 2016) and his eventual termination (in January 2019).  Sgt. Speak argues

that the internal investigation leading to his termination began in June 2018—

approximately one month after the FDLE investigation into Sheriff Whidden's

alleged misconduct during the hit-and-run investigation had ended.  (Doc. 82 at 24–

25.)  Thus, the temporal gap is not as large as Sheriff Whidden makes it seem.

Viewing the facts in the light most favorable to Sgt. Speak, a reasonable trier

of fact could infer that Sheriff Whidden waited to retaliate until after the

investigation into his own misconduct was completed—an investigation that was

itself precipitated by Sgt. Speak's whistleblowing.[19]  Cf. Callahan v. City of

---

[19] District courts have disagreed on whether the end date of an investigation
is the proper starting point to calculate temporal proximity.  Compare Irving v.
Enter. Rent-A-Car, No. 1:06-CV-2167-CC/AJB, 2008 WL 11407237, at *25 n.30
(N.D. Ga. June 13, 2008), report and recommendation adopted as modified, No.
1:06-CV-2167-CC, 2008 WL 11407215 (N.D. Ga. Sept. 29, 2008), with Ceus v. City of
Tampa, No. 8:16-cv-1513-T-36TBM, 2018 WL 10140155, at *11 (M.D. Fla. Jan. 8,
2018), aff'd, 803 F. App'x 235 (11th Cir. 2020).  The ultimate question is whether a
reasonable trier of fact could conclude that the retaliation was related to the
protected activity based on the proximity of the investigation's end to the firing.  In
this case, the Court believes a trier of fact could draw that inference.

Jacksonville, 805 F. App'x 749, 753 (11th Cir. 2020) (suggesting that the end date of an internal investigation spurred by plaintiff "could possibly" qualify as a starting point to calculate temporal proximity for a retaliation claim, but ultimately finding that the investigation ended "three to four months" before the adverse employment action, which was too long to support an inference of causation); see also Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) ("Additional job duties were transferred away from Yartzoff in February 9, 1981, less than two months after the civil rights office finished investigating his charges . . . ." (emphasis added)).

The Court also emphasizes that a plaintiff's prima facie burden under McDonnell Douglas is "not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997), abrogated on other grounds by Lewis v. City of Union City, 918 F.3d 1213 (11th Cir. 2019) (en banc). In this case, the timing of the investigation's end—together with the comments by Sheriff Whidden and other officers involved in Sgt. Speak's termination (discussed below)—could lead a reasonable trier of fact to draw an inference of discrimination. Thus, Sgt. Speak has made a prima facie showing of causation for his FWA whistleblower claim.[20]

---

[20] The Court notes that the investigation into Det. Pascher (which eventually pivoted into an investigation of Sgt. Speak) began before the FDLE investigation into Sheriff Whidden had concluded. But there is insufficient record evidence for the Court to conclude whether the investigation into Sgt. Speak "arose organically," as Sheriff Whidden claims. (Doc. 60 at 21.) Sgt. Speak and Lt. Buchhofer both claim that they reported their concerns about Det. Pascher much earlier, but there was no resultant investigation. (Doc. 76-11 at ¶33; Doc. 76-15 at 121:22–122:6.) It was not until later (after an ASA raised concerns about Det. Pascher) when an investigation began, and by that point the FDLE's investigation into Sheriff

### B.   Causation Under the First Amendment.

After an employee has demonstrated that their speech is protected under the First Amendment, they must show that their speech played a "substantial part" in the government employer's decision to terminate him.  Bryson v. City of Waycross, 888 F.2d 1562, 1565–66 (11th Cir. 1989) (quoting Mt. Healthy City Sch. Dist., v. Doyle, 429 U.S. 274, 287 (1977)).  If the employee can make that showing, then the burden shifts back to the employer to "prove by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct."  Id. at 1566 (internal quotation and citation omitted).  This last stage is essentially a "but-for" test.  Id.

As with FWA claims, the "substantial part" standard can be satisfied by close temporal proximity between the protected speech and the adverse employment action.  See Akins v. Fulton Cnty., 420 F.3d 1293, 1305 (11th Cir. 2005).  Again, a reasonable trier of fact could infer that Sgt. Speak's whistleblowing played a part in his termination based on the temporal proximity between the conclusion of the investigation into Sheriff Whidden and the beginning of the investigation into Sgt. Speak.  Accordingly, Sgt. Speak has made a prima facie showing of causation for his First Amendment retaliation claim.[21]

---

Whidden was nearly complete.  The Court cannot say one way or another whether this timing was "organic."

[21] Sheriff Whidden argues that Sgt. Speak has failed to demonstrate causation because Lt. Joshua Woods, who closed the hit-and-run case, also provided "negative" testimony against the Sheriff but faced no retaliation.  Upon careful review, however, Lt. Woods's testimony was not negative—or at least, not nearly as negative as Sgt. Speak's.  Although Lt. Woods agreed with Sgt. Speak that there

**IV.    Questions of Fact Remain as to Whether Sheriff Whidden Would
Have Discharged Sgt. Speak Regardless of His Protected Conduct**.

Sheriff Whidden next argues that even if Sgt. Speak can present a prima
facie case for retaliation under the FWA or the First Amendment, he would have
been discharged regardless of his protected conduct.  In short, Sheriff Whidden
contends that Sgt. Speak's firing was based on his extensive policy violations during
the auto theft investigation.  Sheriff Whidden also notes that Sgt. Speak's firing was
supported by a unanimous <u>Loudermill</u> panel, and that he has never disagreed with
a unanimous panel's recommendation.[22]

Sheriff Whidden's claims are (again) governed by different standards.  Under
<u>McDonnell Douglas</u>, Sheriff Whidden must proffer a "a legitimate, non-retaliatory
reason for [his] actions."  <u>Castro</u>, 903 F. Supp. 2d at 1302.  "The burden then shifts
back to the employee to prove by a preponderance of the evidence that the

_____

was probable cause to arrest the driver of the truck, he also agreed with the Sheriff
that any case against the driver would ultimately be very weak due to lack of
intent.  (Doc. 88-2 at ¶ 9.)  Thus, Lt. Woods believed the Sheriff was justified in
closing the hit-and-run case.  Sgt. Speak has never agreed with this premise.

[22] The Court notes that the <u>Loudermill</u> panel's role in this case may not be
entirely relevant.  As far as the Court can discern, the ultimate decision to fire Sgt.
Speak always rested with Sheriff Whidden, regardless of what the <u>Loudermill</u> panel
ultimately recommended.  Indeed, the notice of proposed discipline makes clear that
the Sheriff shall merely "review and consider" Sgt. Speak's response at the
<u>Loudermill</u> hearing before "making any final disciplinary decision."  (Doc. 71-2); <u>see
also</u> <u>McKinney v. Pate</u>, 20 F.3d 1550, 1562 (11th Cir. 1994) (explaining that "due
process [does not] require the state to provide an impartial decisionmaker at the
pre-termination hearing" (quoting <u>Schaper v. City of Huntsville</u>, 813 F.2d 709, 715–
16 (5th Cir.1987))).  But even if the <u>Loudermill</u> panel's recommendation was
afforded more weight, the Court believes that there is enough evidence to raise
questions of fact as to causation and pretext in this case.

employee's proffered reason is merely pretext for prohibited, retaliatory conduct." Id. (citing Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000)). Under the First Amendment, however, the burden is on the employer to "prove by a preponderance of the evidence that 'it would have reached the same decision . . . even in the absence of the protected conduct.'" Bryson, 888 F.2d at 1566 (citing Mt. Healthy City Sch. Dist., 429 U.S. at 286).

As to the McDonnell Douglas standard, the Court finds that Sheriff Whidden has articulated a legitimate, non-discriminatory reason for his actions, shifting the burden back to Sgt. Speak. But regardless of where the burden of proof lies, the Court believes there are outstanding questions of fact as to both Sheriff Whidden's alleged pretext and the but-for cause of Sgt. Speak's termination.[23]

To start, there is evidence that Sheriff Whidden told Lt. Buchhofer in December 2018 that he knew Lt. Buchhofer was "on Sgt. Speak's side," but Sheriff

---

[23] Sheriff Whidden argues that the statements below are hearsay. But hearsay may be considered on summary judgment if it meets an exception to the rule against hearsay or can be offered for a non-truth use. See generally Macuba v. Deboer, 193 F.3d 1316, 1323 (11th Cir. 1999). In the Court's view, some of the statements below are not being offered for their literal truth. For example, Sheriff Whidden's purported statement that he could not forgive Sgt. Speak is not being offered for the literal proposition that Sheriff Whidden was incapable of forgiving Sgt. Speak' whistleblowing. Likewise, Sgt. Rowe and Lt. Reed's statements that Sgt. Speak lied during his deposition are not intended to prove that Sgt. Speak literally lied. "Testimony is not hearsay if it is offered only to show the context within which parties had been acting, or to show a party's motive or intent for behavior." See Woolford v. Rest. Concepts, II, LLC, No. 407CV011, 2008 WL 217087, at *8 (S.D. Ga. Jan. 23, 2008)" (citation omitted). Moreover, Sheriff Whidden is being sued in both his individual and official capacity, meaning that statements from him and his HCSO employees may be admissible as opposing party statements under Federal Rules of Evidence 801(d)(2)(A) and (d)(2)(D).

Whidden could not "forgive him" for "[w]hat he did to [him] and [his] family." (Doc. 76-15 at 160:12–17). The obvious inference is that even though Lt. Buchhofer was on Sgt. Speak's side in the auto theft investigation, Sheriff Whidden could not "look past" his personal grudge against Sgt. Speak for his whistleblowing activity years after the fact. (Id. at 159:15.) This is the same inference that Lt. Buchhofer made, although he admitted that Sheriff Whidden "didn't elaborate." (Id. at 159:7–160:17.) Sheriff Whidden allegedly made these statements shortly after he had served Sgt. Speak with a Notice of Proposed Discipline, informing Sgt. Speak that he wanted to fire him. (Doc. 71-2.)

Next, Lt. Buchhofer claims that Lt. Reed—one of the three members of Sgt. Speak's <u>Loudermill</u> panel—told him that Sgt. Speak was "pretty much gone" on December 11, 2018. (Doc. 76-15 at 138:21.) When Lt. Buchhofer suggested that there were numerous problems with the internal investigation into Sgt. Speak's conduct, Lt. Reed allegedly brought up that Sgt. Speak had "lied during his deposition on Sheriff Whidden." (Doc. 75-17 at 1.) Again, the obvious inference to be made—and the one that Lt. Buchhofer did make—is that Lt. Reed did not trust Sgt. Speak's side of the story in the auto theft investigation because of how he felt about Sgt. Speak's whistleblowing from years ago. (Doc. 76-15 at 138:17–141:23.) And although Lt. Reed was only one member of a three-person <u>Loudermill</u> panel, Sheriff Whidden's position in this case is that he has never deviated from the recommendation of a <u>unanimous panel</u>. (Doc. 63-1 at ¶ 18.) If one member of the

panel who was motivated by retaliatory animus had been replaced, then perhaps the panel would not have been unanimous.

Furthermore, Sgt. Speak has provided evidence that Lt. Rowe—the initial factfinder in the internal investigation that led to Sgt. Speak's termination—was motivated by retaliatory animus.  One officer testified that he believed that he was targeted by Lt. Rowe for criticizing the HCSO's logistical response to Hurricane Irma.  (Doc. 76-26 at 7:8–11:7, 13:13–14:15); see also Furcron v. Mail Ctrs. Plus, LLC, 843 F.3d 1295, 1309 (11th Cir. 2016) ("In this Circuit, Rule 404(b) permits the admissibility of so-called 'me too' evidence to prove intent to discriminate and retaliation.")  Yet another officer claimed that he had a conversation with Lt. Rowe about Sgt. Speak's involvement in the hit-and-run, and Lt. Rowe said that Sgt. Speak was "terminated because everything lined up.  He lied in his depo, and then lied about his lying in [the] depo, so this is what happened."  (Doc. 76-22 at 8:23–9:5, 48:3–21) (emphasis added).

And finally, Sgt. Speak has provided comparator evidence of HCSO officers who were accused of investigatory misconduct resembling Sgt. Speak's but were not terminated (or even investigated).  These other officers' misconduct ranges from failure to secure a crime scene, documenting a false confession, and failing to document evidence.[24]  (Docs. 72-10, 72-11, 72-12.)

---

[24] The Eleventh Circuit has held that comparators must be "similarly situated in all material respects," meaning they engaged in the same basic conduct or misconduct as the plaintiff.  See Lewis, 918 F.3d at 1228.  The nondiscriminatory reason that Sheriff Whidden proffers for Sgt. Speak's firing is essentially that Sgt. Speak was sloppy during the auto theft investigation—he failed to pursue leads or

The Court notes that the content and context of many of the remarks above are disputed.  But viewing the facts in the light most favorable to Sgt. Speak, "the substance, context, and timing" of these remarks is "a significant piece of circumstantial evidence."  See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1362 (11th Cir. 1999).  And while isolated and unrelated remarks cannot establish pretext, the evidence viewed in the light most favorable to Sgt. Speak contains multiple remarks related to his termination by several decisionmakers at varying levels of the disciplinary process.

Accordingly, the Court holds that there are remaining questions of fact as to pretext and causation which can only be resolved by a trier of fact.

## IV.   Viewing the Evidence in the Light Most Favorable to Sgt. Speak, Sheriff Whidden is Not Entitled to Qualified Immunity.

Sheriff Whidden's final argument is that he is entitled to qualified immunity in his individual capacity from Sgt. Speak's First Amendment retaliation claim because "[t]here is no clear authority which would have placed [him] on notice that he could be held individually liable for accepting the unanimous recommendation of a panel that he had no role in assembling based on an internal investigation that he had no role in conducting."  (Doc. 60 at 25.)  The Court does not agree with Sheriff Whidden's description of the alleged constitutional violation in this case.  He did not

---

interview witnesses, and he failed to omit problematic language from his probable cause report.  The Court believes that this is the same basic misconduct as the comparators (i.e., that those officers were also sloppy in their investigations).  Id. (explaining that a comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff" but also rejecting a strict "nearly identical" test.)  But even without the comparators, the Court would reach the same conclusion.

merely "accept" the <u>Loudermill</u> panel's recommendation—the panel's role was advisory, and the ultimate responsibility for the termination decision was always with Sheriff Whidden.  See <u>supra</u> note 22; Doc. 71-2; <u>McKinney</u>, 20 F.3d at 1562 (quoting <u>Schaper</u>, 813 F.2d at 715–16).  The dispositive question is whether that termination decision—which was Sherriff Whidden's to make—was motivated by retaliatory animus.  After viewing the facts in the light most favorable to Sgt. Speak, there is indeed evidence that a reasonable juror could reach the conclusion that Sheriff Whidden retaliated against him due to activity protected by the First Amendment, i.e., his whistleblowing.  See <u>Lane</u>, 573 U.S. at 238.  Assuming this constitutional violation indeed occurred, the law governing Sgt. Speak's allegedly violated rights is clearly established.

"The doctrine of qualified immunity provides that 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Case v. Eslinger</u>, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  One way in which a right might be clearly established is through a "broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right." <u>Lewis v. City of W. Palm Beach</u>, 561 F.3d 1288, 1292 (11th Cir. 2009) (citing <u>Long v. Slaton</u>, 508 F.3d 576, 584 (11th Cir. 2007)).  Again, the question in this case is whether Sgt. Speak was terminated for whistleblowing activity, which is protected by the First Amendment.  <u>Lane</u>, 573

U.S. at 238.  For purposes of qualified immunity, the Supreme Court's case law clearly specifies that retaliation against someone for speech protected by the First Amendment is improper.  See Carollo v. Boria, 833 F.3d 1322, 1334 (11th Cir. 2016) ("A robust consensus of our precedent confirms that the district court was correct to rely upon Pickering and Garcetti as a basis for fair warning to appellants."). Accordingly, Sheriff Whidden is not entitled to qualified immunity because the law that governs the alleged constitutional violation in this case is clearly established.

Sheriff Whidden again argues that the only conduct at issue in this case is Sgt. Speak's civil deposition testimony, and no case law clearly establishes First Amendment protection for this type of speech.  Once more, the Court disagrees with Sheriff Whidden's reading of the operative complaint, which states that Sgt. Speak "reported and disclosed violations of rules . . . to others having the authority to investigate, police, manage, and otherwise remedy the violations of [said] rules"; that he further "disclosed [whistleblower] information when he participated in investigations, hearings, [and] other agency inquires"; and that he was consequently subject to retaliation by Sheriff Whidden.  (Doc. 40 at ¶¶ 41-41.)  And the discussion above details that there are genuine issues of material fact that are in dispute.  A trier of fact must ferret out the truth.

## CONCLUSION

At bottom, a trial is needed here because there there are genuine issues of fact that might affect the outcome of this case.  See Anderson, 477 U.S. at 250. These issues may reasonably be resolved in favor of either Sgt. Speak or Sheriff Whidden, although the discussion above takes the facts in the light most favorable

to Sgt. Speak (as it must).  Ultimately, a trier of fact must reconcile these competing narratives.  Having carefully reviewed the record and legal arguments in this case, the Court also encourages (but does not expressly order) that the parties consider settlement talks.  A jury could resolve these facts either way.

Accordingly, it is **ORDERED** that Sheriff Whidden's motion for summary judgment (Doc. 60) is **DENIED**.

**ORDERED** at Fort Myers, Florida, on February 26, 2021.

**JOHN L. BADALAMENTI**
**UNITED STATES DISTRICT JUDGE**